T.C. Memo. 1995-531


UNITED STATES TAX COURT


ANTHONY TEONG-CHAN GAW AS TRANSFEREE OF
RADCLIFFE INVESTMENT LTD., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ANTHONY TEONG-CHAN GAW AS TRANSFEREE
OF BOT BUILDING CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17906-92, 18268-92.       Filed November 9, 1995.


John M. Youngquist, Lemoine Skinner III, and Donald L.

Feurzeig, for petitioner.

Mary E. Wynne and Thomas G. Schleier, for respondent.


Table of Contents

Page

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . .   7

I.   General and Background . . . . . . . . . . . . . . . . .   7
     A.   Radcliffe . . . . . . . . . . . . . . . . . . . . .   7
     B.   BOT . . . . . . . . . . . . . . . . . . . . . . . .   9
     C.   Certain Foreign Corporations That Pledged

Cash Collateral in the Transactions at Issue . . . 10
    1.   Pioneer Industries (Holdings) Ltd. and Its
         Subsidiaries Multi-Credit Finance Co. Ltd.
         and Mandalay Investments Ltd. . . . . . . . . 10
    2.   Traveluck Investments, Inc. . . . . . . . . . 11
    3.   Double Wealth Co., Inc. . . . . . . . . . . . 12
    4.   Forward Investments, Ltd. . . . . . . . . . . 12
  D.   Bangkok Bank Ltd. . . . . . . . . . . . . . . . . 12
  E.   Union Bank and Certain of Its Affiliates . . . . . 14
  F.   Petitioner . . . . . . . . . . . . . . . . . . . 16

II. Transactions Involving Bangkok Bank Ltd. . . . . . . . 16
  A.   BB Loan No. 1 . . . . . . . . . . . . . . . . . . 16
  B.   BB Loan No. 2 . . . . . . . . . . . . . . . . . . 23
  C.   BB Loan No. 3 . . . . . . . . . . . . . . . . . . 31

III. Transactions Involving Union Bank . . . . . . . . . . 34
  A.   UB $570,000 Pre-March 1984 Loan
      and UB $570,000 Renewed Loan . . . . . . . . . . 34
  B.   UB $325,000 Loan . . . . . . . . . . . . . . . . 39
  C.   UB $800,000 Radcliffe Loan . . . . . . . . . . . 43
  D.   UB $1,300,000 Loan . . . . . . . . . . . . . . . 48
  E.   UB $1,830,000 Loan . . . . . . . . . . . . . . . 52
  F.   Facts Pertaining to All the Transactions
      at Issue Involving Union Bank . . . . . . . . . . 54

IV. Transaction Involving Horbury . . . . . . . . . . . . 57

V. Income or Loss Reported by Radcliffe
  and by BOT for the Years at Issue . . . . . . . . . . 57

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . 58

I. Evidentiary Matters . . . . . . . . . . . . . . . . . 59
  A.   The Adverse Inference Rule--
      Mme. Koo's Failure To Testify . . . . . . . . . . 60
  B.   Evidentiary Objections . . . . . . . . . . . . . 71
    1.   Petitioner's Income Tax Returns . . . . . . . 71
    2.   Certain Instruments of Transfer
        and Stock Certificates . . . . . . . . . . . 72
    3.   Horbury Financial Statement . . . . . . . . . 76
    4.   Annual Reports of Pioneer and
        Financial Statements of Multi-Credit . . . . 77
    5.   June 12, 1987 Newspaper Article . . . . . . . 78
    6.   August 28, 1987 Memorandum . . . . . . . . . 83
    7.   Paragraph 152 of the Stipulation of Facts . . 88
  C.   Respondent's Motion To Compel
      Production of Documents . . . . . . . . . . . . . 88

II. General Principles Applicable to These Cases . . . . . . 93
    A. Taxation of Interest Received by
       Foreign Corporations--In General . . . . . . . . . 94
    B. Substance Over Form and Related Doctrines. . . . . . . 99
III. Positions of the Parties With Respect
    To the Transactions at Issue . . . . . . . . . . . . . . . 104
    A. Bank Transactions . . . . . . . . . . . . . . . . . 104
       1. Respondent's Position . . . . . . . . . . . 104
       2. Petitioner's Position . . . . . . . . . . . 107
          a. Petitioner's Principal Arguments . . . . 107
          b. Petitioner's Alternative Arguments . . . 110
    B. Horbury Transaction . . . . . . . . . . . . . . . . 110
       1. Respondent's Position . . . . . . . . . . . 110
       2. Petitioner's Position . . . . . . . . . . . 111

IV. Resolution of Certain Questions That Relate
    to All or Some of the Transactions at Issue . . . . . . 112
    A. Resolution of Certain Questions That
       Relate to All the Transactions at Issue . . . . . . 113
       1. Relationships Among the Persons
          Involved in the Transactions at Issue . . . . 113
          a. Bank Transactions . . . . . . . . . . . 113
          b. Horbury Transaction . . . . . . . . . . 116
       2. Purpose for the Form of Each
          of the Transactions at Issue . . . . . . . . 117
          a. Whether the Form of Each
             of the Transactions at Issue
             Had a Nontax, Business Purpose . . . . . 117
             (1) Bank Transactions . . . . . . . . 118
                (a) Bangkok Bank LA Branch
                    and Union Bank . . . . . . . . 118
                (b) Radcliffe and BOT . . . . . . . 123
                (c) Foreign Corporations
                    Pledging Collateral . . . . . . 128
                (d) Summary . . . . . . . . . . . . 131
             (2) Horbury Transaction . . . . . . . . 132
           b. Whether the Interest Deductions
             Claimed by Radcliffe and by BOT
             Indicate a Tax Avoidance Purpose
             for Any of the Transactions at Issue . . 133
             (1) Bank Transactions . . . . . . . . 133
             (2) Horbury Transaction . . . . . . . 135
    B. Resolution of Certain Questions That
       Relate Only to the Bank Transactions . . . . . . . 136
       1. Whether the Binding Commitment Test
          of the Step Transaction Doctrine
          Applies to Any of the Bank Transactions . . . 136
       2. Whether the Role of the Banks in
          Question in the Bank Transactions

May Be Ignored or Recharacterized
Even Though the Parties Agree on
Brief That Those Banks Were Engaged
in Commercial Banking and That They
Were Not Controlled By Radcliffe,
BOT, or the Foreign Corporations
Pledging Collateral . . . . . . . . . . . . . 137

V.   Analysis of the Transactions at Issue . . . . . . . . . 139
     A.   Bank Transactions . . . . . . . . . . . . . . . . 141
          1.   BB Loan No. 1 Transaction . . . . . . . . . 141
          2.   BB Loan No. 2 Transaction . . . . . . . . . 147
          3.   BB Loan No. 3 Transaction . . . . . . . . . 151
          4.   UB $570,000 Pre-March 1984 Loan and
               UB $570,000 Renewed Loan Transactions . . . . 154
          5.   UB $325,000 Loan Transaction . . . . . . . . 159
          6.   UB $800,000 Radcliffe Loan Transaction . . . . 163
          7.   UB $1,300,000 Loan Transaction . . . . . . . 168
          8.   UB $1,830,000 Loan Transaction . . . . . . . 170
     B.   Horbury Transaction . . . . . . . . . . . . . . . 171

VI.  Petitioner's Constitutional and
     Abuse of Discretion Claims . . . . . . . . . . . . . . . 178
     A.   Petitioner's Constitutional Claim . . . . . . . . 182
          1.   Petitioner's Claim That He Was Singled Out . . 183
          2.   Petitioner's Claim That He Was Singled Out
               Based on Constitutionally Impermissible
               Grounds . . . . . . . . . . . . . . . . . . . 187
     B.   Petitioner's Abuse of Discretion Claims . . . . . 189
          1.   Petitioner's Claim That Rev. Rul. 87-89
               Should Not Be Applied Retroactively . . . . . 189
          2.   Petitioner's Claim That Respondent
               Did Not Comply With Her Duty to Enforce
               the Federal Tax Law Consistently . . . . . . 193

VII. Additions to Tax . . . . . . . . . . . . . . . . . . . . 194

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, _Judge_:  In a notice of transferee liability, respondent determined that petitioner is liable as a transferee of Radcliffe Investment Ltd. (Radcliffe) for the following deficiencies in, additions to, and penalties on Radcliffe's withholding tax:

| | | Additions to Tax or Penalties | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Section 6651(a)[1] | Section 6653(a)(1) | Section 6653(a)(2) | Section 6653(a)(1)(A) | Section 6653(a)(1)(B) | Section 6656(a) |
| 1984 | $65,466 | $16,366 | $3,273 | * | $ -- | -- | $6,547 |
| 1985 | 124,338 | 31,085 | 6,217 | * | -- | -- | 12,434 |
| 1986 | 186,183 | 46,546 | -- | -- | 9,309 | * | 18,618 |

* 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent determined that the entire underpayment was attributable to negligence.

In a separate notice of transferee liability, respondent determined that petitioner is liable as a transferee of BOT Building Corp. (BOT) for the following deficiencies in, additions to, and penalties on BOT's withholding tax:

| | | Additions to Tax or Penalties | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Deficiency | Section 6651(a) | Section 6653(a)(1) | Section 6653(a)(2) | Section 6653(a)(1)(A) | Section 6653(a)(1)(B) | Section 6656(a) |
| 1984 | $95,751 | $23,938 | $4,788 | * | $ -- | -- | $9,575 |
| 1985 | 93,739 | 23,435 | 4,687 | * | -- | -- | 9,374 |
| 1986 | 35,778 | 8,945 | -- | -- | 1,789 | * | 3,578 |

* 50 percent of the interest due on the portion of the underpayment attributable to negligence. Respondent determined that the entire underpayment was attributable to negligence.

The following issues remain for decision:

(1) Was the interest paid by Radcliffe and by BOT with respect to the loan[2] transactions at issue subject to withholding tax under section 1442(a)? We hold that it was to the extent

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The words "loan", "lend", "interest", "fund", "funded", "secure", "security", "pledge", "payment", "lien", "guaranteed", "collateral", and similar words are used herein to describe the form of the transactions at issue and do not reflect acceptance by the Court that the substance of the transactions follows the form thereof.

stated herein.

(2) Is petitioner liable as a transferee of Radcliffe and of BOT for the withholding tax that we have sustained against them? We hold that he is.

(3) Did respondent violate petitioner's right to equal protection of the law under the Fifth Amendment to the Constitution by making the withholding tax determinations that we have sustained against Radcliffe and BOT? We hold that she did not.

(4) Did respondent abuse her discretion by making the withholding tax determinations that we have sustained against Radcliffe and BOT? We hold that she did not.

(5) Are Radcliffe and BOT liable for the additions to tax for failure to file timely required withholding tax returns? We hold that they are to the extent stated herein.

(6) Are Radcliffe and BOT liable for the additions to tax for negligence or disregard of rules or regulations? We hold that they are to the extent stated herein.

(7) Are Radcliffe and BOT liable for the penalties for failure to make timely deposits of required withholding tax? We hold that they are to the extent stated herein.

(8) Is petitioner liable as a transferee of Radcliffe and of BOT for the additions to tax and penalties that we have sustained against them? We hold that he is.

## FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found unless otherwise stated herein.[4]

At the time the petitions were filed, petitioner resided in Hong Kong, British Crown Colony.

I.   General and Background

A.   Radcliffe

Radcliffe, which was incorporated in Liberia around 1979 and conducted business in California during the years at issue, was organized to invest in New Montgomery South Center (NMSC) in San Francisco, California (San Francisco).  As of January 1984, Radcliffe held a 75-percent interest in NMSC.  Radcliffe acquired an additional 13-percent interest in NMSC for $1,300,000 in

---

[3]  We found the record in these cases to have been poorly developed, inconclusive, and/or not reliable in many respects, including certain material respects.  Although the gaps in the evidence are substantial in many instances, and therefore our findings of fact are incomplete in those respects, we have not undertaken to note every instance in which the record does not contain reliable evidence that would have enabled us to find all the facts relevant to our deciding the issues presented.  Our task in the face of such a record has been further complicated by the parties' failure to reflect fully the facts that are reliably established by the record and their attempt (particularly petitioner's attempt) to support their respective positions herein by relying on so-called facts that are alleged in their briefs but that are not supported by credible evidence in the record.  Statements in briefs are not evidence, Rule 143(b), and we have attached no weight to the parties' allegations on brief that are not supported by reliable evidence in the record.

[4]  Each party objected to certain stipulations of fact (stipulations) on grounds of relevancy and/or hearsay.  We address those objections below.

February 1985 and the remaining 12-percent interest for $1,000,000 in March 1986. Radcliffe also owned an interest in the Meridien Hotel in San Francisco.

During relevant periods, NMSC was a California general partnership that was formed to acquire commercial office buildings located at 55 Hawthorne Street and 631 Howard Street in San Francisco. During at least a portion of the years at issue, Lyman Jee (Mr. Jee) was a partner of Radcliffe in NMSC.

Petitioner's father, S.C. Gaw, wholly owned Radcliffe as of the time of his death in October 1983. After S.C. Gaw's death, pursuant to discussions and an agreement among petitioner, his mother, and his siblings (family property division), it was determined that petitioner was to receive the stock of Radcliffe that his father had owned, and petitioner acquired all of the stock of Radcliffe no later than July 1984. During relevant periods, petitioner was chairman and president of Radcliffe, and his wife, Rossana W. Gaw (Ms. Gaw) was its secretary and treasurer.

During the years at issue, the net worth of Radcliffe (including all loan liabilities) was not less than $6,033,039. Radcliffe was liquidated on December 23, 1986, and all of Radcliffe's corporate assets, which had a net value in excess of liabilities of at least $1,000,000, were transferred to petitioner as its sole shareholder.

B.   <u>BOT</u>

BOT, which was incorporated in California in 1979 and conducted business there during the years at issue, was organized to invest in 300 Montgomery Associates (300 Montgomery Associates) in San Francisco.  In 1979, BOT acquired an 80-percent interest in 300 Montgomery Associates that it held during the years at issue.  During relevant periods, 300 Montgomery Associates was a California general partnership that owned a commercial office building located at 300 Montgomery Street in San Francisco.  Mr. Jee was BOT's partner in 300 Montgomery Associates during the years at issue.

When BOT was incorporated and throughout the years at issue until December 29, 1986, its sole shareholder was Pempire Invest-ment Ltd. (Pempire), which was incorporated in Liberia on November 6, 1978.  Prior to the time at which petitioner acquired all the stock of Pempire, it was wholly owned by Merit Investment Co., Inc. (Merit), which was also incorporated in Liberia.

S.C. Gaw wholly owned the stock of Merit as of the time of his death in October 1983.  Pursuant to the family property division with his mother and siblings, petitioner acquired all of the stock of Pempire, and therefore acquired indirectly all of the stock of BOT, no later than July 1984.  At least during 1984, petitioner was chairman and president of Pempire.  During rele-vant periods, petitioner was chairman and president of BOT, and

at least during 1984, Ms. Gaw was vice chairman and secretary of BOT.

During the years at issue, the net worth of BOT (including all loan liabilities) was not less than $4,130,695. Pempire was dissolved on December 29, 1986, and its assets, including its stock in BOT, were distributed to petitioner. BOT was liquidated on December 30, 1986, and all of BOT's corporate assets, which had a net value in excess of liabilities of at least $1,000,000, were transferred to petitioner as its sole shareholder.

C. Certain Foreign Corporations That Pledged Cash Collateral in the Transactions at Issue

1. Pioneer Industries (Holdings) Ltd. and Its Subsidiaries Multi-Credit Finance Co. Ltd. and Mandalay Investments Ltd.

Pioneer Industries (Holdings) Ltd. (Pioneer) was incorporated in Hong Kong, and its stock was publicly traded on the Hong Kong stock exchange from 1970 until at least the time of the trial of these cases.

The annual report of Pioneer for its fiscal year ended March 31, 1986, indicated that petitioner, his wife Ms. Gaw, and family trusts of which they and their family were among the beneficiaries held an aggregate of 2,415,092 shares of Pioneer, or 19.2 percent of the 12,566,202 shares issued and outstanding at that time. As of December 1985, an officer of Union Bank believed that petitioner was a major shareholder of Pioneer. During at least a portion of the years at issue, petitioner's mother and

his mother-in-law Mme. Y.C. Koo (Mme. Koo) owned stock in Pioneer.

Throughout the years at issue until at least the time of the trial of these cases, petitioner was the managing director and chairman of Pioneer. Petitioner became managing director of Pioneer in 1973 at the behest of Mme. Koo. He became chairman of that company after the death of his father in October 1983. Ms. Gaw also was a director of Pioneer during the years at issue.

Prior to and during the years at issue, Pioneer wholly or partially owned a number of corporations, including its two wholly owned subsidiaries Multi-Credit Finance Co. Ltd. (Multi-Credit), which was incorporated in Hong Kong, and Mandalay Investments Ltd. (Mandalay). At least prior to the years at issue, petitioner was president and secretary of Multi-Credit. Prior to those years and at least during 1985 and 1986, petitioner was managing director of Multi-Credit, and at least during 1986, Ms. Gaw was one of its directors. At least during 1984, petitioner was president of Mandalay and Ms. Gaw was its executive director and secretary.

## 2. Traveluck Investments, Inc.

Traveluck Investments, Inc. (Traveluck) was incorporated in Liberia, and, at all relevant periods after January 3, 1985, one share of the stock of Traveluck was held in the name of Mme. Koo. At least during 1985, petitioner was a director of Traveluck.

### 3. Double Wealth Co., Inc.

Double Wealth Co., Inc. (Double Wealth) was incorporated in Liberia on January 7, 1985, and, at all relevant periods after January 7, 1985, one share of the stock of Double Wealth was held in the name of Mme. Koo. During the years at issue, petitioner, Ms. Gaw, and Mme. Koo were the directors of Double Wealth. At least during 1985, petitioner was Double Wealth's chairman and president and Ms. Gaw was its secretary and treasurer.

### 4. Forward Investments, Ltd.

Forward Investments, Ltd. (Forward) was incorporated in Liberia on December 3, 1980. During that month, one share of stock of Forward was issued in the name of Mme. Koo. During the years at issue, petitioner, Ms. Gaw, and Mme. Koo were the directors of Forward. At least during 1984 and 1985, Ms. Gaw was the secretary of Forward.

As of June 25, 1985, petitioner had given his personal guarantee for $3,800,000 to Standard Chartered Bank, Hong Kong (Standard Chartered Bank HK), an affiliate of Union Bank, as security for credit made available to Forward by Standard Chartered Bank HK.

### D. Bangkok Bank Ltd.

During the years at issue, Bangkok Bank Ltd., a Thai banking corporation, was engaged in the banking business in California and Hong Kong through unincorporated branches located in Los

Angeles (Bangkok Bank LA branch or Los Angeles branch) and Hong Kong (Bangkok Bank HK branch or Hong Kong branch), respectively. During those years, the interest income earned by Bangkok Bank LA branch in its lending activity was effectively connected with the conduct of its banking business in California.

Radcliffe began dealing with Bangkok Bank LA branch in May 1984. No later than the years at issue, certain of the foreign corporations that pledged cash collateral in one or more of thetransactions at issue in which the Los Angeles branch and/or the Hong Kong branch of Bangkok Bank Ltd. was involved (viz., Intercontinental Enterprises Corp. of Liberia (Intercontinental), Traveluck, and Double Wealth) maintained at least one account with Bangkok Bank HK branch. Prior to and during the years at issue, Pioneer and at least certain of its subsidiaries, including its wholly owned subsidiaries Multi-Credit and Mandalay, had banking relationships with Bangkok Bank Ltd. Prior to and during the years at issue, Pioneer and at least certain of its subsidiaries, including Mandalay,[5] owned stock in Bangkok Bank Ltd.[6]

The annual reports of Pioneer for its fiscal years ended March 31, 1983, and March 31, 1984, indicated that for each such year (1) Pioneer held 1.6 percent and its subsidiaries held 1.6

---

[5] Mandalay held .91 percent of the equity of Bangkok Bank Ltd. as of Mar. 31, 1984, and .83 percent of that equity as of Mar. 31, 1985, and Mar. 31, 1986.

[6] Petitioner notes on brief that Pioneer's subsidiaries included a subsidiary in which Pioneer owned 60 percent of the equity. The record does not disclose whether or not that subsidiary owned any stock in Bangkok Bank Ltd.

percent of the equity of Bangkok Bank Ltd., or a total of 3.2 percent of that equity and (2) the cost of that total equity investment by Pioneer and its subsidiaries was in excess of 10 percent of Pioneer's net assets. The annual report of Pioneer for its fiscal year ended March 31, 1986, indicated that (1) the effective percentage of the equity of Bangkok Bank Ltd. held (a) by Pioneer and (b) by its subsidiaries and corporations in which it owned 20 to 50 percent of the stock (associated corporations) was 1.44 percent and 3.02 percent, respectively, or a total of 4.46 percent and (2) the cost of that total equity investment (a) by Pioneer and (b) by its subsidiaries and associated corporations exceeded 10 percent of the net assets of those companies.

A record of Union Bank, dated July 10, 1984, indicated that in 1984 petitioner was both a 10-percent shareholder of Bangkok Bank Ltd. and a member of Bangkok Bank Ltd.'s Advisory Board.

Bangkok Bank Ltd. and its Los Angeles and Hong Kong branches desired to accommodate, and were susceptible to influence by, petitioner, Mme. Koo, Radcliffe, Pioneer and its wholly owned subsidiaries Multi-Credit and Mandalay, Intercontinental, Traveluck, and Double Wealth.

E.    Union Bank and Certain of Its Affiliates

During the years at issue, Union Bank, a wholly owned U.S. subsidiary of Standard Chartered Bank PLC, a London-based bank,

was engaged in the banking business in California.[7]  During those years, Standard Chartered Bank HK and Standard Chartered Bank, Singapore, were affiliates of Union Bank that were engaged in the banking business in Hong Kong and Singapore, respectively.

Petitioner, Radcliffe, and BOT began dealing with Union Bank and/or its branches or predecessors in San Francisco in 1979. S.C. Gaw began dealing with Union Bank and/or its branches or predecessors in San Francisco no later than 1979.  Prior to the years at issue, S.C. Gaw, and prior to and during those years, petitioner were valued clients of Standard Chartered Bank HK. During relevant periods, Pioneer and at least certain of its subsidiaries, including its wholly owned subsidiaries Multi-Credit and Mandalay, were valued clients of Standard Chartered Bank PLC and certain of its subsidiary banks including Standard Chartered Bank HK.  No later than the years at issue, certain of the foreign corporations that pledged cash collateral in one or more of the transactions at issue in which Union Bank and its affiliates Standard Chartered Bank HK and/or Standard Chartered Bank, Singapore, were involved (viz., Merit, Forward, and Pempire) maintained at least one account with one or more of those banks.

Union Bank and its affiliates Standard Chartered Bank HK and Standard Chartered Bank, Singapore, desired to accommodate, and

---

[7]  Although not altogether clear from the record, it appears that prior to the years at issue Standard Chartered Bank PLC and/or a predecessor had been known as the Chartered Bank.

were susceptible to influence by, petitioner, Mme. Koo, Radcliffe, BOT, Pioneer and its wholly owned subsidiaries Multi-Credit and Mandalay, Merit, Forward, and Pempire.

F.   Petitioner

Petitioner was a U.S. citizen during the years at issue. Prior to and during those years, petitioner and Mme. Koo had close and amicable business and family relationships.  Thus, for example, petitioner was able to borrow from, and give guarantees for more than he was worth to, banks in Hong Kong because those banks knew that Mme. Koo would honor his obligations if the need arose.

At the time of the transactions at issue, petitioner was familiar with the U.S. withholding tax requirements applicable to interest from a U.S source that was paid to foreign corporations.

II.  Transactions Involving Bangkok Bank Ltd.

A.   BB Loan No. 1

By letter dated May 16, 1984 (May 16, 1984 letter), peti-tioner requested on behalf of Radcliffe that the Hong Kong branch of Bangkok Bank Ltd. arrange for the Los Angeles branch of that bank to fund a loan of $1,000,000 to Radcliffe.  Bangkok Bank HK branch complied with that request, and Bangkok Bank LA branch funded a $1,000,000 loan to Radcliffe on or about May 17, 1984 (original BB Loan No. 1).  That loan was due on May 17, 1985. The proceeds of the original BB Loan No. 1 were used to reimburse Bangkok Bank HK branch for settling a claim by Hong Kong and

Shanghai Banking Corp. of San Francisco against Radcliffe under a standby letter of credit issued by that branch with respect to Radcliffe. That reimbursement was effected by having the loan proceeds credited to an account of Bangkok Bank HK branch that was maintained with Bangkok Bank LA branch.

To document the original BB Loan No. 1, petitioner signed on behalf of Radcliffe (1) a promissory note that was made payable to Bangkok Bank LA branch and that was in the same amount as that loan, (2) a continuing, unlimited, unconditional promise (continuing, unlimited, unconditional promise) by Radcliffe to Bangkok Bank LA branch that stated that Radcliffe agreed to perform its obligations under that loan, and (3) an agreement (general security agreement) that stated that Bangkok Bank LA branch had a security interest in all of Radcliffe's personal property and in all of its real property pledged to or in the possession of that branch.[8]

Petitioner also requested on behalf of Radcliffe in the May 16, 1984 letter that Bangkok Bank HK branch issue to Bangkok Bank LA branch a standby letter of credit for $1,000,000 with respect to Radcliffe. Bangkok Bank HK branch complied with that request by issuing on May 17, 1984, the date on or about which the original BB Loan No. 1 was funded, a $1,000,000 standby letter of credit with respect to Radcliffe ($1,000,000 standby letter of

---

[8] The continuing, unlimited, unconditional promise and the general security agreement applied to all other loans and extensions of credit by Bangkok Bank LA branch to Radcliffe.

credit).[9]  That letter of credit guaranteed the original BB Loan

No. 1, was in the same amount as that loan, and expired on May

17, 1985, the same date on which the original BB Loan No. 1 was

due.

Radcliffe promised in the May 16, 1984 letter to indemnify

Bangkok Bank HK branch for any losses whatsoever that it might

incur with respect to the $1,000,000 standby letter of credit.

In addition to signing the May 16, 1984 letter on behalf of

Radcliffe, petitioner signed it in his individual capacity,

stating that he "join[ed] in the above guarantee" to Bangkok Bank

HK branch reflected in that letter.

A deposit of $450,000 in the name of Intercontinental

(Intercontinental $450,000 deposit) in Bangkok Bank HK branch was

pledged as security for the $1,000,000 standby letter of credit.

The interest rate on the original BB Loan No. 1 was initial-

ly set at 1.5 percent above Bangkok Bank LA branch's prime rate,

but was subsequently reduced, effective November 1, 1984, to .75

---

[9]  The parties stipulated that the $1,000,000 standby letter of
credit was issued with respect to petitioner.  However, the
records of the Los Angeles and Hong Kong branches of Bangkok Bank
Ltd. unequivocally indicate that the $1,000,000 standby letter of
credit was issued with respect to Radcliffe.  Although we do not
lightly disregard facts stipulated by the parties, we will do so
"where justice requires it if the evidence contrary to the
stipulation is substantial or the stipulation is clearly contrary
to facts disclosed by the record."  Cal-Maine Foods, Inc. v.
Commissioner, 93 T.C. 181, 195 (1989).  We find the parties'
stipulation that the $1,000,000 standby letter of credit was
issued with respect to petitioner to be clearly contrary to the
facts disclosed in the record.  Therefore, we will not accept
that stipulation.

percent above that bank's prime rate.   The interest on that loan was payable by Radcliffe on the last day of each month.

The following actual interest rate percentages were ap-plicable to the original BB Loan No. 1 for the following periods:

| Period | Actual Interest Rate Percentage |
|---|---|
| May  17, 1984, until June 25, 1984 | 14.00 |
| June 25, 1984, until Oct.  1, 1984 | 14.50 |
| Oct.  1, 1984, until Oct. 19, 1984 | 14.25 |
| Oct. 19, 1984, until Nov.  1, 1984 | 14.00 |
| Nov.  1, 1984, until Nov.  9, 1984 | 12.75 |
| Nov.  9, 1984, until Dec.  1, 1984 | 12.50 |
| Dec.  1, 1984, until Jan.  2, 1985 | 12.25 |
| Jan.  2, 1985, until May  17, 1985 | 11.50 |

Interest on the original BB Loan No. 1 was paid on the following dates:

June  6, 1984
July  5, 1984
Aug.  6, 1984
Aug. 29, 1984
Oct.  4, 1984
Oct. 31, 1984
Dec. 10, 1984
Jan. 14, 1985
Feb.  5, 1985
Mar.  4, 1985
Apr.  8, 1985
May   6, 1985
June  4, 1985[10]

Bangkok Bank LA branch renewed the original BB Loan No. 1 (BB Loan No. 1 first renewal) when it became due on May 17, 1985, and that renewed loan was due on May 16, 1986.  To document that loan renewal, petitioner signed on behalf of Radcliffe a promis-

---

[10]   The June 4, 1985 interest payment also included interest paid on the first renewal of the original BB Loan No. 1.

sory note that was made payable to Bangkok Bank LA branch and that was in the same amount as that loan. The interest rate on the BB Loan No. 1 first renewal was set at .75 percent above Bangkok Bank LA branch's prime rate. The interest on that renewed loan was payable by Radcliffe on the first day of each month.

By telex dated May 16, 1985, Bangkok Bank HK branch amended its $1,000,000 standby letter of credit in order to renew it to May 17, 1986, one day after the due date of the BB Loan No. 1 first renewal.

The following actual interest rate percentages were applicable to the BB Loan No. 1 first renewal for the following periods:

|  | Period | Actual Interest Rate Percentage |
|---|---|---|
| May 17, 1985, until July 1, 1985 | | 10.75 |
| July 1, 1985, until Apr. 1, 1986 | | 10.25 |
| Apr. 1, 1986, until Apr. 28, 1986 | | 9.75 |
| Apr. 28, 1986, until May 17, 1986 | | 9.25 |

Interest on the BB Loan No. 1 first renewal was paid on the following dates:

June 4, 1985
July 10, 1985
Aug. 4, 1985
Sept. 3, 1985
Oct. 4, 1985
Nov. 5, 1985
Dec. 10, 1985
Jan. 6, 1986
Feb. 10, 1986

                    Mar. 10, 1986
                    Apr.  4, 1986
                    May   7, 1986
                    June 16, 1986[11]

On May 16, 1986, Radcliffe reduced the principal amount of the BB Loan No. 1 first renewal to $600,000 by paying $400,000 to Bangkok Bank LA branch.  By letter dated May 15, 1986, petitioner requested on behalf of Radcliffe that Bangkok Bank HK branch reduce its $1,000,000 standby letter of credit to $600,000 and renew it for another year.  Bangkok Bank HK branch complied with that request by amending the $1,000,000 standby letter of credit to reduce it to $600,000 and renewing the amended $600,000 letter of credit to May 17, 1987.

On June 30, 1986, pursuant to instructions from Intercontinental, the Hong Kong branch of Bangkok Bank Ltd. telexed the following instructions to the Los Angeles branch of that bank: The Los Angeles branch was to debit the account it maintained for the Hong Kong branch by $450,000, and that money was to be applied in partial repayment of the then outstanding $600,000 loan balance.  On June 30, 1986, that balance was reduced to $150,000 by the payment of $450,000.[12]

---

[11]  The June 16, 1986 interest payment also included interest paid for the period following the due date of the BB Loan No. 1 first renewal.

[12]  Petitioner admits on brief, and respondent does not dispute, that on June 30, 1986, the Intercontinental $450,000 deposit was applied to reduce the $600,000 outstanding balance of that loan
(continued...)

On or about July 1, 1986, Bangkok Bank LA branch renewed its outstanding $150,000 loan to Radcliffe and that renewed loan was due on June 30, 1987.[13] By letter dated June 26, 1986, petitioner requested on behalf of Radcliffe that Bangkok Bank HK branch reduce its then outstanding standby letter of credit to $150,000 and renew it to June 30, 1987. Bangkok Bank HK branch complied with that request by amending its standby letter of credit to reduce it to $150,000 and renewing the amended $150,000 letter of credit to June 30, 1987.

On January 14, 1987, the outstanding $150,000 loan balance was repaid. On or about March 3, 1987, Bangkok Bank HK branch canceled its outstanding $150,000 standby letter of credit with respect to that loan.

For the period that commenced on May 16, 1986, the date on which the BB Loan No. 1 first renewal was due, until January 14, 1987, the date on which the then outstanding $150,000 loan balance was repaid, interest on the then outstanding balance of

---

[12](...continued)
to $150,000. We accept the parties' agreement on this point for purposes of our Opinion, even though the record does not establish whether (1) Bangkok Bank HK branch applied $450,000 of its then outstanding standby letter of credit to reduce the then outstanding $600,000 loan balance to $150,000 and immediately thereafter reimbursed itself with the Intercontinental $450,000 deposit or (2) the Intercontinental $450,000 deposit was directly applied to reduce the then outstanding balance of that loan to $150,000.

[13] The record does not disclose the terms of any renewal after the BB Loan No. 1 first renewal became due on May 16, 1986, and before it was renewed in a reduced principal amount on or about July 1, 1986.

that loan was set at a rate that was .75 percent above Bangkok
Bank LA branch's prime rate and interest was payable on the first
day of each month.

During the period May 16, 1986, until January 14, 1987, the
following actual interest rate percentages were applicable to the
Bangkok Bank Los Angeles branch loan to Radcliffe for the follow-
ing periods:

| Period | Actual Interest Rate Percentage |
|---|---|
| May   16, 1986, until Sept. 10, 1986 | 9.25 |
| Sept. 10, 1986, until Jan.  14, 1987 | 8.25 |

Interest on that loan was paid on the following dates:

                    June  16, 1986
                    July   9, 1986
                    Aug.   8, 1986
                    Sept. 12, 1986
                    Oct.  14, 1986
                    Nov.  17, 1986
                    Dec.   5, 1986
                    Jan.  12, 1987
                    Jan.  14, 1987

(Hereinafter, the original BB Loan No. 1 and the renewals of that
loan will be referred to collectively as BB Loan No. 1.)

B.    BB Loan No. 2

By letter dated May 23, 1985, petitioner requested on behalf
of Radcliffe that the Hong Kong branch of Bangkok Bank Ltd.
arrange for the Los Angeles branch of that bank to fund a loan of
$1,625,000 to Radcliffe (BB $1,625,000 Loan No. 2).  Bangkok Bank
HK branch complied with that request, and Bangkok Bank LA branch
funded a $1,625,000 loan to Radcliffe on June 11, 1985.  That
loan was due on June 11, 1986.  The proceeds of BB $1,625,000

Loan No. 2 were credited to the account of Bangkok Bank HK branch with Bangkok Bank LA branch.[14]

To document BB $1,625,000 Loan No. 2, petitioner signed on behalf of Radcliffe a promissory note that was made payable to Bangkok Bank LA branch and that was in the same amount as that loan. The continuing, unlimited, unconditional promise and the general security agreement signed by petitioner on behalf of Radcliffe as part of the BB Loan No. 1 transaction applied to BB $1,625,000 Loan No. 2, as well as to the increase in that loan and the renewal of that increased loan.

BB $1,625,000 Loan No. 2 was secured by a $1,625,000 certificate of deposit issued by Bangkok Bank LA branch in the name of Traveluck (Traveluck $1,625,000 CD). That certificate of deposit was issued on June 11, 1985,[15] the same date on which BB $1,625,000 Loan No. 2 was funded, and was to mature on June 11, 1986, the same date on which BB $1,625,000 Loan No. 2 was due. Throughout the period June 11, 1985, until July 11, 1985, Bangkok Bank LA branch blocked the deposit represented by the Traveluck $1,625,000 CD so that it could not be withdrawn by Traveluck.

The interest rate on BB $1,625,000 Loan No. 2 was set at .5

---

[14] A financial statement of Radcliffe, dated Mar. 31, 1985, and signed by petitioner, indicated that a $1,625,000 loan was outstanding from Intercontinental to Radcliffe and that that loan was to be replaced with a loan from Bangkok Bank LA branch.

[15] The deposit in the name of Traveluck that was used to purchase the Traveluck $1,625,000 CD was made in Bangkok Bank LA branch on June 11, 1985, the same date on which BB $1,625,000 Loan No. 2 was funded.

percent above the interest rate on the Traveluck $1,625,000 CD. The interest rate on BB $1,625,000 Loan No. 2 was 8.25 percent, and the interest rate on the Traveluck $1,625,000 CD was 7.75 percent. At the special request of Radcliffe, the interest on BB $1,625,000 Loan No. 2 was made payable on a monthly basis on the 11th of each month, and, at the special request of Traveluck, the interest on the Traveluck $1,625,000 CD was made payable on a monthly basis on the 11th of each month.

On July 10, 1985, Bangkok Bank HK branch forwarded to Bangkok Bank LA branch instructions from Traveluck (July 10, 1985 instructions) that the deposit in Bangkok Bank LA branch that was represented by the Traveluck $1,625,000 CD was to be transferred to an account in the name of Double Wealth. The July 10, 1985 instructions from Traveluck also directed Bangkok Bank LA branch to remit the interest payable on the Traveluck $1,625,000 CD for the one-month period June 11, 1985, until July 11, 1985, to Traveluck's account with Bangkok Bank HK branch.

Pursuant to the July 10, 1985 instructions, on or about July 11, 1985, (1) the deposit in Bangkok Bank LA branch that was represented by the Traveluck $1,625,000 CD was transferred from the account in the name of Traveluck to an account in the name of Double Wealth; (2) Bangkok Bank LA branch issued to Double Wealth a certificate of deposit (Double Wealth $1,625,000 CD) that was in the same amount for which the Traveluck $1,625,000 CD had been issued and that matured on August 12, 1985; and (3) pursuant to a

decision of the board of directors of Double Wealth (viz., petitioner, Ms. Gaw, and Mme. Koo), the $1,625,000 certificate of deposit in the name of Double Wealth and the renewals of that certificate of deposit were pledged as security for BB $1,625,000 Loan No. 2 and the renewal of that loan.[16]

When the Double Wealth $1,625,000 CD matured on August 12, 1985, Bangkok Bank LA branch issued a second certificate of deposit to Double Wealth in the amount of $1,625,000 that matured on September 12, 1985. From July 11, 1985, until that second certificate of deposit matured, the interest rate on BB $1,625,000 Loan No. 2 was set at 7.5 percent, which was .5 percent above the 7 percent interest rate on both of the $1,625,000 certificates of deposit issued to Double Wealth.

When the second $1,625,000 certificate of deposit issued to Double Wealth matured on September 12, 1985, Bangkok Bank LA branch issued a third certificate of deposit to Double Wealth in the amount of $1,625,000 that matured on June 11, 1986, the same date on which BB $1,625,000 Loan No. 2 was due. During the period September 12, 1985, until June 11, 1986, the interest rate on that third certificate of deposit was set at .5 percent below

---

[16] The decision of Double Wealth's board of directors was documented by minutes of a meeting of that board signed by Mme. Koo as chairman of that meeting. The pledge of the $1,625,000 certificate of deposit in the name of Double Wealth was documented by a pledge executed by Ms. Gaw and witnessed by Mme. Koo.

the interest rate on BB $1,625,000 Loan No. 2.[17]  During that period, the interest rate on BB $1,625,000 Loan No. 2 was 8.25 percent and the interest rate on the third Double Wealth certificate of deposit was 7.75 percent.  Interest on that loan was paid on the following dates:

                    July  15, 1985
                    Aug.  12, 1985
                    Sept. 12, 1985
                    Oct.  15, 1985
                    Nov.  14, 1985
                    Dec.  12, 1985
                    Jan.  14, 1986
                    Feb.  13, 1986
                    Mar.  11, 1986
                    Apr.  14, 1986
                    May   12, 1986

Throughout the period July 11, 1985, until June 11, 1986, during which the three certificates of deposit in the name of Double Wealth served as security for BB $1,625,000 Loan No. 2, Bangkok Bank LA branch blocked the deposit represented thereby so that it could not be withdrawn by Double Wealth.

Pursuant to instructions of petitioner and Ms. Gaw on behalf of Double Wealth, Bangkok Bank LA branch credited monthly to Double Wealth's account with Bangkok Bank HK branch the interest payable for the period August 1985 through May 1986 on the cer-

---

[17]  By telex dated Aug. 17, 1985, Bangkok Bank HK branch informed Bangkok Bank LA branch that Radcliffe preferred that the interest rate on BB $1,625,000 Loan No. 2 be set at 8.25 percent until that loan became due on June 11, 1986.  That telex further stated that "we [Bangkok Bank HK branch] understand * * * [setting the interest rate on BB $1,625,000 Loan No. 2 at 8.25 percent] means the deposit interest rate will also be fixed at 7.75 * * * [percent] until 11 Jun 86".  Bangkok Bank LA branch acceded to Radcliffe's wishes.

tificates of deposit in the name of Double Wealth. Interest on
the certificates of deposit in the name of Double Wealth was paid
on the following dates:

> Aug.  12, 1985
> Sept. 12, 1985
> Oct.  15, 1985
> Nov.  13, 1985
> Dec.  11, 1985
> Jan.  13, 1986
> Feb.  11, 1986
> Mar.  11, 1986
> Apr.  11, 1986
> May   13, 1986

On April 16, 1986, BB $1,625,000 Loan No. 2 was increased by
$400,000 to $2,025,000 (BB $2,025,000 Loan No. 2). The increase
in the loan amount was secured by a $400,000 certificate of de-
posit (Double Wealth $400,000 CD) in Bangkok Bank LA branch in
the name of Double Wealth.[18] The Double Wealth $400,000 CD
matured on June 11, 1986, the same date on which BB $2,025,000
Loan No. 2 was due and the same date on which the third
$1,625,000 certificate of deposit in the name of Double Wealth
that also served as security for that loan matured. From the
time the Double Wealth $400,000 CD was issued on April 16, 1986,
until it matured on June 11, 1986, Bangkok Bank LA branch blocked
the deposit represented thereby so that it could not be withdrawn
by Double Wealth.

---

[18] The $400,000 deposit in the name of Double Wealth that was
used to purchase the Double Wealth $400,000 CD was made in
Bangkok Bank LA branch on Apr. 14, 1986.

The $400,000 increase in the loan amount bore interest at a rate that was set at .5 percent above the interest rate on the Double Wealth $400,000 CD.  The interest rate on the increase in the loan amount was 8.25 percent, and the interest rate on the Double Wealth $400,000 CD was 7.75 percent.  Interest on BB $2,025,000 Loan No. 2 was paid on May 12, 1986, and June 16, 1986.

On May 13, 1986, Bangkok Bank LA branch credited to Double Wealth's account with Bangkok Bank HK branch the interest payable on the Double Wealth $400,000 CD.  On May 26, 1986, and on June 9, 1986, Ms. Gaw and petitioner, respectively, sent instructions to Bangkok Bank LA branch on behalf of Double Wealth (May 26, 1986 and June 9, 1986 instructions) to remit on a monthly basis the interest payable on the Double Wealth $1,625,000 and $400,000 certificates of deposit through Standard Chartered Bank, New York, to the account of Vidda Investment Ltd. (Vidda) that was maintained in Standard Chartered Bank HK.  On June 11, 1986, Bangkok Bank LA branch followed those instructions and remitted to that account of Vidda the June 1986 interest payable on those certificates of deposit.

When BB $2,025,000 Loan No. 2 became due on June 11, 1986, it was renewed, and the renewed loan was due on September 12, 1986.  When the Double Wealth $1,625,000 and $400,000 certificates of deposit matured on June 11, 1986, they were combined

into one certificate of deposit in the amount of $2,025,000 (Double Wealth $2,025,000 CD) that was issued in the name of Double Wealth and that matured on September 12, 1986, the same date on which BB $2,025,000 Loan No. 2 as renewed was due.

During the period June 11, 1986, until September 12, 1986, the interest rate on BB $2,025,000 Loan No. 2 was set at .5 percent above the interest rate on the Double Wealth $2,025,000 CD. The interest rate on BB $2,025,000 Loan No. 2 as renewed was 7 percent, and the interest rate on the Double Wealth $2,025,000 CD was 6.5 percent. Interest on that loan was paid on July 14, 1986, August 15, 1986, and September 12, 1986.

From the time the Double Wealth $2,025,000 CD was issued on June 11, 1986, until September 12, 1986, when its proceeds were used to repay BB $2,025,000 Loan No. 2 as renewed, Bangkok Bank LA branch blocked the deposit represented thereby so that it could not be withdrawn by Double Wealth. Pursuant to the May 26, 1986 and June 9, 1986 instructions, on July 14, 1986, and August 12, 1986, Bangkok Bank LA branch remitted the interest payable on the Double Wealth $2,025,000 CD to the account of Vidda in Standard Chartered Bank HK.

Pursuant to the instructions of Ms. Gaw, on September 12, 1986, BB $2,025,000 Loan No. 2 as renewed was repaid with the proceeds represented by the Double Wealth $2,025,000 CD. Ms. Gaw directed that the interest payable on that certificate of deposit

as of September 12, 1986, be transferred to Bangkok Bank HK branch for the account of Double Wealth. Interest on that certificate of deposit was paid on September 12, 1986. (Hereinafter, BB $1,625,000 Loan No. 2, the $400,000 increase in that loan, and BB $2,025,000 Loan No. 2 as renewed will be referred to collectively as BB Loan No. 2.)

C.  BB Loan No. 3

Petitioner requested on behalf of Radcliffe that the Hong Kong branch of Bangkok Bank Ltd. arrange for the Los Angeles branch of that bank to fund a loan of $1,000,000 to Radcliffe (BB Loan No. 3). Bangkok Bank HK branch complied with that request, and Bangkok Bank LA branch funded a $1,000,000 loan to Radcliffe on November 12, 1985. That loan was due on November 12, 1986. The proceeds of BB Loan No. 3 were credited to the account of Bangkok Bank HK branch with Bangkok Bank LA branch.

To document that loan, petitioner signed on behalf of Radcliffe a promissory note that was made payable to Bangkok Bank LA branch and that was in the same amount as that loan. The continuing, unlimited, unconditional promise and the general security agreement signed by petitioner on behalf of Radcliffe as part of the BB Loan No. 1 transaction applied to BB Loan No. 3.

Pursuant to a decision on October 28, 1985, of the board of directors of Double Wealth (viz., petitioner, Ms. Gaw, and Mme. Koo), a $1,000,000 certificate of deposit issued by Bangkok Bank

LA branch in the name of Double Wealth (Double Wealth $1,000,000 CD) was pledged as security for BB Loan No. 3.[19]  That certificate of deposit was issued on November 12, 1985, the same date on which BB Loan No. 3 was funded, and matured on November 12, 1986, the same date on which BB Loan No. 3 was due.[20]  From the time the Double Wealth $1,000,000 CD was issued on November 12, 1985, until its proceeds were used on September 12, 1986, to repay BB Loan No. 3, Bangkok Bank LA branch blocked the deposit represented thereby so that it could not be withdrawn by Double Wealth.

The interest rate on BB Loan No. 3 was set at .5 percent above the interest rate on the Double Wealth $1,000,000 CD.  The interest rate on BB Loan No. 3 was 8.25 percent, and the interest rate on that certificate of deposit was 7.75 percent.  The interest on BB Loan No. 3 was made payable on a monthly basis on the 12th of each month, and the interest on the Double Wealth $1,000,000 CD was made payable on a monthly basis on the 11th of

---

[19]  The decision of Double Wealth's board of directors was documented by minutes of a meeting of that board signed by Mme. Koo as chairman of that meeting.  Mme. Koo and Ms. Gaw signed on behalf of Double Wealth an application, dated Nov. 12, 1985, for a time deposit in the amount of $1,000,000.  In addition, Mme. Koo signed on behalf of Double Wealth a Form W-8, Certificate of Foreign Status, dated Nov. 12, 1985, that was furnished to Bangkok Bank LA branch in connection with the Double Wealth $1,000,000 CD.

[20]  The deposit in the name of Double Wealth that was used to purchase the Double Wealth $1,000,000 CD was made in Bangkok Bank LA branch on or about Nov. 12, 1985, the date on which BB Loan No. 3 was funded.

each month.   Interest on that loan was paid on the following

dates:

```
                    Dec.  13, 1985
                    Jan.  14, 1986
                    Feb.  13, 1986
                    Mar.  10, 1986
                    Apr.  14, 1986
                    May   12, 1986
                    June  16, 1986
                    July  14, 1986
                    Aug.  15, 1986
                    Sept. 12, 1986
```

Pursuant to the instructions of petitioner on behalf of

Double Wealth, Bangkok Bank LA branch credited monthly to Double

Wealth's account with that branch the interest payable on the

Double Wealth $1,000,000 CD for the period December 1985 through

May 1986.  Interest on that certificate of deposit was paid on

the following dates:

```
                    Dec.  11, 1985
                    Jan.  13, 1986
                    Feb.  11, 1986
                    Mar.  11, 1986
                    Apr.  11, 1986
                    May   13, 1986
```

In the May 26, 1986 and June 9, 1986 instructions, Ms. Gaw

and petitioner, respectively, instructed Bangkok Bank LA branch

on behalf of Double Wealth to remit on a monthly basis the

interest payable on the Double Wealth $1,000,000 CD through

Standard Chartered Bank, New York, to the account of Vidda that

was maintained in Standard Chartered Bank HK.  Pursuant to those

instructions, on June 11, 1986, July 14, 1986, and August 12,

1986, Bangkok Bank LA branch remitted the interest payable on

that certificate of deposit to that account.

Pursuant to the instructions of Ms. Gaw, BB Loan No. 3 was repaid on September 12, 1986, with the proceeds represented by the Double Wealth $1,000,000 CD.  Ms. Gaw directed that the interest payable on that certificate of deposit as of September 12, 1986, be transferred to Bangkok Bank HK branch for the account of Double Wealth.  Interest on that certificate of deposit was paid on September 12, 1986.

III. Transactions Involving Union Bank

A.   UB $570,000 Pre-March 1984 Loan
     and UB $570,000 Renewed Loan

In or about February 1979, Union Bank funded a loan of $570,000 to BOT (UB $570,000 pre-March 1984 loan).  The UB $570,000 pre-March 1984 loan was periodically renewed and was still outstanding in March 1984.  From the time it was funded in 1979 until March 1984, the UB $570,000 pre-March 1984 loan was secured by $570,000 of a Eurodollar deposit in the name of Merit (Merit $570,000 deposit) in Standard Chartered Bank HK.[21]

---

[21]  Although the parties do not make it altogether clear that the interest paid by BOT to Union Bank during 1984 with respect to the UB $570,000 pre-March 1984 loan while it was secured by the Merit $570,000 deposit is at issue in these cases, it appears, and we assume, that that interest was included in respondent's determinations.  The parties make general and sweeping contentions with respect to the transactions at issue involving Union Bank and the foreign corporations that pledged cash collateral in those transactions, and we construe their contentions to include the UB $570,000 pre-March 1984 loan and Merit, unless they refer to a specific transaction or foreign corporation other than

(continued...)

Throughout the period in 1984 during which the UB $570,000 pre-March loan was outstanding, it bore interest at Union Bank's London interbank offered rate (LIBOR) plus 1.5 percent or its prime rate plus 1 percent. During 1984, the interest on the UB $570,000 pre-March 1984 loan was payable (1) at the maturity of any period during which a LIBOR-based interest rate was in effect for no more than 180 days or (2) monthly for any period during which a prime rate-based interest rate was in effect. Interest on the UB $570,000 pre-March 1984 loan was paid in January, February, and March 1984.[22]

In March 1984, the UB $570,000 pre-March 1984 loan was renewed by Union Bank (original UB $570,000 renewed loan), and a $570,000 Asian dollar deposit in the name of Forward (Forward $570,000 deposit) was made in Standard Chartered Bank, Singapore, was substituted for the Merit $570,000 deposit, and was pledged as security for that loan.[23] Interest on that loan was paid

[21](...continued)
Merit.

[22] The March 1984 interest payment with respect to the Union Bank $570,000 loan to BOT does not appear to be broken down between (1) the interest that was paid on that loan for the portion of that month during which it was secured by the Merit $570,000 deposit and (2) the interest that was paid on it for the portion of that month during which it was secured by the $570,000 deposit in the name of Forward.

[23] The parties stipulated that the UB $570,000 pre-March 1984 loan was renewed in March 1984. However, the record contains no Union Bank documents that indicate that a renewal of that loan
(continued...)

monthly to Union Bank.

Pursuant to a decision on March 15, 1984, of the board of directors of Forward (viz., petitioner, Ms. Gaw, and Mme. Koo), the Forward $570,000 deposit was pledged as security for the $570,000 loan to BOT that Union Bank had funded.[24] Throughout the period March 1984 until July 10, 1986, during which the Forward $570,000 deposit served as security for that loan and the renewals thereof, Union Bank maintained a lien on that deposit.

Union Bank renewed the original UB $570,000 renewed loan on four additional occasions for periods that ended on the following dates: July 15, 1985 (UB $570,000 renewed loan first renewal), October 10, 1985 (UB $570,000 renewed loan second renewal), April 10, 1986 (UB $570,000 renewed loan third renewal), and July 10, 1986 (UB $570,000 renewed loan final renewal). To document each of the first three additional renewals, petitioner signed on

---

[23](...continued)
occurred in that month. The documents in the record indicate that the UB $570,000 pre-March 1984 loan was renewed in July or August 1983 and that it was due on July 15, 1984. The next renewal of the Union Bank $570,000 loan to BOT concerning which documents are in the record occurred in July or August 1984. It is possible that a renewal of the UB $570,000 pre-March 1984 loan could have occurred in connection with the replacement of the Merit $570,000 deposit as its security that occurred in March 1984. Accordingly, we do not find the parties' stipulation that the UB $570,000 pre-March 1984 loan was renewed in March 1984 to be clearly contrary to the facts disclosed in the record. Consequently, we will accept that stipulation under the test of Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195-196.

[24] The pledge of the Forward $570,000 deposit was documented by a security agreement signed by Mme. Koo on behalf of Forward.

behalf of BOT a promissory note that was made payable to Union Bank and that was in the same amount as that loan.

The interest rate on the UB $570,000 renewed loan first renewal was set at Union Bank's LIBOR plus 1.5 percent or its prime rate plus 1 percent. The interest rate on the UB $570,000 renewed loan second and third renewals was set at Union Bank's LIBOR plus 1.5 percent or its reference rate[25] plus 1 percent. The interest rate on the UB $570,000 renewed loan final renewal was set at Union Bank's reference rate plus 1 percent.

The first three renewals of the UB $570,000 renewed loan were to bear interest at Union Bank's LIBOR plus 1.5 percent if, in general, BOT informed Union Bank that it wished to pay interest at that rate and specified the period for which that rate was to be in effect. That period could have been between one and six months for the UB $570,000 renewed loan first and third renewals and one and three months for the UB $570,000 renewed loan second renewal. If BOT did not so advise Union Bank, the UB $570,000 renewed loan was to bear interest at (1) the prime rate plus 1 percent in the case of the UB $570,000 renewed loan first renewal and (2) the reference rate plus 1 percent in the case of the UB $570,000 renewed loan second and third renewals.

---

[25] The record does not make clear the difference, if any, between Union Bank's prime rate and its reference rate. Certain Union Bank documents suggest that Union Bank personnel may have used the terms interchangeably.

The promissory note petitioner signed on behalf of BOT to document the UB $570,000 renewed loan first renewal provided that the interest rate on that loan was not to be less than 1 percent more than the annualized effective interest rate on the bank deposit pledged to secure that loan. That note also provided that the interest on that loan was payable by BOT semiannually if the UB $570,000 renewed loan first renewal bore interest at Union Bank's LIBOR plus 1.5 percent and monthly if that loan bore interest at the prime rate plus 1 percent. The promissory note documenting the UB $570,000 renewed loan second renewal provided that the interest on that loan was payable by BOT on the first of each month. The promissory note documenting the UB $570,000 renewed loan third renewal provided that the interest on that renewal was payable by BOT on the 10th of each month. The interest on the UB $570,000 renewed loan final renewal was also payable by BOT on the 10th of each month.

The actual interest rate percentages (percentage interest rates) that were derived from Union Bank's LIBOR, prime, or reference rates, as the case may be, and (1) that were applicable to the UB $570,000 renewed loan third renewal were 10.5 percent as of December 31, 1985, and 10 percent as of March 7, 1986, and (2) that were applicable to the UB $570,000 renewed loan final renewal were 10 percent initially and 9.5 percent as of April 21, 1986, where the percentage interest rate remained for the balance

of the period during which that renewal was outstanding.

Except for August 1984, September and November 1985, and May 1986, interest on the UB $570,000 renewed loan first through final renewals was paid monthly.[26]

On July 10, 1986, the UB $570,000 renewed loan final renewal was repaid with funds wired to Union Bank from Standard Chartered Bank HK, and Union Bank released its lien on the Forward $570,000 deposit. (Hereinafter, the original UB $570,000 renewed loan and the renewals of that loan will be referred to collectively as the UB $570,000 renewed loan.)

B. UB $325,000 Loan

In April 1984, Union Bank funded a loan of $325,000 to Radcliffe (original UB $325,000 loan) that was due on April 15, 1985. The original UB $325,000 loan was used to reduce to $1,125,000 a loan in the amount of $1,450,000 that had been made to NMSC by Union Bank or one of its branches or predecessors in San Francisco and that was secured by a second deed of trust on NMSC's buildings. To document the original UB $325,000 loan, petitioner signed on behalf of Radcliffe a promissory note that was made payable to Union Bank and that was in the same amount as that loan.

---

[26] After Dec. 31, 1985, interest on the UB $570,000 renewed loan third renewal was paid on or about Jan. 24, 1986, Feb. 21, 1986, Mar. 10, 1986, and Apr. 10, 1986. Interest on the UB $570,000 renewed loan final renewal was paid on or about Apr. 22, 1986, June 30, 1986, and July 10, 1986.

Pursuant to a decision on April 12, 1984, of the board of directors of Forward (viz., petitioner, Ms. Gaw, and Mme. Koo), a $325,000 fixed deposit in the name of Forward (Forward $325,000 deposit) was pledged as security for the original UB $325,000 loan and all renewals of that loan.[27] That deposit was in the same amount as that loan and was maintained in Standard Chartered Bank HK.[28] Throughout the period April 1984 until July 10, 1986, during which the Forward $325,000 deposit served as security for the original UB $325,000 loan and the renewals of that loan, Union Bank maintained a lien on that deposit.

The interest rate on the original UB $325,000 loan was set at Union Bank's LIBOR plus 1.5 percent or its prime rate plus 1 percent. The original UB $325,000 loan was to bear interest at Union Bank's LIBOR plus 1.5 percent if Radcliffe selected that rate in a manner essentially the same as that described above

---

[27] The pledge of the Forward $325,000 deposit was documented by a security agreement signed by Mme. Koo on behalf of Forward.

[28] The parties stipulated that the Forward $325,000 deposit was maintained in Standard Chartered Bank HK. Certain records of Union Bank indicate that that deposit was placed with Standard Chartered Bank, Singapore, through Standard Chartered Bank HK. Other records of Union Bank concerning that loan do not indicate the affiliate of Union Bank in which that deposit was maintained. We find the meaning of those Union Bank records unclear, and, accordingly, we do not find the parties' stipulation that the Forward $325,000 deposit was maintained in Standard Chartered Bank HK to be clearly contrary to the facts disclosed in the record. Consequently, we will accept that stipulation under the test of Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. at 195-196.

with respect to the UB $570,000 renewed loan first through third renewals. The period for which that rate was to be in effect could have been between one and six months. If Radcliffe did not select the LIBOR-based rate, the UB original $325,000 loan was to bear interest at Union Bank's prime rate plus 1 percent. The promissory note documenting that loan provided that the interest on that loan was payable by Radcliffe (1) at the maturity of any period during which a LIBOR-based interest rate was in effect for no more than six months and (2) monthly on the 15th day of each month for any period during which a prime rate-based rate was in effect.

Union Bank renewed the original UB $325,000 loan on two occasions for periods that ended on the following dates: April 10, 1986 (UB $325,000 loan first renewal) and July 10, 1986 (UB $325,000 loan final renewal). To document the UB $325,000 loan first renewal, petitioner signed on behalf of Radcliffe a promissory note that was made payable to Union Bank and that was in the same amount as that loan.

The interest rate on the UB $325,000 loan first renewal was set at Union Bank's LIBOR plus 1.5 percent or its prime rate plus 1 percent. That renewal was to bear interest at the LIBOR-based rate if that rate were selected by Radcliffe in a manner essentially the same as that described above with respect to the UB $570,000 renewed loan first through third renewals. If Radcliffe

did not select the LIBOR-based interest rate, the UB $325,000

loan first renewal was to bear interest at Union Bank's prime

rate plus 1 percent.  The promissory note documenting the UB

$325,000 loan first renewal provided that the interest due on

that renewal was payable by Radcliffe on the 10th of each month.

The following percentage interest rates were applicable for the

following periods with respect to the UB $325,000 loan first

renewal:

|  |  | Percentage |
| Period | | Interest Rate |
| Apr. 15, 1985, until May  20, 1985 | | 11.5 |
| May  20, 1985, until June 18, 1985 | | 11.0 |
| June 18, 1985, until Mar.  7, 1986 | | 10.5 |
| Mar.  7, 1986, until Apr. 10, 1986 | | 10.0 |

Interest on the UB $325,000 loan first renewal was paid on or

about the following dates:

> May   14, 1985
> June  12, 1985
> July  10, 1985
> Aug.  13, 1985
> Sept. 13, 1985
> Oct.  16, 1985
> Nov.  18, 1985
> Dec.  11, 1985
> Jan.  23, 1986
> Feb.  18, 1986
> Mar.  12, 1986
> Apr.  22, 1986[29]

    The interest rate on the UB $325,000 loan final renewal was

set at Union Bank's reference rate plus 1 percent and was payable

---

[29]  The Apr. 22, 1986 interest payment also included interest
paid on the UB $325,000 loan final renewal.

by Radcliffe on the 10th of each month.  The percentage interest rate applicable to the UB $325,000 loan final renewal was initially 10 percent, and, as of April 21, 1986, it was 9.5 percent where it remained for the balance of the period during which that renewal was outstanding.  Interest on the UB $325,000 loan final renewal was paid on or about the following dates:  April 22, 1986, June 30, 1986, and July 10, 1986.

The UB $325,000 loan final renewal was repaid on July 10, 1986, using funds wired to Union Bank from Standard Chartered Bank HK, and Union Bank released its lien on the Forward $325,000 deposit.  (Hereinafter, the original UB $325,000 loan and the renewals of that loan will be referred to collectively as the UB $325,000 loan.)

C.   UB $800,000 Radcliffe Loan

On or about June 27, 1985, at the request of petitioner, Radcliffe assumed a loan of $800,000 (original UB $800,000 Radcliffe loan).  The loan assumed by Radcliffe had been made to NMSC by Union Bank or one of its branches or predecessors in San Francisco (UB $800,000 NMSC loan) sometime prior to the years at issue and had been secured by a fixed deposit in the same amount as that loan that was maintained in Standard Chartered Bank HK in the name of Multi-Credit.[30]  The original UB $800,000 Radcliffe

---

[30]  In 1983, pursuant to a request made on behalf of the Gaw family, Union Bank released its lien on the Multi-Credit fixed
(continued...)

loan was due on April 10, 1986. To document that loan, peti-tioner signed on behalf of Radcliffe a promissory note that was made payable to Union Bank and that was in the same amount as that loan.

Pursuant to a decision on June 6, 1985, of the board of directors of Multi-Credit, of which petitioner was managing director, an $800,000 fixed deposit in the name of Multi-Credit in Standard Chartered Bank HK and all renewals of that deposit (Multi-Credit $800,000 deposit)[31] were pledged as security for the original UB $800,000 Radcliffe loan and the renewal of that loan. The Multi-Credit $800,000 deposit was in the same amount as that loan and was maintained in Standard Chartered Bank HK until March 5, 1986, when that deposit was transferred to Stan-dard Chartered Bank, Singapore.[32] Throughout the period from on or about June 27, 1985, until July 23, 1986, during which the Multi-Credit $800,000 deposit served as security for the original

---

[30](...continued)
deposit that was securing the UB $800,000 NMSC loan during Multi-Credit's two-week financial reporting period.

[31] The $800,000 deposit in the name of Multi-Credit had been made in that bank prior to the time it was pledged to secure the original UB $800,000 Radcliffe loan.

[32] Petitioner, as managing director of Multi-Credit, signed on behalf of Multi-Credit a security agreement dated Mar. 18, 1986, pledging the Multi-Credit $800,000 deposit in Standard Chartered Bank, Singapore, as security for the payment and performance of Radcliffe's obligations to Union Bank, irrespective of the manner in which or the time at which those obligations arose or would arise.

UB $800,000 Radcliffe loan and the renewal of that loan, Union Bank maintained a lien on that deposit.

The interest rate on the original UB $800,000 Radcliffe loan was set at Union Bank's LIBOR plus 1.5 percent or its reference rate plus 1 percent. That loan was to bear interest at Union Bank's LIBOR plus 1.5 percent if Radcliffe selected that rate in a manner essentially the same as that described above with respect to the UB $570,000 renewed loan first through third renewals. The period for which that rate was to be in effect could have been between one and six months. If Radcliffe did not select the LIBOR-based rate, the UB $800,000 Radcliffe loan was to bear interest at Union Bank's reference rate plus 1 percent. The promissory note documenting that loan provided that interest was payable by Radcliffe on the 10th of each month. The percentage interest rate on the original UB $800,000 Radcliffe loan was initially 10.91 percent, and, as of October 15, 1985, it was 10.14 percent where it remained until that loan became due. Interest on that loan was paid on or about October 31, 1985.

During the period in which the Multi-Credit $800,000 deposit was in Standard Chartered Bank HK, it was used to purchase fixed time deposits in that bank, as follows:

|                                            | Interest Rate          |
| Term of Fixed Time Deposits                | on Fixed Time Deposits |
| ------------------------------------------ | ---------------------- |
| June 27, 1985, until July 30, 1985         | 7.50                   |
| July 30, 1985, until Aug. 30, 1985         | *                      |
| Aug. 30, 1985, until Oct.  2, 1985         | 7.75                   |
| Oct.  2, 1985, until Nov.  4, 1985         | 7.75                   |
| Nov.  4, 1985, until Dec.  4, 1985         | 7.8125                 |
| Dec.  4, 1985, until Jan.  6, 1986         | 8.00                   |
| Jan.  6, 1986, until Feb.  6, 1986         | 7.875                  |
| Feb.  6, 1986, until Mar.  6, 1986         | 7.75                   |

* Interest rate not disclosed by the record.

The interest on each of the foregoing fixed time deposits was payable on its maturity date.  The interest payable on each of those deposits was (1) included in the amount used to purchase the succeeding fixed time deposit in the case of three such deposits, (2) was ultimately credited to an account in the name of Pioneer in the case of all but two such deposits, and (3) was disposed of in a manner not disclosed by the record in the case of those two deposits.[33]

The original UB $800,000 Radcliffe loan was renewed in 1986 (UB $800,000 Radcliffe renewed loan).  That renewed loan was due on July 10, 1986, although it was not repaid until July 23, 1986.

---

[33]  The parties agree on brief that the interest payable in 1985 and 1986 on all the fixed time deposits purchased with the Multi-Credit $800,000 deposit was deposited into an account in the name of Multi-Credit in Standard Chartered Bank HK.  The parties' agreement is contrary to the record in the case of six of the fixed time deposits purchased with the Multi-Credit $800,000 deposit from June 1985 until February 1986.  In the case of two of those deposits, the record does not disclose whether or not the parties' agreement is correct.

The interest rate on the UB $800,000 Radcliffe renewed loan was set at Union Bank's LIBOR plus 1.5 percent and was payable by Radcliffe on the 10th of each month.  The percentage interest rate on the UB $800,000 Radcliffe renewed loan was 10.14 percent. Interest on that loan was paid on or about June 30, 1986, and July 23, 1986.

During the period in which the Multi-Credit $800,000 deposit was in Standard Chartered Bank, Singapore, it was used to purchase fixed time deposits in that bank, as follows:

| Term of Fixed Time Deposits | Interest Rate on Fixed Time Deposits |
|---|---|
| Mar.  6, 1986,  until Apr.  7, 1986 | 7.6875 |
| Apr.  7, 1986,  until May   8, 1986 | 7.7 to 6.7 |
| May   8, 1986,  until June  9, 1986 | 6.6875 |
| June 11, 1986,* until July 10, 1986 | 6.8750 |

*On June 10, 1986, the Multi-Credit $800,000 deposit was maintained in a call deposit account with respect to which $145.33 of interest was paid.

The interest on each of the foregoing $800,000 fixed time deposits was payable on its maturity date.  None of the interest payable on any of those fixed time deposits was included in the amount used to purchase the succeeding fixed time deposit.  The interest payable on one of those fixed time deposits was credited to an account in the name of Pioneer.

On July 23, 1986, approximately two weeks after it was due, the renewal of the UB $800,000 Radcliffe loan was repaid with (1) $200,000 that had been wired to Union Bank from Standard Chartered Bank HK on or about July 10, 1986, and (2) $600,000

that had been wired to Union Bank from Bangkok Bank Ltd.[34] on or about July 23, 1986.  When that loan was repaid, Union Bank released its lien on the Multi-Credit $800,000 deposit in Standard Chartered Bank, Singapore.  (Hereinafter, the original UB $800,000 Radcliffe loan and the renewal of that loan will be referred to collectively as the UB $800,000 Radcliffe loan.)

D.   UB $1,300,000 Loan

On March 20, 1984, Union Bank funded a $1,300,000 loan to Radcliffe (original UB $1,300,000 loan) that was due on July 16, 1984.  To document the original UB $1,300,000 loan, petitioner and Ms. Gaw signed on behalf of Radcliffe a promissory note that was made payable to Union Bank and that was in the same amount as that loan.  Pursuant to instructions, dated March 14, 1984, from petitioner and Ms. Gaw on behalf of Radcliffe, the proceeds of the original UB $1,300,000 loan were used to acquire from Union Bank on March 20, 1984, a certificate of deposit that was issued in the name of Pioneer (Pioneer $1,300,000 CD).

Pursuant to a decision on March 14, 1984, of the board of directors of Pioneer, of which petitioner was managing director and chairman and Ms. Gaw was a director, the Pioneer $1,300,000 CD was pledged as security for the original UB $1,300,000 loan. That certificate of deposit was issued on March 20, 1984, the

---

[34] The record is not clear as to whether those funds were wired from Bangkok Bank Ltd. headquarters, the Hong Kong branch of that bank, or another branch of that bank.

same date on which the original UB $1,300,000 loan was funded, and matured on July 16, 1984, the same date on which that loan was due.  Throughout the period March 20, 1984, until July 16, 1984, during which the Pioneer $1,300,000 CD served as security for the original UB $1,300,000 loan, Union Bank maintained a lien on the deposit represented by that certificate of deposit.

By letter dated July 2, 1984 (July 2, 1984 Pioneer letter), petitioner and Ms. Gaw instructed Union Bank on behalf of Pioneer to transfer the deposit represented by the Pioneer $1,300,000 CD on the date on which that certificate of deposit matured (viz., July 16, 1984) into the name of Mandalay, a wholly owned subsidiary of Pioneer.  That letter also instructed Union Bank that the $1,300,000 certificate of deposit in the name of Mandalay (original Mandalay $1,300,000 CD) was to be pledged to secure the original UB $1,300,000 loan.  In accordance with that letter, and, pursuant to a decision on July 2, 1984, of the board of directors of Mandalay, of which petitioner was president and Ms. Gaw was executive director and secretary, the original Mandalay $1,300,000 CD and the renewals thereof were pledged as security for the renewals of the original UB $1,300,000 loan.  Throughout the period July 16, 1984, until July 10, 1986, during which the original Mandalay $1,300,000 CD and the renewals of that certificate of deposit served as security for the renewals of that loan, Union Bank maintained a lien on the deposit represented thereby.

The interest rate on the original UB $1,300,000 loan was set at 1.15 percent above the interest rate on the Pioneer $1,300,000 CD. The interest rate on the original UB $1,300,000 loan was 11.5 percent, and the interest payable on the Pioneer $1,300,000 CD was 10.35 percent. The promissory note documenting that loan provided that the interest on it was payable by Radcliffe monthly.

Union Bank renewed the original UB $1,300,000 loan on three occasions for periods that ended on the following dates: April 15, 1985, April 10, 1986, and July 10, 1986. To document each of the first two renewals of the original UB $1,300,000 loan, petitioner and Ms. Gaw signed on behalf of Radcliffe a promissory note that was payable to Union Bank and that was in the same amount as that loan.

The interest rates on all three renewals of the original UB $1,300,000 loan were set at 1.15 percent above the interest rate on the original Mandalay $1,300,000 CD and the renewals of that certificate of deposit (which ranged between 6.6 and 11.45 percent). Interest on all three renewals of the original UB $1,300,000 loan was payable by Radcliffe monthly.

When the original Mandalay $1,300,000 CD matured on October 16, 1984,[35] it was renewed 19 times for successive periods consisting of one three-month renewal and 18 one-month renewals.

---

[35] Interest on the original Mandalay $1,300,000 CD was paid on Aug. 16, 1984, and Sept. 17, 1984.

The 19th and final renewal of that certificate matured on July 10, 1986, the same date on which the final renewal of the original UB $1,300,000 loan was due. The dates on which the other two renewals of the original UB $1,300,000 loan were due coincided with the dates on which two of the one-month renewals of the original Mandalay $1,300,000 CD matured (viz., April 15, 1985, and April 10, 1986).

Throughout the period during which the original Mandalay $1,300,000 CD and the renewals thereof were outstanding, the interest on those certificates was payable by Union Bank monthly. The interest on each of the one-month renewals of the original Mandalay $1,300,000 CD was payable by Union Bank on its maturity date, which occurred at approximately mid-month. In the July 2, 1984 Pioneer letter, petitioner and Ms. Gaw instructed Union Bank on behalf of Mandalay that the interest on the original Mandalay $1,300,000 CD and the renewals thereof was to be credited monthly to an account maintained in the name of Pioneer at Union Bank.

On July 10, 1986, the final renewal of the original UB $1,300,000 loan was repaid with the proceeds represented by the final renewal of the original Mandalay $1,300,000 CD. (Hereinafter, the original UB $1,300,000 loan and the renewals of that loan will be referred to collectively as the UB $1,300,000 loan, and the original Mandalay $1,300,000 CD and the renewals of that certificate of deposit will be referred to collectively as the Mandalay $1,300,000 CD.)

E.    UB $1,830,000 Loan

In August 1984, Union Bank funded a $1,830,000 loan to BOT (original UB $1,830,000 loan) that was due on July 15, 1985. Pursuant to instructions of petitioner on behalf of BOT, the proceeds of that loan were used to acquire from Union Bank a $1,830,000 certificate of deposit that was issued in the name of Pempire (original Pempire $1,830,000 CD).  To document the original UB $1,830,000 loan, petitioner signed on behalf of BOT a promissory note that was made payable to Union Bank and that was in the same amount as that loan.

Pursuant to a decision on July 18, 1984, of the board of directors of Pempire, of which petitioner was chairman and president, the original Pempire $1,830,000 CD and the renewals thereof were pledged as security for the original UB $1,830,000 loan and the renewals of that loan.  That certificate of deposit was issued on August 13, 1984, and matured on July 15, 1985, the same date on which the original UB $1,830,000 loan was due.  Throughout the period August 1984 until July 10, 1986, during which the original Pempire $1,830,000 CD and the renewals thereof served as security for the original UB $1,830,000 loan and the renewals of that loan, Union Bank maintained a lien on the deposit represented thereby.

The interest rate on the original UB $1,830,000 loan was set at 1.15 percent above the interest rate on the original Pempire $1,830,000 CD.  The interest rate on the original UB $1,830,000

loan was 12.95 percent, and the interest rate on the original Pempire $1,830,000 CD was 11.8 percent. The promissory note documenting the original UB $1,830,000 loan provided that the interest on that loan was payable by BOT semiannually.

Union Bank renewed the original UB $1,830,000 loan on three occasions for periods that ended on the following dates: October 10, 1985 (UB $1,830,000 loan first renewal), April 10, 1986 (UB $1,830,000 loan second renewal), and July 10, 1986 (UB $1,830,000 loan final renewal). To document each of the first two renewals of the original UB $1,830,000 loan, petitioner signed on behalf of BOT a promissory note that was made payable to Union Bank and that was in the same amount as that loan. The interest rate on all three renewals of the original UB $1,830,000 loan was set at 1.15 percent above the interest rate on the renewals of the original Pempire $1,830,000 CD (which ranged between 6.6 and 7.9 percent). The interest on the UB $1,830,000 loan first renewal was payable by BOT at that loan's maturity. The interest on the UB $1,830,000 loan second and final renewals was payable by BOT monthly.

When the original Pempire $1,830,000 CD matured on July 15, 1985, it was renewed 10 times for successive periods consisting of three one-month renewals, one three-month renewal, and six one-month renewals. The 10th and final renewal of that certificate matured on July 10, 1986, the same date on which the final renewal of the original UB $1,830,000 loan was due. The dates on

which the other two renewals of the original UB $1,830,000 loan were due either coincided with or were close to the dates on which two of the one-month renewals of the original Pempire $1,830,000 CD matured (viz., October 10, 1985, and April 10, 1986).[36]  Union Bank made six interest payments on or shortly after the maturity dates of certain of the renewals of the original Pempire $1,830,000 CD.

On July 10, 1986, Union Bank repaid the UB $1,830,000 loan final renewal with the proceeds represented by the final renewal of the original Pempire $1,830,000 CD.  (Hereinafter, the original UB $1,830,000 loan and the renewals of that loan will be referred to collectively as the UB $1,830,000 loan, and the original Pempire $1,830,000 CD and the renewals of that certifi-- cate of deposit will be referred to collectively as the Pempire $1,830,000 CD.)

F.   Facts Pertaining to All the Transactions
     at Issue Involving Union Bank

At least as early as August 1984, Union Bank became con- cerned that the cash deposits that had been pledged by the foreign corporations in question as security for the loans it had funded to Radcliffe and to BOT that are at issue herein might

---

[36]  Six payments of interest were made at or shortly after the maturity dates of certain renewals of the original Pempire $1,830,000 CD.  Three payments of interest were credited to Pempire's account with Union Bank, and two payments of interest were credited to Pempire's account without indicating the bank in which that account was maintained.

constitute fraudulent conveyances under California law, in which event Union Bank believed that it might be deprived of an enforceable security interest in those deposits. In order to address that concern, Union Bank sought from petitioner, inter alia, financial information relating to the foreign corporations that pledged cash collateral for those loans and statements that those corporations owned Radcliffe and/or BOT. Union Bank did not receive the information it requested from petitioner. Consequently, it requested its affiliate Standard Chartered Bank HK to guarantee its loans to Radcliffe and to BOT that are at issue herein. That guarantee was to be secured by the cash deposits that had been pledged as security for those loans. Despite Union Bank's concerns about possible fraudulent conveyances under California law and although Standard Chartered Bank HK did not provide the guarantee requested by Union Bank, Union Bank renewed on one or more occasions the loans it had funded to Radcliffe and to BOT as they became due during the years at issue.

In February 1986, petitioner requested Union Bank to consider making a new loan to Radcliffe and/or BOT in the amount of $8,400,000, an amount that was approximately equal to the then outstanding balances of the loans at issue that had been funded by Bangkok Bank LA branch and by Union Bank to Radcliffe and BOT.

That new loan was to be secured by the buildings owned by NMSC and 300 Montgomery Associates.

A letter dated March 3, 1986 (March 3, 1986 letter) from Henry Yung, an officer of Union Bank, to Patrick Kwok of Standard Chartered Bank HK, an affiliate of Union Bank,[37] indicated that, when Union Bank's weighted average interest rate on the loans it had outstanding to Radcliffe and to BOT (viz., the UB $570,000 renewed loan, the UB $325,000 loan, the UB $800,000 Radcliffe loan, the UB $1,300,000 loan, and the UB $1,830,000 loan) was compared to its weighted average cost of funds and overhead costs, it was losing money on those loans. The March 3, 1986 letter further indicated that Union Bank was losing money on those loans even when earnings from deposits that were not connected with such loans were taken into account. Mr. Yung also stated in that letter that Union Bank nonetheless was willing to renew the loans it had funded to Radcliffe and to BOT on terms that would allow it to break even on them. In this regard, the

---

[37] The Mar. 3, 1986 letter was prompted by petitioner's request that the loans that Union Bank had funded to Radcliffe and to BOT and that are at issue herein be renewed at interest rates that were to be set at 1 percentage point in excess of the interest rates on the various deposits that secured those loans. It appears to us that, in early 1986, petitioner was pursuing at least two alternative possible courses of action for restructuring the loans at issue involving Union Bank: (1) replacing them (along with the Bangkok Bank LA branch loans) with a new loan secured by the buildings of NMSC and 300 Montgomery Associates (see discussion above) and (2) altering the manner in which the interest rates on the then outstanding Union Bank loans were to be determined.

March 3, 1986 letter indicated that Union Bank was "pleased to have the opportunity to accommodate this valued Group customer [petitioner] and will entertain all reasonable requests."

The loans to Radcliffe and to BOT by Union Bank that are at issue in these cases did not provide that bank with an opportunity to make a profit.

IV.  Transaction Involving Horbury

During relevant periods, Horbury Holdings B.V. (Horbury), which was incorporated in the Netherlands in 1982, was a subsidiary of Asselwell Mondial N.V. (Asselwell), and Asselwell, which was incorporated in the Netherlands Antilles, was a subsidiary of a foreign subsidiary of Pioneer.

BOT claimed a deduction of $151,722 for interest paid to Horbury in its 1984 Federal income tax return.

V.  Income or Loss Reported by Radcliffe
and by BOT for the Years at Issue

In their Federal income tax returns (income tax returns) for the years at issue, Radcliffe and BOT reported the following amounts of taxable income or loss:

| Year | Radcliffe | BOT |
|------|-----------|-----|
| 1984 | ($809,615) | $93,026 |
| 1985 | (835,080) | (168,669) |
| 1986 | (894,322) | (310,024) |

The foregoing results reported by Radcliffe and by BOT were generated in part by deductions for interest paid that they claimed in their respective income tax returns for the years at

issue.  Specifically, in its income tax returns for the years at issue, Radcliffe claimed the following deductions for interest paid to Bangkok Bank LA branch:

| Year | Amount |
|------|--------|
| 1984 | $73,791 |
| 1985 | 194,289 |
| 1986 | 211,719 |

In its income tax returns for the years at issue, Radcliffe claimed the following deductions for interest paid to Union Bank:

| Year | Amount |
|------|--------|
| 1984 | $144,427 |
| 1985 | 220,171 |
| 1986 | 120,008 |

In its income tax returns for the years at issue, BOT claimed the following deductions for interest paid to Union Bank:

| Year | Amount |
|------|--------|
| 1984 | $167,448 |
| 1985 | 233,853 |
| 1986 | 119,260 |

## OPINION

In determining that petitioner is liable for the deficiencies in, additions to, and penalties on withholding tax that she determined with respect to Radcliffe and BOT, respondent relies on the transferee liability provisions of section 6901.  Petitioner does not dispute that he would be liable as a transferee of each of those taxpayers under section 6901 for those deficiencies in, additions to, and penalties on tax in the event the

Court were to sustain respondent's determinations with respect to Radcliffe and BOT.[38]  Consequently, in the event we were to sustain respondent's determinations with respect to Radcliffe and BOT, respondent would have satisfied her burden under section 6902(a) of proving that petitioner is liable as a transferee of each of those corporations.

The principal dispute in these cases is whether the determinations with respect to Radcliffe and BOT should be sustained. Petitioner bears the burden of demonstrating that those determinations are erroneous.  See sec. 6902(a); Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Before turning to the various issues presented in these cases, we note that we have given due consideration to all of the parties' arguments and contentions with respect to those issues, even though we do not attempt to address each of them herein.

I.  Evidentiary Matters

Petitioner has attempted to satisfy his burden of proof through testimonial and documentary evidence.  Petitioner was the principal witness on his behalf.  We found him to be glib and at

---

[38]  Radcliffe and BOT each distributed property with a net value of not less than $1,000,000 to petitioner as sole shareholder. The net value of the property so distributed by Radcliffe and by BOT exceeds the respective amounts of the deficiencies, additions to tax, and penalties that respondent determined against petitioner as a transferee of Radcliffe and of BOT.

times vague, evasive, inconsistent, and conclusory in his tes-
timony.  In addition, based on our observation of petitioner's
demeanor at trial, we generally did not find him to be credible.
In these circumstances, we are not required to, and we generally
do not, accept petitioner's self-serving and uncorroborated
testimony.  See Geiger v. Commissioner, 440 F.2d 688, 689-690
(9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Wood v.
Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C.
593 (1964); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  We
generally found the other witnesses who testified to be credible.

A.    The Adverse Inference Rule--
      Mme. Koo's Failure To Testify

Mme. Koo, petitioner's mother-in-law, did not testify.
Petitioner claims on brief that she owned certain of the corpora-
tions (viz., Intercontinental, Double Wealth, Traveluck, Forward,
and Pioneer) that pledged cash deposits as security for a number
of the loans at issue.[39]  Citing Wichita Terminal Elevator Co. v.
Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir.
1947), respondent urges us to apply the so-called adverse
inference rule and to infer from petitioner's failure to call
Mme. Koo that her testimony would have been unfavorable to
petitioner.  Relying principally on Wynn v. United States, 397

---

[39]  Petitioner also claims that during the years at issue Mme.
Koo and/or her family owned Vidda, a corporation to whose account
in Standard Chartered Bank HK certain interest due on certain of
the cash deposits that secured BB Loan Nos. 2 and 3 was credited.

F.2d 621, 625-626 (D.C. Cir. 1967), petitioner contends that since Mme. Koo, an alleged resident of Hong Kong, could not have been subpoenaed to appear at the trial of these cases, an adverse inference should not be drawn from her failure to testify. We disagree with petitioner's reading of the Wynn case.[40]

The burden of proof is on petitioner with respect to respondent's determinations against Radcliffe and BOT, and we cannot assume that missing evidence would be favorable to him. See Kamborian v. Commissioner, 56 T.C. 847, 869 (1971), affd. 469

---

[40] We also disagree with petitioner's reading of the other authorities to which he cites, viz., Burgess v. United States, 440 F.2d 226, 235 (D.C. Cir. 1970) (Robinson, J., concurring); Savard v. Marine Contracting Inc., 471 F.2d 536, 542 (2d Cir. 1972); In re Stader, 90 Bankr. 29, 32 n.8 (Bankr. D. Conn. 1988); and 2 Wigmore on Evidence, sec. 286, at 200 (Chadbourn rev. 1979). Judge Robinson began his concurring opinion in the Burgess case with a discussion of the adverse inference rule and his assumption that the missing witness in that case was amenable to subpoena. However, that Judge Robinson made that assumption does not mean to us that it is his view or, more importantly, the view of the U.S. Court of Appeals for the District of Columbia Circuit that a witness must in all events be amenable to subpoena before being considered within a party's power to produce for purposes of the adverse inference rule. Burgess v. United States, supra at 235. Both the Savard and Stader cases indicate that evidence must be within a party's control before a negative inference will be drawn from that party's failure to produce that evidence. However, as will be discussed below, for purposes of the adverse inference rule, evidence may be within a party's control even if it is not subject to production by subpoena. See United States v. Martin, 696 F.2d 49, 52 (6th Cir. 1983). Similarly, the statement in 2 Wigmore on Evidence, sec. 286, at 200, relied on by petitioner (viz., the "lack of power [to produce] may be due to the person's absence from the jurisdiction") does not indicate to us that such an absence necessarily means that for purposes of the adverse inference rule a party is considered to be powerless to produce the witness.

F.2d 219 (1st Cir. 1972); <u>Pollack v. Commissioner</u>, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). Indeed, the usual inference is that such evidence would be unfavorable. See <u>Pollack v. Commissioner</u>, <u>supra</u>; see also 2 Wigmore on Evidence, sec. 285(1), at 192 (Chadbourn rev. 1979). Where a party fails to call a witness peculiarly within the power of that party to produce and the testimony of that witness would elucidate the matters at issue, it generally is permissible under the adverse inference rule to infer that the witness' testimony would have been unfavorable. See <u>Graves v. United States</u>, 150 U.S. 118, 120-121 (1893); <u>United States v. Rollins</u>, 862 F.2d 1282, 1297-1298 (7th Cir. 1988); see also 2 McCormick on Evidence, sec. 264, at 185 (4th ed. 1992).

In <u>Wynn v. United States</u>, <u>supra</u>, the U.S. Court of Appeals for the District of Columbia Circuit, to which an appeal in these cases would normally lie, considered on its own initiative the question of whether an adverse inference could be drawn against a criminal defendant for failing to present certain witnesses he claimed would support his alibi defense. The Court of Appeals stated that the record did not disclose whether any of those uncalled witnesses was within the power, much less peculiarly within the power, of that defendant to produce. In a footnote, the court gave what it described as a "partial enumeration" of the circumstances relevant to resolving that question that were

not disclosed by the record in that case, including the "physical amenability to subpoena" of those witnesses.  Id. at 625 & n.23. Thus, Wynn merely indicates that physical amenability to subpoena is simply one of a number of different factors to be considered in determining whether an uncalled witness is within a party's power to produce for purposes of the adverse inference rule.  It does not stand for the proposition that such a witness is always beyond the power of a party to produce for purposes of that rule when that witness is not subject to subpoena.

Petitioner has not cited, and our research has not disclosed, any case decided by the Court of Appeals for the District of Columbia Circuit involving the adverse inference rule where that court has considered a situation in which an uncalled witness was beyond the subpoena power of the court.[41]  However,

_____

[41] We note that in Harry v. Safeway Stores, Inc., 215 F. Supp. 324, 325-327 (D.D.C. 1963), the U.S. District Court for the District of Columbia, the court in accordance with whose rules of evidence we conduct our trials, Rule 143(a), found that a jury was permitted to draw a negative inference from a defendant's failure to call a former employee who was apparently living in Florida at the time of trial.  That court found that the jury could infer that that witness was peculiarly available to the defendant because of the witness' past employment relationship with the defendant, the defendant's apparent knowledge of where the witness could be reached, and the lack of a satisfactory explanation for his absence.  Id.  We note that, at the time the Harry case was decided, Fed. R. Civ. P. 45(e) provided that a subpoena for attendance at trial generally could be served within the district where trial was held or within 100 miles of that place.  Fed. R. Civ. P. 45(e), 28 U.S.C. app. at 5167 (1958). Accordingly, it seems that the missing witness in Harry v. Safeway Stores, Inc., supra, was beyond the subpoena power of the
(continued...)

other U.S. Courts of Appeals have addressed situations where uncalled witnesses were beyond their subpoena power and have concluded that an adverse inference may be drawn against a party from the failure to present a witness even where that witness may not be subpoenaed by that party. See <u>United States v. Martin</u>, 696 F.2d 49, 52 (6th Cir. 1983); <u>United States v. Lehmann</u>, 613 F.2d 130, 135-136 (5th Cir. 1980); see also <u>A.B. Dick Co. v. Burroughs Corp.</u>, 798 F.2d 1392, 1400 & n.9 (Fed. Cir. 1986). For example, in <u>Martin</u>, the Court of Appeals for the Sixth Circuit concluded that the friendship with one of the parties of certain uncalled witnesses who lived in Canada rendered those witnesses within the power of that party to produce, notwithstanding that those witnesses were beyond the subpoena power of the Federal courts.[42] <u>United States v. Martin</u>, <u>supra</u>.

We have found based on the record in these cases that petitioner and Mme. Koo had close and amicable business and

---

[41](...continued)
District Court for the District of Columbia.

[42] For purposes of applying the adverse inference rule, other courts have concluded that the question whether a witness is within the power of a party to produce is generally to be determined by taking account of various factors, including the witness' accessibility to the service of a subpoena upon him and the relationship of the witness to that party. See <u>United States v. Johnson</u>, 467 F.2d 804, 808-809 (1st Cir. 1972); <u>McClanahan v. United States</u>, 230 F.2d 919, 926 (5th Cir. 1956).

family relationships prior to and during the years at issue.[43]

Mme. Koo is, and was during and preceding the years at issue, petitioner's mother-in-law. Thus, she would ordinarily be expected to favor him. In fact, the record discloses that she did favor him with respect to various business transactions.[44] The failure of a party to call as a witness a relative who would ordinarily be expected to favor that party suggests that that relative's testimony would be unfavorable. See Steiner v. Commissioner, 350 F.2d 217, 222-223 (7th Cir. 1965), affg. T.C. Memo. 1963-128; Stoumen v. Commissioner, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 13, 1953.

On the present record, we find that Mme. Koo was within petitioner's power to produce for purposes of the adverse in-

---

[43]  Petitioner's relationships with his mother-in-law Mme. Koo contrast sharply with his relationships with his mother and siblings, which both he and his brother, Henry Gaw, testified were hostile. Union Bank records also indicate that that bank understood that there was disunity among members of S.C. Gaw's family following his death and that each member of that family was responsible for his or her own activities.

[44]  By way of illustration, petitioner testified that he became managing director of Pioneer in 1973 at Mme. Koo's behest and that he was able to borrow from, and give guarantees for more than what he was worth to, banks in Hong Kong because those banks knew that Mme. Koo would honor his obligations if the need arose. Documentary evidence in the record shows Mme. Koo's involvement in transactions with respect to the pledges of cash deposits by Double Wealth and Forward for certain of the loans at issue, e.g., her signature on documents of Double Wealth and Forward connected with the pledge of those corporations' deposits as security for those loans.

ference rule, notwithstanding her alleged residence in Hong Kong.[45]

We turn now to the requirement of the adverse inference rule that an uncalled witness not only must be within a party's power to produce but also must be "peculiarly" within that party's power to produce before such an inference may be drawn against that party. See United States v. Rollins, 862 F.2d at 1297-1298. If a witness is "equally available" to both parties and neither calls that witness at trial, no adverse inference is warranted. See Kean v. Commissioner, 469 F.2d 1183, 1188 (9th Cir. 1972), affg. in part, revg. in part 51 T.C. 337 (1968). For this purpose, an uncalled witness is not equally available to the party requesting that the inference be drawn against the other party, and thus is peculiarly within the other party's power to produce, where that witness' relationship to that other party is such that the witness is likely to favor that other party. See id.; McClanahan v. United States, 230 F.2d 919, 925 (5th Cir. 1956).

---

[45] In addition to petitioner's close and amicable business and family relationships with Mme. Koo, it is noteworthy that although petitioner did not attempt to depose Mme. Koo prior to trial, on May 10, 1994, well after these cases were submitted and after the parties had filed their briefs, petitioner (1) filed a motion to reopen the record that the Court denied by order dated May 26, 1994, and (2) lodged an application to take the deposition of Mme. Koo in Hong Kong. Thus, Mme. Koo was willing to be deposed for purposes of these cases after the trial herein and after respondent's opening brief advancing the adverse inference rule with respect to Mme. Koo had been served on petitioner.

On the instant record, we find that Mme. Koo's business and family relationships with petitioner are such that she would likely favor petitioner, and therefore she was not equally available to respondent for purposes of the adverse inference rule.  We further find that Mme. Koo was peculiarly within petitioner's power to produce for purposes of that rule.

Before applying the adverse inference rule, another requirement must be satisfied, that is to say, the testimony of the missing witness must elucidate the matters at issue, and not be merely cumulative.  See United States v. Rollins, supra; 2 McCormick on Evidence, sec. 264, at 185.  On the instant record, we find that Mme. Koo's testimony would have elucidated the transactions at issue and would not have been merely cumulative. During the years at issue, petitioner was managing director and chairman of Pioneer and a director of Forward.  During 1985, he was a director of Traveluck and a director and officer of Double Wealth.  While petitioner might arguably have been in as good a position as Mme. Koo to know of certain circumstances relevant to these cases, there are disputed matters, such as the ownership of Pioneer and the other foreign corporations petitioner claims Mme. Koo owned, which her testimony would have elucidated.  Mme. Koo also would have been in a better position than petitioner to testify concerning the intentions and actions of the corporations that petitioner claims she owned with respect to the loan trans-

actions at issue, and she may have been able to supply information concerning matters as to which petitioner claimed ignorance, such as the source of the deposits made by Forward that were used as collateral.

We also note that the failure of a party to call available witnesses to corroborate that party's testimony can justify drawing an adverse inference from their absence. See Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991), affg. T.C. Memo. 1989-393; see also Stoumen v. Commissioner, supra. Petitioner's testimony was at times vague, evasive, and conclusory, his credibility was challenged by respondent on cross-examination, and, based on our observation of his demeanor at trial, we generally did not find him to be credible. The testimony of a corroborating witness, such as Mme. Koo, would not have been merely cumulative.

In order to avoid having an adverse inference drawn from the failure to present a witness, a party may attempt, as petitioner does here, to explain the reason that witness was not called. See Case v. New York Central R.R., 329 F.2d 936, 937-938 (2d Cir. 1964); Schumacher v. United States, 216 F.2d 780, 787-788 (8th Cir. 1954). If the failure to present a witness is not satisfactorily explained, we may draw an adverse inference from that witness' absence. See Pollack v. Commissioner, 47 T.C. at 108.

On brief, petitioner alleges, and asks us to infer from the record, that Mme. Koo's age, the length of the journey from Hong Kong, where she allegedly resided, to San Francisco, where, at the request of petitioner, trial was held, and the scheduling of the trial herein prevented her attendance at trial.[46]  When the

---

[46]  We note first that petitioner could have requested, but did not request, that trial be held in Hawaii, which might have ameliorated the alleged difficulty of Mme. Koo's traveling to San Francisco where the trial was held.  We also note that petitioner's contentions appear to be inconsistent.  If Mme. Koo's inability to attend trial was due to her age and the distance that she may have had to travel to San Francisco, those circumstances could not have been ameliorated by the scheduling of the trial.

Petitioner also suggests on brief that Mme. Koo made travel plans in reliance on the Court's indication in a telephonic conference call with counsel for the parties prior to the start of the trial session on which these cases were calendared that it would try to schedule the trial of these cases in the second week of its session.  Petitioner, in his application to take Mme. Koo's deposition that was lodged with the Court on May 10, 1994, well after the record in these cases was closed, further alleges that Mme. Koo planned to travel to the United States on July 15, 1994.  Petitioner's suggestion that Mme. Koo made travel plans in reliance on the Court's comment in a telephonic conference with counsel for the parties and his representation in his application to take her deposition well after trial indicate that Mme. Koo was able to travel, which undercuts petitioner's contention that Mme. Koo did not testify because of the difficulty of traveling from Hong Kong to San Francisco.

Petitioner's contention that Mme. Koo's failure to testify was attributable to the scheduling of the trial in these cases is contrary to the record herein.  While the Court did indicate during a telephonic conference with counsel for the parties prior to the calendar call that it would attempt to schedule the trial in these cases during the second week of its trial session in San Francisco, it emphasized that it could not assure petitioner that it could accommodate him by scheduling the trial during that

(continued...)

Court asked petitioner at the call of these cases from the calendar and before it had scheduled the time and date of the trial herein to name the witnesses he intended to call at trial, he did not include Mme. Koo among those witnesses and did not explain that omission. Nor did petitioner ask the Court at that time toconsider Mme. Koo's availability to testify in scheduling the trial, object to the trial date set by the Court on the grounds that Mme. Koo was not available at that time, or offer an explanation at trial for her absence. Petitioner's trial memorandum that was submitted approximately two weeks before the call of these cases from the calendar simply stated that Mme. Koo's ability to testify was "uncertain" due to her age and residence in Hong Kong, not that those circumstances prevented her from testi-

---

[46](...continued)
week. The Court also indicated to the parties at the call of these cases from the calendar and before scheduling the trial that it might not be able to accommodate their scheduling preferences. When the Court asked the parties at the call of these cases from the calendar to estimate trial time and name the witnesses they intended to call at trial, petitioner's counsel did not name Mme. Koo as one of the witnesses he would call at trial and did not ask the Court to schedule the trial to take place at a time when she would be available. The only ground on which petitioner's counsel sought at that time to delay the commencement of the trial was petitioner's absence from the calendar call and his expected arrival in San Francisco the following night. The Court scheduled trial to begin on the first day of its trial session in San Francisco because a witness named Mr. Catterton, who was subpoenaed by petitioner only three business days prior to the call of these cases from the calendar, was available to testify only on that day and would not have been available again until after the Court ended its trial session in San Francisco.

fying.  We conclude that Mme. Koo did not testify at trial be-
cause petitioner did not intend to call Mme. Koo as a witness,
rather than for any of the reasons advanced by petitioner on
brief.

Based on our review of the entire record in these cases, we
will draw an adverse inference from petitioner's failure to call
Mme. Koo as a witness.[47]

B.   Evidentiary Objections

We now deal with the admissibility of certain exhibits to
which the parties stipulated, but as to which one of the parties
preserved an evidentiary objection in their stipulations.[48]  At
trial, we admitted those exhibits into evidence conditionally,
subject to our ruling on their admissibility.

1.   Petitioner's Income Tax Returns

Petitioner objected in the stipulations on grounds of
relevance to the admission of his individual Federal income tax

---

[47]  Even if we were not to draw such an adverse inference, our
findings and holdings in these cases would not change.

[48]  The parties' stipulation of facts was received by the Court
at the call of these cases from the calendar on Oct. 25, 1993,
and was filed with the Court at the beginning of the trial later
that day.  The Court did not rule on the evidentiary objections
stated in the stipulations because it did not have sufficient
time prior to trial to consider them or the parties' voluminous
stipulations and the exhibits attached thereto.  That was because
of the time constraints placed on the Court attributable to other
Court business that had previously been scheduled to take place
on Oct. 25, 1993, and the need to schedule the trial in these
cases on that same day in order to accommodate a witness
subpoenaed by petitioner only three business days prior to the
first day of the trial session, see supra note 46.

returns for 1984, 1985, and 1986.  On brief, he does not restate that objection or advance any argument relating to it.  We therefore presume that petitioner has abandoned his evidentiary objection to the admission into evidence of his individual Federal income tax returns for 1984, 1985, and 1986.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  Consequently, we unconditionally admit those returns into evidence and make them a part of the record in these cases.

### 2.   Certain Instruments of Transfer and Stock Certificates

Respondent objected in the stipulations on grounds of hearsay to the admission of certain instruments of transfer with respect to Traveluck, Double Wealth, and Forward, and certain stock certificates with respect to Traveluck and Forward.  On brief, respondent restates those objections.

To counter respondent's hearsay objections, petitioner appears to argue that the documents in question are not excludible hearsay under rule 802 of the Federal Rules of Evidence because he is not offering them for the truth of the matters asserted therein, but to show that the persons signing those documents believed that Mme. Koo was a shareholder of those corporations.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove

the truth of the matter asserted."  Rule 801(a) of the Federal

Rules of Evidence defines a "statement" as "(1) an oral or

written assertion or (2) nonverbal conduct of a person, if it is

intended by the person as an assertion."  The notes of the

Advisory Committee on the Federal Rules of Evidence discuss the

effect of the foregoing definitions as follows:

> The effect of the definition of "statement" is to
> exclude from the operation of the hearsay rule all
> evidence of conduct, verbal or nonverbal, not intended
> as an assertion.  The key to the definition is that
> nothing is an assertion unless intended to be one.
>
>      * * * nonverbal conduct * * * [not intended as an
> assertion] may be offered as evidence that the person
> acted as he did because of his belief in the existence
> of the condition sought to be proved, from which belief
> the existence of the condition may be inferred. * * *
> [Notes of the Advisory Committee on the Federal Rules
> of Evidence, 28 U.S.C. app. at 722 (1988).]

Assertions falling within the hearsay rule may be express or

implied.  See United States v. Reynolds, 715 F.2d 99, 103 (3d

Cir. 1983).  The Court of Appeals for the District of Columbia

Circuit has concluded that, whether an assertion is express or

implied, the critical distinction for purposes of deciding wheth-

er conduct constitutes a statement as defined in rule 801(a) of

the Federal Rules of Evidence is whether that conduct constitutes

an intentional or unintentional message with respect to the

matter sought to be proven.  See United States v. Long, 905 F.2d

1572, 1580 (D.C. Cir. 1990).  Where the conduct in question

constitutes an unintentional message, that conduct is not hear-

say.  See id.

The instrument of transfer with respect to Traveluck, dated January 3, 1985, stated, inter alia, that Ms. Gaw was transferring the one share of the stock of Traveluck held in her name to Mme. Koo, subject to the same conditions under which Ms. Gaw held that share.  There are two instruments of transfer with respect to Double Wealth.  In one such instrument, entitled "Transfer of Subscription" and dated January 8, 1985, S.B. Goweh, inter alia, (1) stated that he was transferring to Mme. Koo all his interest as a subscriber to the stock of Double Wealth to the extent of one share of the common stock of that corporation; (2) requested Double Wealth to issue a certificate in her name for that one share; and (3) directed Double Wealth to register that transfer on its books, effective January 8, 1985.  A second instrument of transfer with respect to Double Wealth, dated June 5, 1988, stated, inter alia, that Mme. Koo was transferring the one share of the stock of that corporation held in her name to Pioneer, subject to the same conditions under which Mme. Koo held that share.  In the instrument of transfer with respect to Forward, entitled "Transfer of Subscription" and dated December 4, 1980, S.B. Goweh, inter alia, (1) stated that he was transferring to Mme. Koo all his interest as a subscriber to the stock of Forward to the extent of one share of the common stock of that corporation; (2) requested Forward to issue a certificate in her name for that one share; and (3) directed Forward to register that transfer on its books, effective December 4, 1980.

Based on the assertions in, and the nature of, the instruments of transfer with respect to Traveluck, Double Wealth, and Forward, we conclude that the persons signing those documents intended to assert expressly that one share of the stock of each of those corporations was, or was to be, held in the name of Mme. Koo.[49] Accordingly, those documents fall within the definition of hearsay in rule 801(c) of the Federal Rules of Evidence, and, pursuant to rule 802 of those rules, we will not admit them into evidence.

The respective stock certificates of Traveluck and of Forward to which respondent objected (1) certified that Mme. Koo was the owner of one share of the stock of each of those corporations and (2) further stated, inter alia, that each corporation had caused its respective officers to sign the respective certificates in witness of that certification. Obviously, by having signed the respective stock certificates as officers of Traveluck and Forward, the persons signing those certificates intended to assert that Mme. Koo owned one share of the stock of Traveluck and Forward, respectively. Accordingly, those stock certificates fall within the definition of hearsay in rule 801(c) of the Federal Rules of Evidence, and, pursuant to rule 802 of those

---

[49] We note that none of those instruments of transfer establishes whether or not Mme. Koo was the beneficial owner of the one share of stock of the corporation to which each relates or was holding such stock for some other person.

rules, we will not admit them into evidence.[50]

### 3. Horbury Financial Statement

Respondent objected in the stipulations on grounds of hearsay to the admission of Horbury's balance sheet and income statement for the year ended March 31, 1986. On brief, respondent does not restate that objection or advance any argument relating to it. We therefore presume that respondent has abandoned her evidentiary objection to the admission into evidence of Horbury's

---

[50] Even if we were to conclude that the documents in question were not hearsay as petitioner contends, we would not necessarily admit them into evidence. This is because those documents appear to be merely cumulative of evidence already in the record. See Fed. R. Evid. 403. The parties stipulated that (1) one share of the stock of Traveluck was held in the name of Mme. Koo at all relevant periods after Jan. 3, 1985; (2) one share of the stock of Double Wealth was held in the name of Mme. Koo from Jan. 8, 1985, through the remainder of the years at issue; and (3) one share of the stock of Forward was issued in the name of Mme. Koo in December 1980. The beliefs of the persons signing the instruments of transfer with respect to Traveluck, Double Wealth, and Forward and the stock certificates of Traveluck and Forward appear to add nothing to, and seem to be merely cumulative of, those stipulations.

Moreover, even if we were to admit the documents in question into evidence, they would not necessarily establish who owned a majority of the stock of, or who controlled, Traveluck, Double Wealth, or Forward; nor would they change our resolution of the issues in these cases. Each instrument of transfer purports to effect the transfer to or by, or the issuance to, Mme. Koo of only one share of stock in each of those corporations, and the respective stock certificates purport to certify ownership by Mme. Koo of only one share of stock in Traveluck and in Forward. No instrument of transfer indicated the number of issued and outstanding shares of stock of the corporation to which it relates. Although each stock certificate indicated the number of authorized shares of stock of the corporation to which it relates, there is no evidence in the record concerning the total number of authorized shares of stock of each corporation that was issued and outstanding during the years at issue.

balance sheet and income statement for the year ended March 31, 1986.  See Rybak v. Commissioner, 91 T.C. at 566 n.19.  Consequently, we unconditionally admit that document into evidence and make it a part of the record in these cases.

### 4.    Annual Reports of Pioneer and Financial Statements of Multi-Credit

Respondent objected in the stipulations on grounds of hearsay to the admission of certain documents that purport to be Pioneer's annual reports for the years ended March 31, 1983, March 31, 1984, March 31, 1985,[51] and March 31, 1986, and Multi-Credit's financial statements for the years ended March 31, 1986, and March 31, 1987.  On brief, respondent does not restate those objections or advance any argument relating to them.  We therefore presume that respondent has abandoned her evidentiary objections to the admission into evidence of the documents that purport to be the annual reports of Pioneer and the financial statements of Multi-Credit.  See Rybak v. Commissioner, 91 T.C. at 566 n.19.  Consequently, we unconditionally admit those documents into evidence and make them a part of the record in these cases.[52]

---

[51]  Contrary to the parties' stipulation that Exhibit 15-O is Pioneer's annual report for the year ended Mar. 31, 1985, we find that exhibit to be an incomplete copy of that annual report.  At a minimum, that exhibit lacks certain notes to the financial statements of Pioneer and its subsidiaries that are referred to therein.

[52]  We unconditionally admit Exhibit 15-O as an incomplete copy
(continued...)

## 5.    June 12, 1987 Newspaper Article

Respondent objected in the stipulations on grounds of relevance and hearsay to the admission of an article (newspaper article) that appeared in the June 12, 1987 edition of the Financial Times.[53]  On brief, respondent restates those objections.

To counter respondent's relevancy objection, petitioner appears to contend that the newspaper article is relevant to his claims that respondent violated his constitutional right to equal protection of the law and abused her discretion by relying on Rev. Rul. 87-89, 1987-2 C.B. 195, situations (1) and (2), obsoleted for payments made after September 10, 1995, by Rev. Rul. 95-56, 1995-36 I.R.B. 20, in making the withholding tax determinations against Radcliffe and BOT that are at issue in these cases.  To counter respondent's hearsay objection, petitioner argues that the Court should take judicial notice of the newspaper article as a legislative fact and that the article is admissible under rules 803(17) and 803(24) of the Federal Rules of Evidence.

Even assuming arguendo that the newspaper article were rele-

---

[52](...continued)
of Pioneer's annual report for the year ended Mar. 31, 1985.

[53]  The newspaper article included so-called "back-to-back loan structures" in a list of "commercial activities often carried out from a favorable tax jurisdiction".  The term "back-to-back loan structures" is contained in a table accompanying the newspaper article that attributes the information contained in that table to Price Waterhouse.

vant to petitioner's constitutional and abuse of discretion claims, we disagree with petitioner that the Court should take judicial notice of the newspaper article as a legislative fact or that it is admissible as an exception to the hearsay rule under rules 803(17) and 803(24) of the Federal Rules of Evidence.

With respect to petitioner's argument that the Court should take judicial notice of the newspaper article as a legislative fact, legislative facts generally are those pertinent to legal reasoning that assist a court in deciding questions of law, policy, and discretion. See Nolan v. Ramsey, 597 F.2d 577, 580-581 n.2 (5th Cir. 1979); see also Notes of the Advisory Committee on the Federal Rules of Evidence, 28 U.S.C. app. at 738 (1988); 1 Weinstein & Berger, Weinstein's Evidence, par. 200[03], at 200-16 to 200-17 (1995). We do not find the newspaper article to be pertinent to the legal reasoning involved in, or otherwise of assistance to the Court's resolution of, the claims to which petitioner contends that article is relevant. Accordingly, we will not admit the newspaper article as a legislative fact.

With respect to petitioner's reliance on rules 803(17) and 803(24) of the Federal Rules of Evidence, we note at the outset that the statement appearing in the newspaper article concerning "back-to-back loan structures" was attributed by that article to Price Waterhouse. Consequently, there are two layers of hearsay that we face, viz., the statement made by Price Waterhouse to the declarant in the newspaper article and that declarant's statement

in the newspaper article.  Each layer of hearsay must be independently admissible.  Fed. R. Evid. 805.  Petitioner has not attempted to show that the statement made by Price Waterhouse to the declarant in the newspaper article is within any exception to the hearsay rule.

Turning to the newspaper article itself, rule 803(17) of the Federal Rules of Evidence on which petitioner relies applies to market quotations or other published compilations generally used or relied upon by the public or persons in particular occupations.  Petitioner has not shown that the newspaper article is the type of compilation contemplated by rule 803(17) of the Federal Rules of Evidence or that it was relied upon by the public or persons in particular occupations.  We therefore will not admit the newspaper article under that rule.

Rule 803(24) of the Federal Rules of Evidence, one of the residual exceptions to the hearsay rule on which petitioner also relies, allows admission of a statement not expressly within any of the other exceptions to the hearsay rule if:

     1.  The statement has "circumstantial guarantees of trustworthiness" equivalent to the enumerated hearsay exceptions of * * * [rule 803 of the Federal Rules of Evidence];

     2.  the statement is offered as evidence of a material fact;

     3.  the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;

     4.  the general purposes of the rules of evidence and

the interest of justice will [best] be served by admission of the statement into evidence; and

   5.  the proponent of the statement has made it known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it.[54]  [Goldsmith v. Commissioner, 86 T.C. 1134, 1139 (1986); fn. ref. omitted.]

The foregoing residual exception to the hearsay rule is to be "used very rarely and only in exceptional circumstances" to ensure that it does not emasculate the body of law underlying the rules of evidence.  Id. at 1140.

Petitioner argues on brief that the admission of the newspaper article is justified because of petitioner's inability to obtain other evidence showing how common "back-to-back loan structures" were when Rev. Rul. 87-89, supra, was issued[55] and

---

[54]  Fed. R. Evid. 803(24) also requires the proponent of the statement to furnish the opposing party with the particulars of the statement, including the name and address of the declarant.

[55]  During a deposition of Henry Yung, an officer of Union Bank, that was taken by petitioner approximately two weeks prior to the trial of these cases, petitioner learned that Mr. Yung was not able to testify that "back-to-back loan structures" were popular when Rev. Rul. 87-89, 1987-2 C.B. 195, situations (1) and (2), obsoleted for payments made after Sept. 10, 1995, by Rev. Rul. 95-56, 1995-36 I.R.B. 20, was issued.  At about the same time, petitioner subpoenaed Thomas D. Fuller, an individual who petitioner believed was employed by the Internal Revenue Service (Service) and was able to testify that such arrangements had been popular when that ruling was issued.  Petitioner learned approximately five days prior to trial that Mr. Fuller had left the employ of the Service and was abroad.  At the call of these cases from the calendar, petitioner attempted to offer the testimony of a witness not listed in his trial memorandum with respect to the popularity of "back-to-back loan structures", which the Court did
(continued...)

because petitioner cited that article in his trial memorandum and furnished a copy to respondent approximately two weeks prior to the trial of these cases. Even assuming arguendo that petitioner were to satisfy the third and fifth conditions (set forth above) which are imposed by rule 803(24) of the Federal Rules of Evidence and to which petitioner's argument is addressed, he has not attempted to show that the other conditions for admissibility of the newspaper article that are imposed by rule 803(24) of the Federal Rules of Evidence are satisfied.

For example, we are not persuaded that the newspaper article possesses circumstantial guarantees of trustworthiness equivalent to other classes of hearsay governed by rule 803 of the Federal Rules of Evidence. The statement in that article concerning "back-to-back loan structures" seems to be nothing more than a repetition of what the declarant in the newspaper article was told by Price Waterhouse, which clearly is hearsay, and the mere fact of its publication in a newspaper is not in itself suffi-cient to establish its trustworthiness. Cf. <u>Meschino v. North American Drager, Inc.</u>, 841 F.2d 429, 434 (1st Cir. 1988). Be-cause we find that the newspaper article does not possess cir-cumstantial guarantees of trustworthiness equivalent to other classes of admissible hearsay, we need not consider the other requirements of rule 803(24) of the Federal Rules of Evidence.

---

[55](...continued)
not allow because of potential prejudice to respondent.

On the instant record, we conclude that the newspaper article is not admissible under that rule.[56]

### 6.   August 28, 1987 Memorandum

Respondent objected in the stipulations on grounds of relevance and hearsay to the admission of a memorandum dated August 28, 1987 (August 1987 memorandum), from Thomas D. Fuller, then Special Assistant to the Associate Chief Counsel (International), to the Director of Public Affairs that accompanied copies of Rev. Rul. 87-89, 1987-2 C.B. 195, for release under the Service's advance revenue ruling procedures.  On brief, respondent restates those objections.[57]

To counter respondent's relevancy objection, petitioner appears to contend that the August 1987 memorandum is relevant to petitioner's constitutional and abuse of discretion claims.  To counter respondent's hearsay objection, petitioner argues that that memorandum is admissible under rules 803(8) and 803(24) of the Federal Rules of Evidence to show that the form of financing analyzed in Rev. Rul. 87-89, supra, was popular at the time the ruling was issued and under rules 801 and 803(3) of the Federal Rules of Evidence to show that the Service's National Office

---

[56]   Even if we were to admit the newspaper article into evidence, it would not change our resolution of petitioner's constitutional and abuse of discretion claims in these cases.

[57]   The August 1987 memorandum stated in relevant part that Rev. Rul. 87-89, supra, provides guidance with respect to "currently popular international financing structures."

(National Office) was aware that it was popular at that time.

Even assuming arguendo that the August 1987 memorandum were relevant to petitioner's constitutional and abuse of discretion claims, we disagree with petitioner that that memorandum is admissible for the purposes for which he has offered it under any of the exceptions to the hearsay rule upon which he relies.

We consider first whether the August 1987 memorandum is admissible under rules 803(8) and 803(24) of the Federal Rules of Evidence to show that the pattern of financing described in Rev. Rul. 87-89, supra, was popular at the time that ruling was issued. We conclude that the August 1987 memorandum is not admissible under rule 803(8) of the Federal Rules of Evidence. That rule permits introduction of statements of public agencies setting forth, inter alia, matters observed pursuant to a duty imposed by law as to which there was a duty to report or factual findings resulting from an investigation made pursuant to authority granted by law. Petitioner has made no showing that the statements in the August 1987 memorandum were recorded pursuant to a duty to report or that they are factual findings from an investigation made pursuant to legal authority.

Petitioner argues in a conclusory manner on brief that the conditions for admissibility imposed by rule 803(24) of the Federal Rules of Evidence are satisfied. As was true of his evidentiary arguments relating to the newspaper article, petitioner contends on brief that the admission of the August 1987

memorandum is justified because of petitioner's inability to obtain other evidence showing how common "back-to-back loanstructures" were when Rev. Rul. 87-89, supra, was issued and because petitioner cited that memorandum in his trial memorandum and advised respondent approximately one month prior to the trial of these cases that he would ask the Court to take judicial notice of that memorandum. Even assuming arguendo that petitioner were to satisfy the third and fifth conditions (set forth above) that are imposed by rule 803(24) of the Federal Rules of Evidence and to which petitioner's contentions are addressed, he has not attempted to establish that the other conditions for admissibility of the August 1987 memorandum that are imposed by rule 803(24) of the Federal Rules of Evidence are satisfied.

For example, petitioner has not attempted to establish that the August 1987 memorandum possesses circumstantial guarantees of trustworthiness equivalent to other classes of hearsay governed by rule 803 of the Federal Rules of Evidence, such as those of rule 803(8), on which petitioner also relies. Nor has petitioner attempted to show the knowledge and qualifications of the declarant (i.e., the author of the August 1987 memorandum), factors to be considered in evaluating the trustworthiness of a statement. See Herdman v. Smith, 707 F.2d 839, 841 (5th Cir. 1983). On the instant record, we do not consider the August 1987 memorandum admissible under rule 803(24) of the Federal Rules of Evidence.

We will not admit the August 1987 memorandum into evidence under rule 803(8) or 803(24) of the Federal Rules of Evidence for the purpose of showing that the pattern of financing described in Rev. Rul. 87-89, supra, was popular at the time that ruling was issued.[58]

We now consider petitioner's contention that the August 1987 memorandum is admissible to show that the National Office was aware that the pattern of financing described in Rev. Rul. 87-89, supra, was popular at the time that ruling was issued. As we understand petitioner's argument, that memorandum is not excludible hearsay under rule 802 of the Federal Rules of Evidence because either (1) it is not hearsay as defined by rule 801(c) of those rules in that it is offered to show circumstantially the National Office's state of mind, and not for the truth of the matter asserted therein, or (2) it is admissible under rule 803(3) of those rules that provides an exception to the hearsay rule for:

> A statement of the declarant's then existing state of
> mind, emotion, sensation, or physical condition (such
> as intent, plan, motive, design, mental feeling, pain,
> and bodily health), but not including a statement of
> memory or belief to prove the fact remembered or be-
> lieved unless it relates to the execution, revocation,
> identification, or terms of declarant's will.

Petitioner is not seeking to admit the August 1987 memorandum

---

[58] Even if we were to admit that memorandum for that purpose, it would not change our resolution of petitioner's constitutional and abuse of discretion claims in these cases.

under the foregoing hearsay exception in order to show that the financing structures described in Rev. Rul. 87-89, 1987-2 C.B. 195, in fact were "currently popular" at the time the ruling was issued.  Instead, petitioner asserts that that document is admissible to show that the National Office was aware that those financing structures were "currently popular" at that time.

On its face, the August 1987 memorandum seems to represent only the views or state of mind of its author.  Petitioner has not shown that that memorandum is a statement of the institutional view or position of the National Office or that its author was in a position that enabled or entitled him to articulate the view or position of the National Office with respect to the current popularity of the financing structures described in Rev. Rul. 87-89, supra.  Petitioner has not established the basis on which we may impute to the National Office the state of mind of the author of the August 1987 memorandum.  That memorandum reflects only its author's state of mind with respect to the popularity of the pattern of financing analyzed in Rev. Rul. 87-89, supra, regardless whether that state of mind was correct.  On the instant record, we conclude that the August 1987 memorandum is not admissible to show the state of mind of the National Office.[59]

---

[59]  Even if we were to admit the August 1987 memorandum into evidence for the purposes advocated by petitioner, it would not change our resolution of petitioner's constitutional and abuse of
(continued...)

### 7.  Paragraph 152 of the Stipulation of Facts

Respondent objected in the stipulations on grounds of relevance to the admission of paragraph 152 of the parties' stipulation of facts.[60]  On brief, respondent restates that objection.

We conclude that paragraph 152 of the stipulations is relevant to petitioner's constitutional and abuse of discretion claims.  Consequently, we unconditionally admit that paragraph of the stipulations into evidence and make it a part of the record in these cases.

### C.    Respondent's Motion To Compel Production of Documents

Petitioner contends that the Court erred in granting respondent's motion to compel production of certain documents (motion to compel) that respondent had sought to discover under Rule 72. In response to that motion, petitioner denied having possession, custody, or control of those documents.  He argues that his denial was sufficient to prevent the Court from granting respondent's motion to compel and that the Court erroneously placed on

---

[59](...continued)
discretion claims in these cases.

[60]    Paragraph 152 of the stipulations provides:

After making reasonable inquiry of the Office of Associate Chief Counsel (International), the Office of the Assistant Commissioner (International), the Office of Western Regional Counsel, and the San Francisco District Office, respondent has not discovered any unagreed case in the Examination Division or docketed case other than these cases and the case of Fu Investment Company v. Commissioner, Docket No. 13306-92, in which Rev. Rul. 87-89 has been applied retroactively.  * * *

him the burden of showing that he lacked possession, custody, or control of the documents in question. Petitioner contends that it was respondent's burden to establish those circumstances in order to prevail on her motion to compel.

Petitioner is incorrect in contending that respondent bore the burden of demonstrating that he had possession, custody, or control of the documents with respect to which the Court granted respondent's motion to compel. The burden is on the party objecting to show that that party's objections to a request for production of documents should be sustained by the Court. See Branerton Corp. v. Commissioner, 64 T.C. 191, 193 (1975); see also 4A Moore's Federal Practice, par. 34.05[3], at 34-36 (2d ed. 1994) (on motion to compel production under rule 34 of Federal Rules of Civil Procedure, from which Rule 72 is derived, see Rosenfeld v. Commissioner, 82 T.C. 105, 120 (1984), the party objecting to discovery must show that production should not be ordered).[61] A claim that a party is not in possession, custody,

_____

[61] In 1970, Fed. R. Civ. P. 34 was amended to eliminate the requirement that a party show "good cause" (e.g., a showing that the party from whom discovery was sought had possession, control, or custody of the documents requested) in order to obtain discovery of documents. See 4A Moore's Federal Practice, par. 34.08[2], at 34-43 to 34-44 (2d ed. 1994); 8A Wright & Miller, Federal Practice and Procedure, par. 2210, at 396-397 (2d ed. 1994); see also Norman v. Young, 422 F.2d 470, 472-473 (10th Cir. 1970) (describing requirements imposed on party seeking discovery under Fed. R. Civ. P. 34 prior to its amendment in 1970). Rule 72 is derived from Fed. R. Civ. P. 34 as amended in 1970. Rule 72, like Fed. R. Civ. P. 34 as amended in 1970, requires no showing of good cause by the party requesting discovery as a prereq-
(continued...)

or control of documents constitutes an objection to the production of documents. See <u>Henderson v. Zurn Indus., Inc.</u>, 131 F.R.D. 560, 567 (S.D. Ind. 1990) (construing analogous provision of Federal Rules of Civil Procedure).

In telephonic conference calls and written filings with the Court after respondent filed her motion to compel, petitioner's counsel described efforts being made to produce the documents that were the subject of that motion and claimed that certain documents could not be produced. The Court was not satisfied that petitioner had demonstrated that he did not have possession, custody, or control of the documents sought by respondent that he

_____

[61](...continued)
uisite to the production of documents. See <u>Morris v. Commissioner</u>, 65 T.C. 324, 325-326 (1975).

The Federal Rules of Civil Procedure now expressly impose on the party requesting discovery the burden of showing that requested materials are discoverable only with respect to trial preparation materials described in Fed. R. Civ. P. 26(b)(3) and (b)(4). Those materials generally consist of documents and tangible things prepared in anticipation of litigation and facts known to and opinions of experts not expected to be called at trial.

The present law regarding the burden of proof with respect to requests for discovery of documents under the Federal Rules of Civil Procedure may be summarized as follows:

> [The good cause] requirement was dropped in 1970, leaving the initiative with the party from whom documents are sought to object, or apply to the court for a protective order under * * * [Fed. R. Civ. P.] 26(c), and to show good cause why the documents should <u>not</u> be produced. Thus, the burden of making a showing rests on the party seeking discovery only if seeking documents or tangible things "prepared in anticipation of litigation or for trial." * * * [4 Moore's Federal Practice, par. 26.15[2], at 26-294 (2d ed. 1994); fn. ref. omitted.]

did not produce.  Consequently, the Court ordered an evidentiary hearing concerning those documents that took place on October 27, 1993, during the trial of these cases.[62]

Both prior to and at the conclusion of that hearing, the Court informed petitioner that he had the burden of proving that he did not have possession, custody, or control of the documents in question.  At the evidentiary hearing, petitioner produced certain documents sought by respondent, and respondent was satisfied with respect to all her requests except for certain records of (1) Double Wealth with respect to BB Loan No. 3, (2) Horbury with respect to, inter alia, the loan at issue involving Horbury, and (3) Forward with respect to, inter alia, the ownership of its stock during the years 1983 through 1986 and its alleged pledges of cash deposits to secure loans to Radcliffe and BOT during the years 1982 through 1986.  At the evidentiary hearing on respondent's motion to compel, petitioner testified that he did not have possession, custody, or control of the documents in question that had not been produced and about his alleged efforts to locate them.

On October 27, 1993, at the conclusion of the hearing on respondent's motion to compel, the Court orally ruled that peti-

---

[62] The evidentiary hearing was held on Oct. 27, 1993, during the trial of these cases because petitioner, without good cause, did not make himself available to the Court at the call of these cases from the calendar and did not present himself in Court until Oct. 27, 1993, two days after the trial of these cases had commenced.  Despite petitioner's unjustified absence, the Court delayed holding that hearing in an effort to accommodate him and interrupted the trial in order to hold it.

tioner had not carried his burden of proving that he did not have possession, custody, or control of the documents that had been requested by respondent and that had not been produced by him and that, therefore, respondent's motion to compel was granted in that those documents must be produced by petitioner. In so ruling, the Court found petitioner's testimony at that evidentiary hearing to be contradictory, vague, evasive, nonresponsive, and not credible in certain respects. The Court therefore granted respondent's motion to compel. In the Court's written order, dated October 27, 1993, confirming its oral ruling granting respondent's motion to compel, the Court restated those findings and conclusions. After considering petitioner's arguments on brief, we remain persuaded that petitioner failed to show why he should not have been compelled to produce the documents in question, and we reaffirm our granting of respondent's motion to compel. See Rosenfeld v. Commissioner, supra at 117.

After the Court orally ruled on respondent's motion to compel, respondent apparently assumed that the Court intended to impose a sanction on petitioner and inquired whether that sanction was that petitioner was not to be allowed to elicit testimony relating to the documents that the Court ordered him to produce. The Court indicated that it was not imposing any sanction at that time. During petitioner's testimony at the trial of these cases, which resumed after the hearing on respondent's motion to compel, respondent requested the Court not to allow petitioner to testify with respect to the BB Loan No. 3 transaction

as a sanction for his failure to produce records of Double Wealth concerning that loan. The Court permitted petitioner to testify about the BB Loan No. 3 transaction, indicating that it would give that testimony whatever weight it considered appropriate.

On brief, respondent renews her request that we exclude petitioner's testimony concerning the BB Loan No. 3 transaction. She also asks the Court to exclude petitioner's testimony relating to certain records of Horbury and of Forward that the Court ordered petitioner to produce. Petitioner counters that the sanctions sought by respondent are inappropriate because petitioner did not have an opportunity to comply with the Court's order granting respondent's motion to compel, which was made on the same day on which the trial of these cases concluded.

Based on our consideration of all of the circumstances surrounding respondent's motion to compel and her request at trial and on brief for sanctions, including the simultaneity of the Court's granting that motion and the trial of these cases, we will not impose sanctions on petitioner.

II. <u>General Principles Applicable to These Cases</u>

Before turning to the specific questions that we must resolve in order to decide whether to sustain respondent's determinations against Radcliffe and BOT, and therefore whether to sustain respondent's determinations of petitioner's transferee liability, we set forth the basic legal framework within which we must consider those questions.

A. Taxation of Interest Received by
   Foreign Corporations--In General

Except as provided in section 881(c), section 881(a) imposes a tax of 30 percent on, inter alia, amounts received as interest from sources within the United States by a foreign corporation[63] to the extent the interest received is not effectively connected with the conduct of a trade or business within the United States (noneffectively connected interest).  Section 1442(a) generally requires the payor of interest subject to the tax imposed by section 881(a) to deduct and withhold that tax at the source.[64]

Respondent contends, and petitioner does not dispute, that during the years at issue the interest in question that was received from Radcliffe and BOT was from sources within the United States.  See sec. 861(a)(1); sec. 1.861-2(a)(1) and (2), Income Tax Regs.  Nor does petitioner dispute respondent's posi-tion that during the years at issue the foreign corporations that are treated as having received interest from Radcliffe and/or BOT under respondent's theory of these cases (viz., Intercontinental, Traveluck, Double Wealth, Merit, Pempire, Forward, Pioneer, Multi-Credit, Mandalay, and Horbury) were not engaged in any

---

[63]  A "foreign corporation" is a corporation that is not organ-ized in the United States or under the law of the United States or of any State.  Sec. 7701(a)(4) and (5).

[64]  Income effectively connected with the conduct of a trade or business within the United States that is included in the recip-ient's gross income under sec. 882(a)(2) is not subject to withholding.  Secs. 1442(a), 1441(c).

trade or business within the United States.  The parties there-
fore agree on brief that in the event we were to sustain respon-
dent's theory that the interest that was, in form, paid to
Bangkok Bank LA branch and Union Bank by Radcliffe and/or BOT
was, in substance, paid to those foreign corporations, that
interest would satisfy the general rules for taxation under
section 881(a) and withholding under section 1442(a) (unless the
portfolio interest exemption under section 881(c)(1) were ap-
plicable) in that it was from sources, and was not effectively
connected with the conduct of a trade or business, within the
United States.  The parties also agree on brief that in the event
we were to sustain respondent's theory that the interest that
was, in form, paid to Horbury by BOT in 1984 does not qualify for
exemption from U.S. tax under the United States-Netherlands
income tax treaty in effect for that year, Convention With Re-
spect to Taxes, Apr. 29, 1948, U.S.-Neth., art. VIII(1), 62 Stat.
1757, 1761, modified by Supplementary Convention, Dec. 30, 1965,
art. VI, 17 U.S.T. 896, 901 (U.S.-Netherlands treaty), that
interest would satisfy the general rules for taxation under
section 881(a) and withholding under section 1442(a) (unless the
portfolio interest exemption under section 881(c)(1) were appli-
cable).

Hereinafter, (1) Intercontinental, Traveluck, Double Wealth,
Merit, Pempire, Forward, Pioneer, Multi-Credit, and Mandalay will
be referred to collectively as the foreign corporations pledging

collateral, (2) the Los Angeles and Hong Kong branches of Bangkok Bank Ltd. and Union Bank and its affiliates Standard Chartered Bank HK and Standard Chartered Bank, Singapore, will be referred to collectively as the banks in question, (3) Bangkok Bank LA branch and Union Bank will be referred to collectively as the U.S. banks in question, (4) the loans at issue that were, in form, from the U.S. banks in question to Radcliffe and/or BOT will be referred to collectively as the Bank loans, (5) the transactions at issue involving the Bank loans will be referred to collectively as the Bank transactions, (6) the loan at issue that was, in form, from Horbury to BOT will be referred to as the Horbury loan, and (7) the transaction at issue involving the Horbury loan will be referred to as the Horbury transaction.

Certain exemptions from the tax imposed by section 881(a) on noneffectively connected interest are provided by the Code, and we now describe those relevant to these cases.[65]  As pertinent here, section 861(a)(1)(A) exempts from that tax noneffectively connected interest received by a foreign corporation on a deposit with a person resident in the United States that is carrying on the banking business by treating that interest as not arising from sources within the United States.

Section 881(c)(1) generally exempts from the tax imposed by section 881(a)(1) portfolio interest received by a foreign cor-

---

[65]  The tax imposed by sec. 881(a) may also be reduced or elim-inated by treaty.  Sec. 894(a).

poration from sources within the United States.[66]  "Portfolio

interest" is defined as any interest (including original issue

discount) that would be subject to tax under section 881(a) but

for section 881(c) and that is paid on certain unregistered or

registered obligations.  Sec. 881(c)(2).  Portfolio interest does

not, however, include interest received by certain types of

foreign corporations.[67]  Specifically, portfolio interest does

not include, inter alia, interest received by a 10-percent for-

eign shareholder of the payor corporation.[68]  Sec. 881(c)(3)(B).

Nor does portfolio interest include interest received by a con-

trolled foreign corporation (CFC), as defined in section 957(a),

---

[66]  Sec. 881(c) was added by the Deficit Reduction Act of 1984
(1984 Act), Pub. L. 98-369, sec. 127(b)(1), 98 Stat. 650-651, and
generally applies to portfolio interest received after July 18,
1984, the date of the enactment of the 1984 Act, with respect to
obligations issued after that date in taxable years ending after
that date.  Deficit Reduction Act of 1984, Pub. L. 98-369, sec.
127(g)(1), 98 Stat. 652.

[67]  The General Explanation of the Tax Reform Act of 1984 notes:

> Congress did not believe it appropriate to repeal
> the 30-percent tax for interest paid to related foreign
> * * * [persons], because the combination of [a] U.S.
> deduction [for that interest] and non-inclusion [of
> that interest in U.S. taxable income] would create an
> incentive for interest payments that Congress did not
> intend. * * *  [Staff of Joint Comm. on Taxation,
> General Explanation of the Revenue Provisions of the
> Deficit Reduction Act of 1984 at 393-394 (J. Comm.
> Print 1984).]

[68]  The attribution rules of sec. 318(a), with certain modifica-
tions, are used to determine stock ownership for purposes of de-
termining whether a recipient of interest is a 10-percent foreign
shareholder of the payor corporation.  Secs. 881(c)(3)(B),
871(h)(3).

from a related person, as defined in section 864(d)(4).[69]  Sec. 881(c)(3)(C).

In connection with the 10-percent foreign shareholder rule, the conference report for the Deficit Reduction Act of 1984 stated:

> taxpayers may attempt to circumvent the foreign share-
> holder * * * rule * * * by entering into "back to back"
> loans, wherein a foreign affiliate of a U.S. taxpayer *
> * * lends money to an unrelated foreign party that
> relends that money at discount to the U.S. taxpay-
> er.[70]  The conferees intend that the Internal Revenue
> Service, when appropriate, use means at its disposal to
> determine whether back to back loans exist.  [H. Conf.
> Rept. 98-861 at 937-938, 1984-3 C.B. (Vol. 2) 191-192.]

In connection with the enactment of the exemption from U.S. taxation for portfolio interest, Congress provided that interest paid on a "United States affiliate obligation" to an "applicable CFC" in existence on or before June 22, 1984, is to be treated as paid to a resident of such CFC's country of incorporation.  See Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 127(g)(3), 98 Stat. 652-653; see also H. Conf. Rept. 98-861 at 938, 1984-3 C.B. (Vol. 2) 192.  A "United States affiliate obligation" is an obligation issued before June 22, 1984, by a U.S. person related to an applicable CFC within the meaning of section 482.  Deficit

---

[69]  Sec. 881(c)(4) prescribes certain rules in the case of port-
folio interest received by a CFC.

[70]  We note that the U.S. Court of Appeals for the Ninth Circuit
has described a "back-to-back loan" as "a bank loan * * * col-
lateralized with a cash deposit from a third party."  Erhard v.
Commissioner, 46 F.3d 1470, 1473 n.2 (9th Cir. 1995), affg. T.C.
Memo. 1992-376 and T.C. Memo. 1991-290.

Reduction Act of 1984, Pub. L. 98-369, sec. 127(g)(3)(C)(ii), 98 Stat. 653.  An "applicable CFC" is, in general, a CFC that maintains a debt-to-equity ratio of not more than five to one and the principal activity of which is the issuing of obligations to foreign persons or the holding of short term obligations and the lending of the proceeds of such obligations to U.S. persons related to it within the meaning of section 482.  See Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 127(g)(3)(C)(ii), 98 Stat. 653.

B.   Substance Over Form and Related Doctrines

Because the parties argue these cases essentially in terms of substance over form and related (e.g. step transaction and sham) doctrines, we briefly describe those principles.[71]

---

[71]  In 1993, Congress enacted sec. 7701(l).  That provision authorizes the Secretary to prescribe regulations recharacterizing multiple-party financing transactions where the Secretary determines that such recharacterization is appropriate to prevent tax avoidance.  Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13238, 107 Stat. 508-509.  By enacting sec. 7701(l) in 1993, Congress did not intend any negative inference to be drawn concerning positions taken by respondent under preexisting law.  S. Prt. 103-36 at 191 (Comm. Print 1993); H. Rept. 103-111 at 729 (1993), 1993-3 C.B. 167, 305.  Sec. 7701(l) took effect on Aug. 10, 1993.  See 107 Stat. 685; H. Conf. Rept. No. 103-213 at 655 (1993), 1993-3 C.B. 393, 533.  On Aug. 11, 1995, final regulations were issued under sec. 7701(l).  T.D. 8611, 60 Fed. Reg. 40997 (Aug. 11, 1995).  As pertinent here, those regulations apply to payments by financed entities, as defined in sec. 1.881-3(a)(2)(i), Income Tax Regs., made on or after Sept. 11, 1995, but do not apply to interest payments covered by sec. 127(g)(3) of the Deficit Reduction Act of 1984, 98 Stat. 652-653, or to interest payments with respect to other debt obligations issued prior to Oct. 15, 1984 (whether or not such debt was issued by a Netherlands Antilles corporation).  Sec. 1.881-3(f), Income Tax Regs.

Under the substance over form doctrine, although the form of a transaction may literally comply with the provisions of the Code, that form will not be given effect where it has no business purpose and operates simply as a device to conceal the true character of that transaction.  See Gregory v. Helvering, 293 U.S. 465, 469-470 (1935).  "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."  Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945).  If, however, the substance of a transaction accords with its form, that form will be upheld and given effect for Federal tax purposes.  See Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100-101 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

The step transaction doctrine developed from the substance over form doctrine.  See Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1521 (10th Cir. 1991).  We have considered step transaction principles on many occasions.  Those principles can be summarized by restating what we said about them in Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987):

> The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate "steps" as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result. * * * There is no universally accepted test as to when and how the step transaction doctrine should be applied to a given set of facts.  Courts have applied three alternative tests in deciding whether to invoke the step transaction doctrine in a particular situation.

The narrowest alternative is the "binding commit-
ment" test, under which a series of transactions are
collapsed if, at the time the first step is entered
into, there was a binding commitment to undertake the
later step.  See Commissioner v. Gordon, 391 U.S. 83,
96 (1968); * * *
     At the other extreme, the most far-reaching alter-
native is the "end result" test.  Under this test, the
step transaction doctrine will be invoked if it appears
that a series of formally separate steps are really
prearranged parts of a single transaction intended from
the outset to reach the ultimate result.  See King
Enters., Inc. v. United States, 418 F.2d at 516; * * *
     The third test is the "interdependence" test,
which focuses on whether "the steps are so interdepen-
dent that the legal relations created by one transac-
tion would have been fruitless without a completion of
the series."  Redding v. Commissioner, 630 F.2d at
1177; * * *

Steps that are transitory, meaningless, or lacking in a non-

tax, business purpose may be disregarded for purposes of deter-

mining the true nature of a transaction.  See Minnesota Tea Co.

v. Helvering, 302 U.S. 609, 613 (1938).

A transaction may be treated as a sham where a taxpayer is

motivated by no business purpose other than obtaining tax bene-

fits and the transaction has no economic substance because no

reasonable possibility of profit exists.  See Rice's Toyota

World, Inc. v. Commissioner, 752 F.2d 89, 91-95 (4th Cir. 1985),

affg. on this issue 81 T.C. 184 (1983).  Even if a transaction is

not a sham, it may still be recast in order to reflect its true

nature.  See Packard v. Commissioner, 85 T.C. 397, 419-422

(1985).

Interposition of an intermediary between other persons in-

volved in a transaction may be disregarded under substance over

form and related principles.  See <u>Commissioner v. Court Holding Co.</u>, <u>supra</u>; <u>Reef Corp. v. Commissioner</u>, 368 F.2d 125, 129-130 (5th Cir. 1966), affg. in part, revg. in part on another issue T.C. Memo. 1965-72.  If a person involved in a transaction functions as a conduit or intermediary between the other persons involved in that transaction, that is to say, where the actual obligation, whether legal or otherwise, runs between those other persons, such person will be treated as such for Federal tax purposes.  See <u>Esmark, Inc. & Affiliated Cos. v. Commissioner</u>, 90 T.C. 171, 194 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989); see also <u>Aiken Indus., Inc. v. Commissioner</u>, 56 T.C. 925, 934 (1971).  Even if a person involved in a transaction is otherwise engaged in business and is not controlled by any of the other persons involved in that transaction, the role of that person in the transaction may nonetheless be ignored or recharacterized.  See <u>Koehring Co. v. United States</u>, 583 F.2d 313, 320 (7th Cir. 1978); <u>Burns v. Commissioner</u>, 78 T.C. 185, 212-213 (1982); <u>Estate of Weiskopf v. Commissioner</u>, 64 T.C. 78, 93-98 (1975), affd. without published opinion 538 F.2d 317 (2d Cir. 1976); <u>Bank of Am. Natl. Trust & Sav. Association v. Commissioner</u>, 15 T.C. 544, 552-553 (1950), affd. per curiam 193 F.2d 178 (9th Cir. 1951).

A very important consideration in applying substance over form and related principles relates to the presence or the absence of a nontax, business purpose for the form of a transac-

tion.  See, e.g., Packard v. Commissioner, supra.  However, an intention to minimize taxes, standing alone, does not require that the form of a transaction be disregarded.  See, e.g., McLane v. Commissioner, 46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967).

Substance over form and related doctrines all require "a searching analysis of the facts to see whether the true substanceof the transaction is different from its form or whether the form reflects what actually happened."  Harris v. Commissioner, 61 T.C. 770, 783 (1974).  The issue of whether any of those doctrines should be applied involves an intensely factual inquiry.  See Gordon v. Commissioner, 85 T.C. 309, 327 (1985); see also Bowen v. Commissioner, 78 T.C. 55, 79 (1982).  In this regard, we note that the issues presented in the instant cases turn on the particular facts and circumstances established by the record herein, and we do not intend to, and do not, provide herein any resolution of the proper tax treatment of transactions that may appear to be similar to those presented in these cases.

In deciding whether to apply substance over form and related principles to the transactions at issue, we examine the relationships among the persons involved in those transactions because those relationships are factors that we may consider in deciding whether those transactions should be ignored or recharacterized. See Wrenn v. Commissioner, 67 T.C. 576, 584 (1976); Aiken Indus., Inc. v. Commissioner, 56 T.C. at 934.  However, those transac-

tions will not be ignored or recharacterized for Federal tax purposes solely because relationships exist among the persons involved in them. See Goodman v. Commissioner, 74 T.C. 684, 707-709 (1980), affd. without published opinion 673 F.2d 1332 (7th Cir. 1981).

## III. Positions of the Parties With Respect To the Transactions at Issue[72]

### A. Bank Transactions[73]

#### 1. Respondent's Position

Respondent concedes that loans were, in fact, made to Radcliffe and to BOT in the Bank transactions and that those corporations paid interest with respect to those loans. Thus, as she acknowledges, "This controversy involves the identity of the true lender of the funds borrowed by BOT and Radcliffe and the true recipient of the interest paid by BOT and Radcliffe." It is respondent's position that, in substance, one or more of the foreign corporations pledging collateral, and not the U.S. banks in question, made the Bank loans at issue to Radcliffe and to BOT and Radcliffe and BOT paid interest to those corporations, and

---

[72] We set forth what we understand to be the main arguments and contentions that the parties advance in support of their respective positions.

[73] Although the parties' respective positions and the contentions supporting those positions are discussed by them principally in terms of the U.S. banks in question, in addressing those positions and contentions we have considered all of the banks in question and their respective roles in the Bank transactions. Accordingly, we have, when appropriate, expanded the parties' contentions to include all of the banks in question.

not to those banks.  Respondent asserts that the banks in question were used as mere conduits between the borrower (Radcliffe or BOT) and the actual lender (one or more of those foreign corporations) and that those banks served no purpose other than to attempt to enable the foreign corporations pledging collateral to escape tax on the interest that she alleges was, in substance, paid to them by Radcliffe and BOT.  The reason respondent espouses for her position is that the foreign corporations pledging collateral were "the ultimate source of the loans to BOT and Radcliffe."

To support her position, respondent relies on two of the three tests (viz., the binding commitment test and the end result test)[74] that courts have applied in determining whether to invoke the step transaction doctrine.  Respondent contends that the binding commitment test is satisfied because--

> petitioner, for each of the Foreign Corporations [pledging collateral], made a binding commitment to the U.S. banks [in question] to make funds available to the banks [in question] for BOT and Radcliffe.  In each case the two separate transactions, a loan from the U.S. bank [in question] and a deposit in a U.S. or foreign bank, were linked by this binding commitment. Neither aspect of the transaction would have occurred without the other, and the completion of the loan side of the transaction required the simultaneous completion of the other side, that is, the deposit and pledge.  In the case of each loan to BOT or Radcliffe, there was a corresponding deposit, made under a binding commitment, in the same amount to either the U.S. bank [in ques-

---

[74]  Respondent does not argue that the Bank transactions are subject to recharacterization under the interdependence test.  We therefore do not consider the application of that test to those transactions.

tion], or its foreign affiliate.  [Fn. ref. omitted.]
Respondent contends that the end result test is satisfied be-
cause--

>    at the time the deposits [of the foreign corporations
>    pledging collateral] were made, BOT and Radcliffe
>    intended to obtain loans in amounts equal to the cor-
>    responding deposits, with tax avoidance as the planned
>    outcome of the two steps.  The Foreign Corporations
>    [pledging collateral] made the deposits intending to
>    make funds of an equal amount available to BOT and
>    Radcliffe without incurring any U.S. tax liabilities.
>    BOT and Radcliffe borrowed the funds intending to incur
>    interest expense to reduce their respective current and
>    future U.S. tax liabilities.  All the parties intended
>    that BOT and Radcliffe obtain loans from related off-
>    shore parties and that interest be paid offshore with
>    no tax consequences to the recipients of the interest.

Respondent further argues that, in addition to attempting to
allow the foreign corporations pledging collateral to escape tax
on the interest that, in substance, was paid to them by Radcliffe
or BOT, the Bank transactions attempted to enable Radcliffe and
BOT to shelter their respective income from tax for the years at
issue by generating interest deductions.

Presumably because the relationships of the persons involved
in a transaction are factors that we may consider in deciding
whether the transaction should be recharacterized for Federal tax
purposes, respondent advances certain contentions concerning the
relationships of the persons involved in the Bank transactions.
In this connection, respondent acknowledges that during the years
at issue the banks in question (1) were engaged in commercial
banking and therefore were cognizable for Federal tax purposes
under Moline Properties, Inc. v. Commissioner, 319 U.S. 436

(1943), and (2) were not controlled by Radcliffe, BOT, or the foreign corporations pledging collateral.  However, respondent asserts that the involvement of those banks does not necessarily insulate the Bank transactions from being recharacterized for Federal tax purposes, especially where, according to respondent, those banks desired to accommodate, and were susceptible to influence by, petitioner, Radcliffe and/or BOT, and the foreign corporations pledging collateral.

Respondent also contends that during the years at issue petitioner controlled the foreign corporations pledging collateral through his ownership of the stock, and/or his position as a director and/or an officer, of those corporations.  (Hereinafter, that contention will be referred to as respondent's control contention.)  Respondent further argues that the Bank transactions would still be subject to recharacterization even if the Court were not to accept respondent's control contention.

### 2.  Petitioner's Position

#### a.  Petitioner's Principal Arguments

It is petitioner's position that, in both form and substance, each of the Bank transactions was a loan from the U.S. bank in question to Radcliffe or BOT.  As we understand his position, petitioner contends that because the U.S. banks in question satisfied the tests of Moline Properties, Inc. v. Commissioner, supra, during the years at issue and therefore were cognizable for Federal tax purposes, their respective roles in

the Bank transactions in which each was involved cannot be disregarded.

Although not altogether clear, petitioner appears to argue further that the form of each of the Bank transactions should be respected because it satisfies the test of Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978). According to petitioner, each such transaction was "a genuine multiple-party transaction with economic substance which * * * [was] compelled or encouraged by business or regulatory realities, and * * * [was] not shaped solely by tax-avoidance features that have meaningless labels attached".[75]

Relying on Newman v. Commissioner, 902 F.2d 159, 163-164 (2d Cir. 1990), vacating and remanding T.C. Memo. 1988-547, petitioner contends that, in order for the form of a transaction to be respected, only one person involved in the transaction--a person who need not be the taxpayer--must have a nontax, business purpose for that form. Petitioner asserts that each party to the Bank transactions had a nontax, business purpose for the form of those transactions.

To counter respondent's argument that the Bank transactions attempted to enable Radcliffe and BOT to shelter their respective income from tax for the years at issue by generating interest

---

[75] We note that petitioner, intentionally or inadvertently, omitted the additional requirement imposed by the Supreme Court that the multiple-party transaction be "imbued with tax-independent considerations". Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978).

deductions, petitioner points out that interest deductions attributable to the loans at issue provided little benefit to Radcliffe and BOT for certain years at issue. Indeed, according to petitioner, such deductions gave no benefit to Radcliffe and BOT for other years at issue because those corporations would have reported losses in their income tax returns for such other years without taking account of the interest deductions claimed with respect to the loans in question.

As was true of respondent, petitioner advances certain contentions concerning the relationships of the persons involved in the Bank transactions. Petitioner contends that during the years at issue the banks in question were (1) "commercial banks engaged in the commercial banking activity" and (2) independent of Radcliffe, BOT, or the foreign corporations pledging collateral in that they were not subsidiaries of or otherwise controlled by those companies. Petitioner further asserts that during those years Mme. Koo owned the foreign corporations pledging collateral, with the exception of Merit and Pempire,[76] implying, although never explicitly contending, that she controlled those corporations. (Hereinafter, that contention will be referred to as petitioner's control contention.)

---

[76] Petitioner seems to contend, and respondent does not dispute, that after S.C. Gaw's death in October 1983 petitioner's mother acquired all of the stock of Merit and therefore indirectly acquired all of the stock of Merit's wholly owned subsidiary, Pempire. The parties stipulated that petitioner acquired all of the stock of Pempire no later than July 1984.

### b. Petitioner's Alternative Arguments

Petitioner advances alternative arguments applicable to certain of the Bank transactions (viz., BB Loan No. 1, BB Loan No. 2, BB Loan No. 3, the UB $570,000 renewed loan, and the UB $325,000 loan) in an effort to establish that the form of those transactions should be respected. Petitioner argues that in the event BB Loan No. 1 were recharacterized in the manner sought by respondent, that loan should be treated as a loan from a foreign lender to Radcliffe only to the extent of the Intercontinental $450,000 deposit. Petitioner also argues that interest paid after July 18, 1984, with respect to the Bank transactions that were, in form, secured by deposits in the name of Intercontinental, Traveluck, Double Wealth, and Forward should not be subject to tax and withholding because interest payable on indebtedness of Radcliffe and of BOT to those corporations after that date is or could have been exempt from tax and withholding as portfolio interest under section 881(c)(2).[77]

### B. Horbury Transaction

#### 1. Respondent's Position

While conceding that a loan, in fact, was made to BOT in the

---

[77] Petitioner does not otherwise argue and has presented no evidence that, assuming arguendo we were to sustain respondent's determinations with respect to the Bank transactions, a portion of the interest that Radcliffe and BOT, in form, paid with respect to the Bank loans should not be subject to tax and withholding because such portion was retained by the U.S. banks in question (as, for example, a fee for serving as a conduit) and was not, in substance, paid to any of the foreign corporations pledging collateral. Consequently, we do not consider that question.

Horbury transaction, respondent argues that petitioner has not satisfied his burden of proving, inter alia, that, in substance, Horbury, and not Pioneer, was the lender with respect to that transaction or that the interest paid in 1984 by BOT to Horbury, which was incorporated in the Netherlands, otherwise was exempt from tax under the U.S.-Netherlands treaty. Although respondentdoes not expressly argue that petitioner has failed to establish a nontax, business purpose for the form of the Horbury transaction, she does cite <u>Aiken Indus. Inc. v. Commissioner</u>, 56 T.C. 925 (1971), where we found that only a tax avoidance purpose existed for the form of the transaction there involved. We thus understand respondent to be arguing that petitioner has not established a nontax, business purpose for the form of the Hor-bury transaction.

### 2.   <u>Petitioner's Position</u>

Petitioner argues that the interest at issue in the Horbury transaction is exempt from U.S. taxation and withholding under the U.S.-Netherlands treaty. In this connection, he contends that, based on, inter alia, allegations in his testimony concerning that transaction, the Court should create a presumption, which respondent should be required to rebut, that that interest is exempt from U.S. taxation.

IV.  Resolution of Certain Questions That Relate
     to All or Some of the Transactions at Issue

Having set forth the positions of the parties with respect to the various matters they believe are important to resolving the issues presented in these cases, we first decide (A) certain questions they raise that relate to all the transactions at issue (namely, (1) whether the relationships among the persons involved in each of those transactions are such that they are factors we will take into account in deciding whether any of those transactions should be recharacterized and (2)(a) whether the form of each of those transactions had a nontax, business purpose and (b) whether the interest deductions claimed by Radcliffe and BOT indicate an intention to minimize tax with respect to any of those transactions) and (B) certain questions they raise that relate only to the Bank transactions (namely, (1) whether the binding commitment test of the step transaction doctrine applies to any of the Bank transactions and (2) whether the role of the banks in question in any of the transactions in which each of those banks was involved may be ignored or recharacterized even though the parties agree on brief that those banks were engaged in commercial banking and that they were not controlled by Radcliffe, BOT, or the foreign corporations pledging collateral). After deciding those questions, we analyze the transactions at issue to determine whether the form of each of those transactions

should be recharacterized, as respondent contends, or respected, as petitioner contends.

    A.    Resolution of Certain Questions That
          Relate to All the Transactions at Issue

        1.    Relationships Among the Persons
              Involved in the Transactions at Issue

            a.    Bank Transactions

Respondent contends that petitioner controlled all of the foreign corporations pledging collateral[78] through his ownership of the stock,[79] and/or his position as a director and/or officer,

---

[78] One of petitioner's alternative arguments relates to respondent's control contention. He argues that if respondent believes that he owned a controlling stock interest in the foreign corporations pledging collateral, she should have determined that those corporations were CFC's as defined in subpart F of the Code and that petitioner is taxable under that subpart on the interest received by those corporations, rather than having determined deficiencies in the respective withholding tax liabilities of Radcliffe and BOT. The short answer to that argument is that respondent is free to make whatever determinations she chooses; whether the determinations that respondent makes should be sustained is for the Court to decide.

[79] Respondent makes general and sweeping allegations on brief regarding petitioner's stock ownership of the foreign corporations pledging collateral. She then concludes from those allegations that petitioner controlled those corporations. However, with respect to Merit, respondent seems to admit that petitioner's mother controlled Merit throughout the period during the years at issue in which Merit's deposit secured the Union Bank $570,000 loan to BOT (viz., from January until March 1984).

With respect to Pioneer and its two wholly owned subsidiaries Multi-Credit and Mandalay, respondent contends that during the years at issue petitioner owned an amount of stock that, albeit less than all of the stock of Pioneer, gave him "effective control" of that corporation and therefore of those subsidiaries.

(continued...)

of those corporations.[80] She further asserts on brief that the banks in question desired to accommodate, and were susceptible to influence by, petitioner, Radcliffe and/or BOT, and the foreign corporations pledging collateral. Petitioner contends that Mme. Koo controlled the foreign corporations pledging collateral, except Merit and Pempire, and that the banks in question were commercial banks and were not controlled by Radcliffe, BOT, or the foreign corporations pledging collateral.

Based on our review of the entire record in these cases, we find that, with the exception of Pempire in which the parties stipulated that petitioner owned a controlling stock interest no later than July 1984,[81] the evidence in the record is insufficient to enable us to determine whether, during the years at issue, petitioner or Mme. Koo owned a controlling stock interest in, or otherwise controlled, any of the foreign corporations pledging collateral.[82]

---

[79](...continued)
    With respect to Pempire, the deposit of which was pledged as collateral for the UB $1,830,000 loan made to BOT in August 1984, as stated supra note 76, the parties stipulated that petitioner acquired all of the stock of Pempire no later than July 1984.

[80]  Respondent does not point to any portion of the record supporting her allegation on brief that, and nothing in the record establishes whether or not, petitioner was a director and/or an officer of Intercontinental and Merit during the years at issue.

[81]  The parties appear to agree on brief that petitioner's mother controlled Merit at all relevant times. See supra note 76 and first paragraph note 79.

[82]  The insufficiency of the record is illustrated by the follow-
(continued...)

Nonetheless, we have found as facts from our examination of the entire record in these cases that, prior to and during the years at issue, petitioner and Mme. Koo had close and amicable business and family relationships. We have also found as facts

---

[82](...continued)

ing examples. To support her control contention with respect to Pioneer, respondent essentially relies on the testimony of Henry Gaw, petitioner's brother, concerning two conversations that he had with petitioner in 1980. In the first conversation, petitioner informed Henry Gaw that he owned as much stock in Pioneer as his father did, which Henry Gaw understood to be between 19 and 25 percent. In the second conversation, petitioner informed Henry Gaw that he had purchased from Mme. Koo an additional amount of stock that, combined with the stock he already owned, gave him a controlling interest in Pioneer (although Henry Gaw could not recall whether petitioner specified the percentage of Pioneer's stock that petitioner informed him he owned). While we have no reason to doubt Henry Gaw's credibility, we do not find that that testimony, standing alone, establishes respondent's allegation that petitioner owned a controlling interest in Pioneer during the years at issue.

To support his control contention with respect to Double Wealth and Forward, petitioner relies on his testimony that Mme. Koo owned those corporations. Petitioner did not testify that Mme. Koo was the only owner of those corporations or that Mme. Koo owned a controlling interest in them. We found petitioner's testimony about Mme. Koo's ownership of Double Wealth and Forward vague and conclusory, and, for the reasons discussed above and based on our observation of his demeanor at trial, we generally did not find him to be credible. Petitioner also relies to support his control contention on certain instruments of transfer purporting to effect the issuance or transfer to Mme. Koo of one share of the stock of Double Wealth and of Forward and a stock certificate of Forward purporting to certify ownership by her of one share of the stock of that corporation. Although we have not admitted those documents into evidence because of respondent's hearsay objections, even if we had made them part of the record in these cases, they would not in any event have been conclusive with respect to petitioner's allegation that Mme. Koo owned a controlling interest in Double Wealth and in Forward. This is because, inter alia, petitioner has not shown the total number of authorized shares of stock of each such corporation that was issued and outstanding during the years at issue. See second paragraph supra note 50.

that, during the years at issue, the banks in question desired to accommodate, and were susceptible to influence by, petitioner, Mme. Koo, Radcliffe and/or BOT, and the foreign corporations pledging collateral that were involved in the Bank transactions.

On the record before us, we conclude that the relationships during the years at issue of the persons involved in each of the Bank transactions were such that they are factors we will take into account in deciding whether the form of each of those transactions should be ignored or recharacterized.[83] See Wrenn v. Commissioner, 67 T.C. at 584; Aiken Indus., Inc. v. Commissioner, 56 T.C. at 934.

### b.  Horbury Transaction

During all relevant periods, Horbury was a third-tier subsidiary of Pioneer. Consequently, whoever controlled Pioneer during those periods also controlled Horbury. As stated above, the evidence in the record is insufficient to enable us to determine whether, during the years at issue, petitioner or Mme. Koo owned a controlling stock interest in, or otherwise controlled, Pioneer. However, we have found as facts that, prior to and

---

[83] It appears that throughout the period in the years at issue during which Merit's deposit secured the $570,000 loan to BOT (viz., from January until early March 1984), Merit owned all of the stock of Pempire, and thus indirectly all of the stock of BOT. As stated supra note 76, the parties stipulated that petitioner acquired all the stock of Pempire, and thus indirectly all of the stock of BOT, a wholly owned subsidiary of Pempire, no later than July 1984. We will consider the relationship of Merit, Pempire, and BOT in deciding whether that loan transaction should be recharacterized.

during the years at issue, close and amicable business and family relationships existed between petitioner and Mme. Koo.  Those relationships are factors we will take into account in deciding whether the form of the Horbury transaction should be ignored or recharacterized.  See Wrenn v. Commissioner, 67 T.C. at 584; Aiken Indus., Inc. v. Commissioner, 56 T.C. at 934.

### 2. Purpose for the Form of Each of the Transactions at Issue

#### a. Whether the Form of Each of the Transactions at Issue Had a Nontax, Business Purpose

##### (1) Bank Transactions

Respondent contends that tax avoidance was the only purpose for the form of each of the Bank transactions.  Petitioner acknowledges on brief that the persons involved in those transactions structured them as loans to Radcliffe and to BOT from the U.S. banks in question, rather than as direct loans from the foreign corporations pledging collateral, in order to avoid tax on the interest that would have been paid through withholding by Radcliffe and by BOT had those transactions been structured as direct loans.  However, relying on Newman v. Commissioner, 902 F.2d at 163, petitioner contends that only one person involved in a transaction--who need not be the taxpayer--must have a nontax, business purpose for the form of a transaction in order for that form to be respected and that each person involved in each of the transactions at issue had a nontax, business purpose for the form in which it was structured.

We need not decide whether the proposition for which petitioner cites the U.S. Court of Appeals for the Second Circuit in Newman is a correct interpretation by that court of applicable Federal tax law.[84]  This is because, even assuming arguendo that that court's interpretation were correct, petitioner has not established that any of the persons involved in any of the Bank transactions had a nontax, business purpose for the form in which those transactions were cast.

(a)  Bangkok Bank LA Branch
     and Union Bank

Petitioner contends that the U.S. banks in question preferred the form in which the transactions involving them were cast because (1) their participation afforded them an opportunity to earn a profit and (2) they preferred cash deposits as collateral for loans over tangible property located outside the United States since it would have been difficult for them to protect their security interest in and foreclose against such property.

With respect to petitioner's first contention (viz., the U.S. banks in question participated in the transactions involving them because they afforded them an opportunity to make a profit), petitioner adduced no proof that the rates of interest payable on

---

[84]  We note that the instant cases are appealable, absent a stipulation by the parties to the contrary, to the U.S. Court of Appeals for the District of Columbia Circuit, and not to the Court of Appeals for the Second Circuit that decided Newman v. Commissioner, 902 F.2d 159 (2d Cir. 1990), vacating and remanding T.C. Memo. 1988-547.  Sec. 7482(b).

the loans by Bangkok Bank LA branch to Radcliffe[85] afforded that bank an opportunity to earn a profit. The record does not disclose the direct or indirect costs, including overhead, incurred by Bangkok Bank LA branch with respect to the loans to Radcliffe. No representative of Bangkok Bank LA branch or of other branches of Bangkok Bank Ltd. testified, and none of the documents in the record indicated, that the loan transactions at issue involving Bangkok Bank LA branch gave that bank an opportunity to make a profit.[86]

---

[85] Those rates were (1) initially 1.5 percent and thereafter .75 percent in excess of Bangkok Bank LA branch's prime rate for BB Loan No. 1 and (2) .5 percent in excess of the interest rates on the respective certificates of deposit securing BB Loan No. 2 and BB Loan No. 3. That the interest rate on BB Loan No. 1 was determined by reference to Bangkok Bank LA branch's prime rate does not, standing alone, establish that that loan afforded that bank an opportunity to make a profit. In this connection, we note that an officer of Union Bank stated in the Mar. 3, 1986 letter that that bank lost money on loans it had funded to Radcliffe and to BOT that bore interest at rates that were equal to stated percentages in excess of that bank's LIBOR or prime rate.

[86] Respondent suggests on brief that Bangkok Bank LA branch was not making any profit on the spread between (1) the interest rate on BB Loan No. 2 and on BB Loan No. 3 and (2) the interest rate on the certificates of deposit that secured those loans. To support that suggestion, she points to the Mar. 3, 1986 letter in which an officer of Union Bank stated that Union Bank was losing money on transactions with respect to which there was a 1.15 percent spread between (1) the interest rates on certain of Union Bank's loans to Radcliffe and BOT (viz., the UB $1,300,000 loan and the UB $1,830,000 loan) and (2) the interest rates on the deposits in Union Bank that were pledged to secure those loans (viz., the Pioneer $1,300,000 CD and the Mandalay $1,300,000 CD in the case of the UB $1,300,000 loan and the Pempire $1,830,000 CD in the case of the UB $1,830,000 loan). We are not willing to accept respondent's suggestion that we assume that Bangkok Bank LA branch could not have made a profit on a .5 percent spread
(continued...)

Nor did petitioner adduce any proof that the interest rate on any of the loans at issue to Radcliffe and BOT that UnionBank had funded[87] afforded that bank an opportunity to earn a profit. To the contrary, we have found as a fact that those loan transactions did not provide Union Bank with such an opportunity.

An officer of Union Bank, Henry Yung, testified generally that that bank tried to make a profit on its loans. However, he did not testify specifically that Union Bank was trying to make a profit on its loans to Radcliffe and BOT. In fact, he wrote the March 3, 1986 letter to Patrick Kwok of Standard Chartered Bank HK, an affiliate of Union Bank, in which he indicated that Union Bank was losing money on the loans to Radcliffe and to BOT that it had funded. That letter further stated that Union Bank was losing money on those loans even when earnings from deposits that were not connected with those loans also were taken into account and that Union Bank nonetheless was willing to renew those loans on terms that would allow it to break even on them. It appears to us that Union Bank's willingness to renew on break-even terms

---

[86](...continued)
solely because Union Bank was losing money on a 1.15 percent spread.

[87] The rate on the UB $570,000 pre-March 1984 loan, the UB $570,000 renewed loan, the UB $325,000 loan, and the UB $800,000 Radcliffe loan was 1.5 percent in excess of Union Bank's LIBOR or 1 percent in excess of its prime rate or its reference rate. The interest rate on the UB $1,300,000 loan and the UB $1,830,000 loan was 1.15 percent in excess of the interest rate on the certificates of deposit that secured those loans.

the loans at issue to Radcliffe and to BOT that it had funded was attributable to a desire to accommodate petitioner. In this regard, the March 3, 1986 letter stated that Union Bank was "pleased to have the opportunity to accommodate this valued Group customer [petitioner] and will entertain all reasonable requests."

Based on our review of the entire record in these cases, petitioner has failed to persuade us that the Bank transactions took the form they did because those transactions afforded the U.S. banks in question an opportunity to earn a profit.[88]

With respect to petitioner's second contention (viz., the U.S. banks in question preferred cash as collateral for loans over tangible property located outside the United States because it would have been difficult for them to protect their security interest in and foreclose against such property),[89] petitioner

---

[88] Respondent contends that it is irrelevant whether the U.S. banks in question earned or had an opportunity to earn a profit on the Bank transactions. In view of our finding, we need not decide whether respondent is correct. We note, however, that the role of a person in a transaction has been ignored or recharacterized even where that person was allowed to make a profit with respect to the transaction in which such person was involved. See Estate of Weiskopf v. Commissioner, 64 T.C. 78, 96-98 (1975), affd. without published opinion 538 F.2d 317 (2d Cir. 1976); see also Davant v. Commissioner, 366 F.2d 874, 878, 881 (5th Cir. 1966), affg. in part, revg. in part on another issue South Texas Rice Warehouse Co. v. Commissioner, 43 T.C. 540 (1965); Blueberry Land Co. v. Commissioner, 361 F.2d 93, 98 (5th Cir. 1966), affg. 42 T.C. 1137 (1964).

[89] It is noteworthy that petitioner's contention appears to be at odds with his assertion on brief that Union Bank's security interest in the cash deposits pledged by Pioneer and Mandalay that secured the UB $1,300,000 loan was probably unenforceable because the pledges of those deposits violated Hong Kong cor-

(continued...)

does not cite to any, and we have found no, portion of the record that shows that any such preference on the part of the U.S. banks in question affected the form of the Bank transactions.

It is also significant that, during the years at issue, Union Bank believed that its ability to protect its security interest in and foreclose against the cash deposits pledged to secure the loans to Radcliffe and to BOT that it had funded was impaired by the possibility that the pledges of those deposits constituted fraudulent conveyances under California law. Under those circumstances, Union Bank could hardly have considered those cash deposits a preferred form of collateral.

Based on our review of the entire record in these cases, petitioner has failed to persuade us that the Bank transactions took the form they did because the U.S. banks in question preferred the use of cash as collateral for the loan transactions at issue in which they were involved.

We have found on the instant record that petitioner has not established that the Bank transactions took the form they did because of any nontax, business purpose of the U.S. banks in question that petitioner alleges on brief.

---

[89](...continued)
porate law. See sec. 157H(2), Companies Ordinance of Hong Kong. Although petitioner does not include the deposit of Multi-Credit that was pledged to secure the UB $800,000 Radcliffe loan in his assertion, Union Bank's security interest in that deposit also was probably unenforceable for the same reason, i.e., petitioner's admission that the pledge of that deposit violated Hong Kong corporate law. See id.

(b)  Radcliffe and BOT

As we understand petitioner, he contends that Radcliffe and BOT had nontax, business purposes for the form of the Bank transactions because (1) by using cash as collateral for the loans at issue from the U.S. banks in question, Radcliffe and BOT were able to obtain lower interest rates on such loans than would have been charged had those loans been secured by second deeds of trust on real estate and (2) the use of cash collateral obviated the need to obtain the consent of Lyman Jee, the partner of Radcliffe and BOT in NMSC and in 300 Montgomery Associates, respectively, in order to encumber the assets of those partnerships.

With respect to petitioner's first contention (viz., Radcliffe and BOT had a nontax, business purpose for the form ofthe Bank transactions because, by using cash as collateral for the loans at issue from the U.S. banks in question, Radcliffe and BOT were able to obtain lower interest rates on such loans than would have been charged had those loans been secured by second deeds of trust on real estate), the only evidence on which petitioner relies to support his contention is the testimony of Mr. Richard Catterton, an executive of Citibank.  Mr. Catterton testified generally that a loan secured by a second mortgage on real estate would "probably" bear interest at a higher rate than

a loan secured by a cash deposit.[90]  He did not testify, and

_____

[90]  Petitioner's claim on brief based on Mr. Catterton's tes-
timony is rejected by the record herein.  By way of illustration,
during the period from May 1981 until at least April 1985, the
interest rate terms for certain loans that Union Bank had out-
standing to NMSC and that were secured by a second deed of trust
on NMSC's buildings were the same as the interest rate terms for
certain loans that that bank had outstanding to NMSC, Radcliffe,
and BOT, respectively (viz., the UB $800,000 NMSC loan, the UB
$325,000 loan, and the UB $570,000 pre-March 1984 loan (beginning
in July 1983)) and that were secured by cash deposits of the
foreign corporations pledging collateral.  For instance, from May
1981 until September 1982, a loan by Union Bank to NMSC secured
by a second deed of trust on NMSC's buildings and a loan by that
bank to NMSC secured by a cash deposit bore interest at Union
Bank's prime rate plus .75 percent.  In addition, from July 1984
until April 1985, Union Bank's terms with respect to the interest
on a loan to NMSC that was secured by a second deed of trust on
NMSC's buildings and certain loans to NMSC and Radcliffe, respec-
tively, that were secured by cash deposits (viz., the UB $800,000
NMSC loan and the UB $325,000 loan) were the same (viz., Union
Bank's LIBOR plus 1.5 percent or its prime rate plus 1 percent).
In fact, in light of the interest rate terms for a Union Bank
loan to BOT that was secured by a cash deposit (viz., the UB
$570,000 renewed loan first renewal), it is possible that during
a portion of the time that loan was outstanding (viz., from July
1984 until April 1985) it bore a higher interest rate than Union
Bank's loan to NMSC that was secured by a second deed of trust on
NMSC's buildings.  This is because the loan that was secured by
the cash deposit was to bear interest at a rate that was equal to
Union Bank's LIBOR plus 1.5 percent or its prime rate plus 1
percent, but that was not less than 1 percent more than the
annualized effective interest rate on the deposit securing that
loan, while the loan secured by NMSC's buildings bore interest at
Union Bank's LIBOR plus 1.5 percent or its prime rate plus 1
percent.

We note that after S.C. Gaw's death in October 1983 petition-
er guaranteed the Union Bank loan to NMSC that was secured by the
second deed of trust on NMSC's buildings, but did not guarantee
any other loan by Union Bank to NMSC, Radcliffe, or BOT.  Peti-
tioner does not suggest, and the record does not indicate, that
the presence or absence of petitioner's guarantee would have
affected the interest rate on any of those loans.  We also note
that S.C. Gaw guaranteed Union Bank's loans to NMSC and BOT,
respectively, and that that guarantee had no effect on the
(continued...)

there is no evidence in the record, that the purpose of Radcliffe and of BOT for using cash as collateral for the Bangkok Bank LA branch and Union Bank loans at issue was to obtain lower interest rates on any of those loans.[91]

Based on our review of the entire record in these cases, petitioner has failed to persuade us that the Bank transactions took the form they did because, by using cash as collateral for the loans at issue from the U.S. banks in question, Radcliffe and BOT were able to obtain lower interest rates on those loans than would have been charged had those loans been secured by second deeds of trust on real estate.[92]

---

[90](...continued)
interest rate on any of those loans.  This is because, to the extent the record shows such interest rates, they were the same.

[91]  In fact, the record does not indicate that petitioner even investigated whether to place additional encumbrances on the respective real estate held by NMSC and by 300 Montgomery Associates before arranging the pledges of cash deposits that, in form, collateralized the Bank loans.

[92]  A further circumstance weighing against that purported purpose for the form of those transactions is Radcliffe's request that Bangkok Bank LA branch raise the interest rate on BB Loan No. 2.  After the Traveluck $1,625,000 CD was replaced by the Double Wealth $1,625,000 CD as security for that loan in July 1985, Bangkok Bank LA branch issued to Double Wealth two successive one-month certificates of deposit that matured in August and September 1985, respectively, and that bore interest at the rate of 7 percent, which was .5 percent below the 7.5 percent interest rate on BB Loan No. 2 during that time.  Records of Bangkok Bank LA branch indicate that, by telex dated Aug. 17, 1985, Bangkok Bank HK branch informed Bangkok Bank LA branch that Radcliffe preferred to have the interest rate on BB Loan No. 2 set at 8.25 percent until that loan was due on June 11, 1986.  That circumstance indicates that Radcliffe did not seek to minimize the
(continued...)

With respect to petitioner's second contention (viz., the use of cash collateral for the loans at issue from the U.S. banks in question obviated the need to obtain the consent of Mr. Jee in order to encumber those partnerships' assets), there is nothing in the record that supports petitioner's contention that that need affected the form of any of the Bank transactions. During the years at issue, Radcliffe and BOT held a majority interest in NMSC and 300 Montgomery Associates, respectively. Respondent concedes that Mr. Jee's consent would have been required in order to encumber the assets of those partnerships, see Cal. Corp. Code sec. 15009(3)(a) (West 1991), but there is no indication that Mr. Jee would have refused to grant it. In fact, in February 1986, apparently in an effort to restructure the existing Bank loans that were secured by cash deposits, petitioner requested Union Bank to consider making a new loan to Radcliffe and/or BOT in the amount of $8,400,000 that would have replaced those existing loans and that was to be secured by the buildings owned by NMSC and 300 Montgomery Associates. This indicates to us that peti- tioner did not consider obtaining Mr. Jee's consent an obstacle to the funding of loans that were to be secured by those build- ings.[93] Furthermore, petitioner testified that, in order to

_____

[92](...continued)
rate of interest on its loans.

[93]  It is not altogether clear whether petitioner knew when he made that request in February 1986 that Radcliffe was to acquire
(continued...)

assist Mr. Jee, in 1985 he allowed him to encumber NMSC's proper-

ty with a $5,000,000 second deed of trust.  This indicates to us

that the relationship between petitioner and Mr. Jee was such

that his consent could probably have been obtained had it been

requested.  We have found nothing in the record before us to

suggest that Radcliffe and BOT could not have encumbered the

assets of the respective partnerships in which they held a major-

ity interest had they desired to do so.

Based on our review of the entire record in these cases,

petitioner has failed to persuade us that the Bank transactions

took the form they did because of the need of Radcliffe and of

BOT to obtain the consent of Mr. Jee before the respective assets

of NMSC and 300 Montgomery Associates could be encumbered.

We have found on the instant record that petitioner has not

established that the Bank transactions took the form they did

because of any nontax, business purpose of Radcliffe and BOT that

petitioner alleges on brief.[94]

---

[93](...continued)
Mr. Jee's remaining interest in NMSC, which it did in March 1986.

[94]  Petitioner also contends on brief, relying in part on his
testimony, that (1) he did not have the resources to finance the
acquisition by Radcliffe and by BOT of their interests in NMSC
and 300 Montgomery Associates, respectively; (2) the proceeds of
the loans by the U.S. banks in question to Radcliffe and to BOT
were used for those purposes; and (3) Radcliffe and BOT expected
to make a profit on those acquisitions.  Assuming arguendo we
were satisfied that the record in these cases established those
reasons, they would merely provide an overall justification for
the decision of Radcliffe and of BOT to borrow money.  They would
(continued...)

### (c)  Foreign Corporations
### Pledging Collateral

Petitioner acknowledges on brief that the persons involved in the Bank transactions structured those transactions as loans to Radcliffe and to BOT from the U.S. banks in question, rather than as direct loans from the foreign corporations pledging collateral, in order to avoid tax on the interest that would have been paid through withholding by Radcliffe and by BOT had those transactions been structured as direct loans.[95]  He contends, however, that the foreign corporations pledging collateral also

---

[94](...continued)
not provide a nontax, business purpose for the form of the transactions through which that borrowing was accomplished.

Petitioner also suggests on brief that the loans at issue from the U.S. banks in question were obtained from those banks in order for petitioner, Radcliffe, and BOT to establish relationships with banks in the United States.  He does not cite any evidence in the record showing that establishing relationships with banks in the United States was a nontax, business purpose for the form of any of the Bank transactions.  Indeed, the record shows that petitioner sought to take advantage of his existing banking relationships, rather than establish new ones, in that he relied on his relationships with Bangkok Bank Ltd., of which Bangkok Bank LA branch was a branch, and Standard Chartered Bank PLC and certain of its affiliates including Standard Chartered Bank HK, affiliates of Union Bank, in obtaining the loans at issue from the U.S. banks in question.

[95]  In fact, petitioner testified that Mme. Koo did not want any assistance she gave him to cost her anything.  We take this to mean, inter alia, that Mme. Koo did not want to incur any tax liability with respect to any assistance that she and/or corporations petitioner alleges she owned provided to petitioner and/or corporations he controlled.  In this regard, we note that petitioner was familiar with the U.S withholding tax requirements applicable to interest from a U.S. source that was paid to foreign corporations.

had nontax, business purposes for the form of those transactions, viz., they desired to (1) earn interest on their deposits and (2) assist Radcliffe and BOT.

With respect to petitioner's first contention (viz., the foreign corporations pledging collateral desired to earn interest on their deposits), the accomplishment of that alleged objective was in no way dependent upon the completion of the other steps of the Bank transactions (i.e., the funding by the U.S. banks in question of the loans to Radcliffe and to BOT and the granting by the foreign corporations pledging collateral to those banks of security interests in those deposits). Therefore, the alleged objective of the foreign corporations pledging collateral of earning interest on their deposits does not provide a nontax, business purpose for the other steps of the Bank transactions.

Based on our review of the entire record in these cases, petitioner has failed to persuade us that the Bank transactions took the form they did because the foreign corporations pledging collateral desired to earn interest on their deposits.

With respect to petitioner's second contention (viz., the foreign corporations pledging collateral wished to assist Radcliffe and BOT), such a desire, if true, does not by itself provide a nontax, business purpose for the form of any of the Bank transactions. For instance, had those corporations desired to assist Radcliffe and BOT, with the exception of Pioneer and its subsidiaries Multi-Credit and Mandalay, nothing in the record

suggests that those foreign corporations (viz., Intercontinental, Traveluck, Double Wealth, Merit, Pempire, and Forward) could not have made direct loans to Radcliffe and BOT. Indeed, the record indicates that one such loan was made by Intercontinental to Radcliffe.[96]

With respect to Pioneer and its subsidiaries Multi-Credit and Mandalay, as petitioner admits on brief, Hong Kong corporate law prohibited them from making direct loans to Radcliffe. Sec. 157H(2), Companies Ordinance of Hong Kong. Petitioner also concedes on brief that Hong Kong corporate law prohibited those corporations from pledging collateral for loans to Radcliffe by the U.S. banks in question. Because either form of assistance to Radcliffe by Pioneer and its subsidiaries Multi-Credit and Mandalay was prohibited by Hong Kong corporate law, petitioner cannot, and does not, argue that the transactions involving those corporations took the form that they did in order to comply with the requirements of Hong Kong corporate law.[97]

_____

[96] A financial statement of Radcliffe, dated Mar. 31, 1985, and signed by petitioner, indicated that Intercontinental had a loan outstanding in the amount of $1,625,000 to Radcliffe and that a loan from Bangkok Bank LA branch to Radcliffe, presumably BB Loan No. 2, was to be used to replace that loan from Intercontinental.

[97] However, petitioner does contend on brief, relying in part on his testimony, (1) that he replaced a direct loan from Pioneer to Radcliffe with a loan from Union Bank (viz., the UB $1,300,000 loan) that was secured by a certificate of deposit in the name of Mandalay because he believed that that form created a less obvious conflict with Hong Kong corporate law and (2) that Pioneer and its subsidiaries Multi-Credit and Mandalay also
(continued...)

Based on our review of the entire record in these cases, petitioner has failed to persuade us that the Bank transactions took the form they did because the foreign corporations pledging collateral desired to assist Radcliffe and BOT.

We have found on the instant record that petitioner has not established that the Bank transactions took the form that they did because of any nontax, business purpose of the foreign corporations pledging collateral that petitioner alleges on brief.

(d)  Summary

We have found on the instant record that petitioner has not established that the Bank transactions took the form they did because of any nontax, business purpose on the part of any of the persons involved in those transactions that petitioner alleges on brief.  The only indication of the purpose for that form is petitioner's acknowledgment on brief that the persons involved in

_____

[97](...continued)
preferred the form of the Bank transactions involving them for that reason.  We do not accept petitioner's contention that the form of the transactions at issue involving Pioneer and its subsidiaries Multi-Credit and Mandalay made their violation of Hong Kong corporate law less obvious.  As just stated, Hong Kong corporate law prohibited not only direct loans to Radcliffe by Pioneer and its subsidiaries, but also the pledging by those corporations of collateral for loans to Radcliffe by the U.S. banks in question.  Furthermore, the parties do not dispute on brief that in 1983, at the request of petitioner, Union Bank released its lien on the $800,000 deposit of Multi-Credit that secured the $800,000 NMSC loan during Multi-Credit's financial reporting period.  That petitioner found it necessary to have Union Bank release that lien indicates to us that neither he nor Pioneer and its subsidiaries Multi-Credit and Mandalay believed that the form of the loan transactions at issue involving those corporations made their violation of Hong Kong law less obvious.

the Bank transactions structured them as loans to Radcliffe and
to BOT from the U.S. banks in question, rather than as direct
loans from the foreign corporations pledging collateral, in order
to avoid tax on the interest that would have been paid through
withholding by Radcliffe and by BOT had those transactions been
structured as direct loans.[98]

### (2)  Horbury Transaction

Although respondent does not expressly argue that petitioner
failed to establish a nontax, business purpose for the form of
the Horbury transaction, she does cite Aiken Indus., Inc. v.
Commissioner, 56 T.C. 925 (1971).  We held in Aiken that, based
on the facts there involved, including the presence of only a tax
avoidance purpose for the form of the transaction at issue in
that case, the provisions of the applicable U.S.-Honduras income
tax convention did not apply to exempt from tax interest that
was, in form, paid to a Honduran corporation.  Id. at 934.  We
thus address whether petitioner has shown a nontax, business
purpose for the form of the Horbury transaction.

Based on our review of the entire record in these cases, we

---

[98]  We reject petitioner's position that under Frank Lyon Co. v.
United States, 435 U.S. at 583-584, the form of the Bank transac-
tions should be respected.  In Frank Lyon Co. the Supreme Court
found that the form of the transaction at issue had a nontax,
business purpose.  Here, petitioner has failed to establish a
nontax, business purpose for the form of any of the Bank transac-
tions.  Moreover, a transaction may pass muster under the test of
Frank Lyon Co. v. United States, 435 U.S. at 583-584, and still
be recharacterized under the substance over form doctrine and
related principles.  See Packard v. Commissioner, 85 T.C. 397,
419-422 (1985).

find that petitioner has failed to establish any nontax, business purpose for the form of the Horbury transaction.

> b.   Whether the Interest Deductions
>      Claimed by Radcliffe and by BOT
>      Indicate a Tax Avoidance Purpose
>      <u>for Any of the Transactions at Issue</u>

> (1)   <u>Bank Transactions</u>

Respondent contends that an additional reason for the Bank transactions was to generate interest deductions for Radcliffe and for BOT for the years at issue that enabled them to avoid Federal tax on their respective income.  Petitioner counters that interest deductions attributable to the loans at issue provided little benefit to Radcliffe and BOT for certain years at issue and no benefit for other years because those corporations would have reported losses in their income tax returns for such other years without taking account of the interest deductions claimed with respect to those loans.  He contends that, therefore, any alleged tax benefit from the interest deductions claimed by those corporations does not justify recharacterizing the Bank transactions.[99]

--------

[99]  Petitioner also argues that if it is respondent's position that the Bank transactions had no purpose other than tax avoidance, she should have disallowed the interest deductions claimed by Radcliffe and by BOT with respect to those transactions.  As we indicated <u>supra</u> note 78, respondent is free to make whatever determinations she chooses.  Moreover, as we understand respondent's position, she does not question that interest was paid by Radcliffe and BOT; rather, it is her contention that, in substance, that interest was paid to the foreign corporations pledging collateral, and not to the U.S. banks in question.

We reject the contentions of both parties. There is no dispute herein that Radcliffe and BOT borrowed funds or that they paid deductible interest on those borrowed funds. The only dispute relates to the identity of the lenders of those funds and of the payees of that interest.

With respect to respondent's contention (viz., an additional reason for the Bank transactions was to generate interest deductions for Radcliffe and for BOT for the years at issue), Radcliffe and BOT are entitled to interest deductions on the funds they borrowed regardless whether we sustain respondent's theory or petitioner's theory of these cases. Accordingly, we conclude that the interest deductions claimed by Radcliffe and BOT for the years at issue with respect to the Bank transactions do not necessarily indicate a tax avoidance purpose by Radcliffe or by BOT for those transactions.

With respect to petitioner's contention (viz., the Bank transactions should not be recharacterized since Radcliffe and BOT received little benefit from their interest deductions for certain years at issue and no benefit for other years), the issue in these cases concerns the respective obligations of Radcliffe and BOT under section 1442(a) to withhold tax on the interest that was, in form, paid to the U.S. banks in question, and not the Federal income tax imposed on the respective income of Radcliffe and BOT. If we were to sustain respondent's theory that each of the Bank loans at issue was, in substance, a loan to

Radcliffe or BOT from one or more of the foreign corporations pledging collateral so that the interest on each such loan was, in substance, paid to one or more of those corporations, we would conclude that the failure of Radcliffe and BOT to withhold tax on such interest resulted in the avoidance of such withholding, regardless whether the interest deductions generated by those transactions reduced the respective Federal income tax of Radcliffe and BOT.

(2)  Horbury Transaction

While respondent does not expressly argue that the deduction claimed by BOT in its 1984 income tax return for interest paid to Horbury indicates a tax avoidance purpose with respect to the form of the Horbury transaction, petitioner includes that deduction in his argument that BOT received little benefit from the interest deductions generated by the transactions at issue. Consequently, we address whether BOT's claim to a deduction for 1984 with respect to the Horbury transaction indicates a tax avoidance purpose by BOT for the form of that transaction.

For the reasons discussed above with respect to the Bank transactions, we find that the deduction claimed by BOT in its 1984 income tax return with respect to the interest it paid to Horbury does not necessarily indicate a tax avoidance purpose for the form of that transaction.[100]

---

[100]   Moreover, if we were to sustain respondent's theory that the
                                                          (continued...)

B.    Resolution of Certain Questions That
      Relate Only to the Bank Transactions

      1.    Whether the Binding Commitment Test
            of the Step Transaction Doctrine
            Applies to Any of the Bank Transactions

Respondent relies upon both the binding commitment test and the end result test of the step transaction doctrine in arguing that each of the Bank transactions should be recharacterized as a loan to Radcliffe or BOT, as the case may be, that was made by one (and, in certain instances, more than one) of the foreign corporations pledging collateral.  We now address whether the binding commitment test applies to any of the Bank transactions.

In Commissioner v. Gordon, 391 U.S. 83, 96-98 (1968), the Supreme Court applied the binding commitment test with respect to a series of transactions that were implemented over several years.  In the present cases, the various aspects of each of the Bank transactions were implemented in one year, although the Bank loans extended beyond the respective years in which they were funded.

Based on our review of the entire record in these cases, we find that the binding commitment test, the narrowest of the three

---

[100](...continued)
Horbury transaction was, in substance, a loan to BOT from a foreign corporation that was not entitled to the benefits of the U.S.-Netherlands treaty, we would conclude that the failure of BOT to withhold tax on the interest paid on such loan resulted in the avoidance of tax regardless of the extent of the income tax benefit conferred on BOT by the interest deduction generated by that transaction.

tests formulated by the courts under the step transaction doctrine,[101] is inapplicable here. The record does not support a finding that each step in each of the Bank transactions was carried out pursuant to a binding commitment to do so.[102] See Commissioner v. Gordon, supra; Associated Wholesale Grocers, Inc. v. United States, 927 F.2d at 1522-1523 n.6; King Enters., Inc. v. United States, 189 Ct. Cl. 466, 418 F.2d 511, 517-518 (1969). Consequently, we reject respondent's argument with respect to the binding commitment test.

2.    Whether the Role of the Banks in
      Question in the Bank Transactions
      May Be Ignored or Recharacterized
      Even Though the Parties Agree on
      Brief That Those Banks Were Engaged
      in Commercial Banking and That They
      Were Not Controlled By Radcliffe,
      BOT, or the Foreign Corporations
      Pledging Collateral

Petitioner contends that the banks in question were engaged in commercial banking and were not controlled by Radcliffe, BOT, or the foreign corporations pledging collateral. Respondent does not dispute those facts. However, each party draws a different conclusion in the face of those facts. Petitioner concludes that, because of those facts, the role of the banks in question

---

[101] As one court has observed, the binding commitment test has seldom been applied since it was first enunciated. Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1522 n.6 (10th Cir. 1991).

[102] The simultaneous funding of each loan and the pledge of the collateral that secured it appears to be typical of commercial loan transactions.

in the Bank transactions at issue may not be disregarded under Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).[103] Respondent concludes that despite those facts and that the banks in question were cognizable for Federal tax purposes under Moline Properties, Inc. v. Commissioner, supra, the role of those banks as lenders may be disregarded.

We agree with respondent that the role of a person involved in a transaction may be ignored or recharacterized even if that person (1) is otherwise engaged in business and therefore is cognizable for Federal tax purposes under Moline Properties, Inc. v. Commissioner, supra, and (2) is not controlled by any of the other persons involved in that transaction.[104]  See Koehring Co. v. United States, 583 F.2d at 320; Burns v. Commissioner, 78 T.C. at 212-213; Estate of Weiskopf v. Commissioner, 64 T.C. at 93-98; Bank of Am. Natl. Trust & Sav. Association v. Commissioner, 15 T.C. at 552-553.

---

[103]  Petitioner appears to advance the same contention under Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), with respect to the role of Horbury in the Horbury transaction.

[104]  With respect to petitioner's contention that the role of Horbury in the Horbury transaction may not be disregarded under the doctrine of Moline Properties, Inc. v. Commissioner, supra, the record in these cases is insufficient to enable us to conclude whether or not Horbury was formed for a business purpose or carried on business activity and therefore satisfied one of the tests of Moline Properties.  Even assuming arguendo that Horbury were to satisfy one of those tests, as stated above, we would nonetheless be able to ignore or recharacterize its role in that transaction.

## V.   Analysis of the Transactions at Issue

We note again that, in general, the record in these cases is poorly developed, inconclusive, and/or unreliable in many respects, including certain material respects.[105]  Despite the state of the record in these cases, we have been able to find, inter alia, that (1) the relationships among the persons involved in the transactions at issue (viz., the close and amicable business and family relationships between petitioner and Mme. Koo and, in the case of the Bank transactions, the desire of the banks in question to accommodate petitioner, Mme. Koo, Radcliffe and/or BOT, and the foreign corporations pledging collateral that were involved in those transactions and their susceptibility to influence by those persons) are factors we will take into account in deciding whether to recharacterize those transactions; (2) petitioner failed to establish a nontax, business purpose for the form of any of the transactions at issue and acknowledges on brief a tax avoidance purpose for that form; (3) the record does not support application of the binding commitment test of the step transaction doctrine to any of the Bank transactions; and (4) the role of the banks in question in the Bank transactions

---

[105]  The record relating to the transactions involving BB Loan Nos. 2 and 3 is relatively complete.  Although the record relating to the transactions involving the UB $800,000 Radcliffe loan, the UB $1,300,000 loan, and the UB $1,830,000 loan are not poorly developed, there are a number of gaps in the evidence with respect to each of those transactions.

may be ignored or recharacterized even though they were otherwise engaged in business and were not controlled by Radcliffe, BOT, or the foreign corporations pledging collateral.

Additional factors that we consider relevant to our analysis of the transactions at issue include (1) the nature of the relationships, if any, between (a) the respective rates of interest on the loans at issue and the cash deposits that secured them and (b) the respective dates on which interest was payable or paid on those loans and deposits and (2) whether the respective cash deposits that secured the loans at issue were applied to repay those loans. With respect to the last factor, it is significant that there is nothing in the record to suggest that Radcliffe or BOT was in default on any of the Bank loans at issue at the time such loans were repaid, and petitioner does not attempt to explain why any of those loans was repaid in the manner in which it was. Petitioner does not argue, and the record does not support a finding, that the manner in which repayment of any of the Bank loans was made was attributable to any financial or other difficulties that he, Radcliffe or BOT, as the case may be, and/or NMSC or 300 Montgomery Associates, as the case may be, were experiencing at the time any of those loans was repaid. Instead, petitioner alleges on brief that Radcliffe and BOT had sufficientnet worth and cash flow to repay their respective Bank loans. If the role of the foreign corporations pledging collateral in the various Bank transactions had, in substance, been

limited to pledging their respective cash deposits as security, it would seem to us, absent any explanation by petitioner, that Radcliffe or BOT itself, as the case may be, would have repaid each of the Bank loans, as petitioner alleges each could have done, rather than having had the foreign corporations pledging collateral repay those loans.

Bearing in mind the findings we have already made, we turn to each of the transactions at issue.

A.    Bank Transactions

    1.    BB Loan No. 1 Transaction

While conceding that a loan, in fact, was made to Radcliffe in the BB Loan No. 1 transaction, respondent contends that one or more foreign corporations pledging collateral including Intercontinental, and not Bangkok Bank LA branch, was "the ultimate source" of that loan.  She asserts that "at least" the Intercontinental $450,000 deposit was pledged as security in connection with the BB Loan No. 1 transaction and that she was unable to obtain information concerning any other deposits pledged with respect to that transaction.

With respect to respondent's suggestion that there were other deposits besides the Intercontinental $450,000 deposit that were pledged as security in connection with the BB Loan No. 1 transaction, we are unable to conclude from the record before us that there were any such additional deposits.  With respect to respondent's alleged inability to obtain information relating to

any such other deposits, we note that respondent did not represent to the Court in her motion to compel production of documents or in the evidentiary hearing on that motion that she sought documents concerning the BB Loan No. 1 transaction that petitioner failed to produce or that the documents she sought that petitioner failed to produce related to that loan.[106]

The only foreign corporation pledging collateral involved in the BB Loan No. 1 transaction that is disclosed by the record in these cases is Intercontinental. The deposit pledged by Intercontinental was in the amount of $450,000. BB Loan No. 1 was funded by Bangkok Bank LA branch in the amount of $1,000,000. Consequently, under respondent's theory in these cases, Intercontinental could not have been the "ultimate source" of the full amount of that loan, although it could have been the "ultimate source" of $450,000 of that loan. On the record before us, we limit our analysis of the BB Loan No. 1 transaction to $450,000 of BB Loan No. 1 throughout the period during which the Intercontinental $450,000 deposit served, in form, as security as part of that loan transaction.

The record establishes that, in form, Bangkok Bank Ltd. through its Los Angeles branch funded a $1,000,000 loan to Radcliffe and through its Hong Kong branch provided a $1,000,000

---

[106] We also note that during the trial of these cases petitioner provided respondent with copies of certain records of the Los Angeles or the Hong Kong branch of Bangkok Bank Ltd. that respondent did not seek to introduce into evidence.

standby letter of credit guaranteeing that loan and held a $450,000 deposit in the name of Intercontinental that, in turn, secured that standby letter of credit and thereby secured that loan to the extent of $450,000. The record also shows that, in form, Bangkok Bank Ltd. through its Los Angeles branch received interest from Radcliffe with respect to BB Loan No. 1 and, although the record is silent on this point, Bangkok Bank Ltd. through its Hong Kong branch presumably paid interest to Intercontinental on its $450,000 deposit.

Petitioner asserts, and respondent does not dispute, that Bangkok Bank Ltd. through its Los Angeles branch had sufficient funds to make BB Loan No. 1 to Radcliffe without that bank through its Hong Kong branch having had the Intercontinental $450,000 deposit. Presumably Bangkok Bank Ltd. through its Hong Kong branch also had sufficient funds to pay interest on the Intercontinental $450,000 deposit without that bank through its Los Angeles branch having received interest from Radcliffe with respect to BB Loan No. 1.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Bangkok Bank Ltd. and its Los Angeles and Hong Kong branches with petitioner, Mme. Koo, Radcliffe, and Intercontinental and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the BB Loan No. 1 transaction, that Bangkok Bank Ltd. (1) through its Hong Kong branch had a source (viz., the Intercontinental

$450,000 deposit) for $450,000 of the $1,000,000 BB Loan No. 1 it funded through its Los Angeles branch and (2) through its Los Angeles branch had a source (viz., the interest paid by Radcliffe to Bangkok Bank LA branch on BB Loan No. 1) for the interest it presumably paid through its Hong Kong branch on the Intercontinental $450,000 deposit. Moreover, Bangkok Bank Ltd. (1) through its Hong Kong branch had an inflow of funds (viz., the Intercontinental $450,000 deposit) that was sufficient to cover $450,000 of its outflow of funds through its Los Angeles branch for the $1,000,000 BB Loan No. 1 to Radcliffe and (2) through its Los Angeles branch had an inflow of funds (viz., the interest paid by Radcliffe to Bangkok Bank LA branch on BB Loan No. 1) that was sufficient to cover its outflow of funds through its Hong Kong branch for the interest presumably paid on the Intercontinental $450,000 deposit.[107]

We cannot determine the nature of the relationships, if any, between (1) the respective rates of interest on BB Loan No. 1 and the Intercontinental $450,000 deposit and (2) the respective dates on which interest was payable or paid on that loan and that

---

[107] The record does not disclose the interest rates applicable to or the amounts of interest payable or paid on the Intercontinental $450,000 deposit. Nonetheless, we find it reasonable to infer from the evidence in the record, in particular the evidence relating to the transactions involving BB Loan Nos. 2 and 3, that the interest rates applicable to and the amounts of interest payable or paid on that deposit were always less than the interest rates applicable to and the amounts of interest payable or paid on BB Loan No. 1.

deposit. This is because the record is inadequate. In this regard, while the record shows certain facts relating to that inquiry with respect to BB Loan No. 1 (viz., the interest rate and actual interest rate percentages that were in effect for the period during which that loan was outstanding and the dates on which interest was payable and paid on that loan), the record does not disclose those facts with respect to the Intercontinental $450,000 deposit.

Turning to whether the Intercontinental $450,000 deposit that secured BB Loan No. 1 was applied to repay that loan, petitioner admits on brief, and respondent does not dispute, that on June 30, 1986, the Intercontinental $450,000 deposit was applied to reduce the then outstanding $600,000 balance of BB Loan No. 1 to $150,000.

Based upon our examination of the entire record in these cases, and bearing in mind the substantial gaps in the evidence with respect to the BB Loan No. 1 transaction, we find that petitioner has failed to carry his burden of showing that respondent erred in determining that Radcliffe was required to withhold tax on the interest that it, in form, paid to Bangkok Bank LA branch on $450,000 of Bangkok Bank Loan No. 1 for the period during which the Intercontinental $450,000 deposit served, in form, as security for that loan (viz., from on or about May 17,

1984, until June 30, 1986).[108]  Accordingly, we sustain respon-

---

[108]  Petitioner argues, in the alternative, with respect to BB Loan No. 1 (as well as BB Loan Nos. 2 and 3, the UB $570,000 renewed loan, and the UB $325,000 loan) that if the Court were to sustain respondent's determinations, the interest paid after July 18, 1984, by Radcliffe or BOT, as the case may be, would not be subject to withholding tax because either the interest is portfolio interest or the loan transaction could have been restructured to qualify the interest paid thereunder as portfolio interest. On the record before us, we find that petitioner has not demonstrated that the interest paid by Radcliffe in the BB Loan No. 1 transaction (or in any other Bank loan transaction at issue as to which he advances this alternative contention) qualifies as portfolio interest.  For example, petitioner has not shown on the instant record that the interest at issue was not received by a 10-percent shareholder within the meaning of sec. 871(h)(3)(B). He therefore has not established that sec. 881(c)(3)(B) does not apply to the interest at issue.  With respect to his contention that BB Loan No. 1 (or any of the other loan transactions as to which he advances this alternative contention) could have been restructured to qualify the interest thereon as portfolio interest, we note that a transaction is to be given effect in accordance with what actually occurred, and not with what might have occurred.  See Commissioner v. National Alfalfa Dehydrating and Milling Co., 417 U.S. 134, 148 (1974).

   Petitioner advances an additional alternative argument relating solely to the BB Loan No. 1 transaction, which is apparently based upon the parties' erroneous stipulation that the $1,000,000 standby letter of credit was issued with respect to petitioner, rather than Radcliffe, see supra note 9.  According to petitioner, if the Court were to sustain respondent's determination, BB Loan No. 1 would, in substance, be from petitioner to Radcliffe and, in that event, any interest paid with respect to that loan would not be subject to withholding under sec. 1441(a) because petitioner was a U.S. citizen during the years at issue.  We disagree.  We have found that the $1,000,000 standby letter of credit was issued with respect to Radcliffe, and not petitioner.  Moreover, on the record before us, we do not find petitioner's purported promise to indemnify Bangkok Bank HK branch for any losses it might have incurred with respect to its $1,000,000 standby letter of credit to have been intended by the persons involved in the BB Loan No. 1 transaction to be meaningful, at least to the extent of $450,000 of that loan.  We therefore do not find that that purported personal obligation of petitioner establishes that, in substance, a loan was made to Radcliffe by petitioner.

dent's determinations that (1) for the period that commenced on or about May 17, 1984, the date on which BB Loan No. 1 was funded, and ended on June 30, 1986, the date on which the Intercontinental $450,000 deposit was applied to reduce the then outstanding balance of that loan, Radcliffe was required to withhold tax on the full amount of the interest that it, in form, paid to Bangkok Bank LA branch on $450,000 of BB Loan No. 1 and (2) petitioner, as transferee of Radcliffe, is liable for that withholding tax liability of Radcliffe.

### 2. BB Loan No. 2 Transaction

The record establishes that, in form, Bangkok Bank Ltd. through its Los Angeles branch funded a $1,625,000 loan to Radcliffe, later increased to $2,025,000, and held various certificates of deposit initially in the name of Traveluck and thereafter in the name of Double Wealth that secured that loan. The record also shows that, in form, Bangkok Bank Ltd. through its Los Angeles branch received interest from Radcliffe with respect to BB Loan No. 2 and paid interest initially to Traveluck and thereafter to Double Wealth on their respective certificates of deposit.

Petitioner asserts, and respondent does not dispute, that Bangkok Bank Ltd. through its Los Angeles branch had sufficient funds to make BB Loan No. 2 to Radcliffe without having had the

deposit represented by the certificates of deposit that were initially in the name of Traveluck and thereafter Double Wealth. Presumably Bangkok Bank Ltd. through that same branch also had sufficient funds to pay interest on the certificates of deposit that secured BB Loan No. 2 without its having received interest from Radcliffe with respect to BB Loan No. 2.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Bangkok Bank Ltd. and its Los Angeles branch with petitioner, Mme. Koo, Radcliffe, Traveluck, and Double Wealth and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the BB Loan No. 2 transaction, that Bangkok Bank Ltd. through its Los Angeles branch (1) had a source (viz., the certificates of deposit initially in the name of Traveluck and thereafter Double Wealth) for BB Loan No. 2 and (2) had a source (viz., the interest paid by Radcliffe on BB Loan No. 2) for the interest it paid on the various certificates of deposit that secured that loan. Moreover, Bangkok Bank Ltd. through its Los Angeles branch (1) had an inflow of funds (viz., the certificates of deposit initially in the name of Traveluck and thereafter Double Wealth) that was sufficient to cover its outflow of funds for BB Loan No. 2 and (2) had an inflow of funds (viz., the interest paid by Radcliffe on BB Loan No. 2) that was sufficient to cover its

outflow of funds for the interest paid on the various certifi-
cates of deposit that secured that loan.

With respect to the nature of the relationships disclosed by
the record between (a) the respective rates of interest on BB
Loan No. 2 and the various certificates of deposit that, in form,
secured that loan and (b) the respective dates on which interest
was payable or paid on that loan and those certificates, the
record establishes that, throughout the period during which that
loan was outstanding, the interest rate on that loan was .5
percent above the corresponding interest rate on those certifi-
cates.  In addition, petitioner acknowledges on brief that inter-
est was payable on BB Loan No. 2 by Radcliffe to Bangkok Bank
Ltd. through its Los Angeles branch on the same day of the month
on which interest was payable by that bank through that same
branch on the various certificates of deposit that, in form,
secured that loan.[109]  Consequently, even though, as petitioner

---

[109]  Petitioner suggests on brief that the due dates of the
interest on BB Loan No. 2 (as well as on BB Loan No. 3) were made
coextensive with the due dates of the interest on the various
certificates of deposits that secured that loan (as well as BB
Loan No. 3) "apparently" to keep track of the .5 percent dif-
ference between the loan interest rates and the deposit interest
rates.  That suggestion serves only to point out the importance
to the persons involved in the BB Loan No. 2 transaction (as well
as the BB Loan No. 3 transaction) of ensuring that the loan
interest payments corresponded with the interest payments on the
various certificates of deposit.

points out, Bangkok Bank Ltd. through its Los Angeles branch could be considered to have "owned" the interest that Radcliffe, in form, paid to it with respect to BB Loan No. 2, the inflow of those interest payments to it was matched in both amount (except for the .5 percent difference between the interest rate on that loan and the interest rate on each of the various certificates of deposit that, in form, secured that loan) and time by the outflow of interest payments by it initially to Traveluck and thereafter to Double Wealth on the various certificates of deposit that secured BB Loan No. 2.

Turning to whether the Double Wealth $2,025,000 CD that secured BB Loan No. 2 was applied to repay that loan, the record discloses that that loan was repaid on September 12, 1986, with the proceeds represented by that certificate of deposit.

Based on our examination of the entire record in these cases, we find that petitioner has failed to carry his burden of showing that respondent erred in determining that Radcliffe was required to withhold tax on the interest that it, in form, paid to Bangkok Bank LA branch as part of the BB Loan No. 2 transaction.[110] Accordingly, we sustain respondent's determinations that (1) for the period that commenced on June 11, 1985, the date on which BB Loan No. 2 was funded, and ended on September 12, 1986,

---

[110] See first paragraph supra note 108 for our views on petitioner's alternative argument about portfolio interest.

the date on which that loan was repaid, Radcliffe was required to withhold tax on the full amount of the interest that it, in form, paid to Bangkok Bank LA branch on BB Loan No. 2 and (2) petitioner, as transferee of Radcliffe, is liable for that withholding tax liability of Radcliffe.

### 3. BB Loan No. 3 Transaction

The record establishes that, in form, Bangkok Bank Ltd. through its Los Angeles branch funded a $1,000,000 loan to Radcliffe and held a $1,000,000 certificate of deposit in the name of Double Wealth that secured that loan. The record also shows that, in form, Bangkok Bank Ltd. through its Los Angeles branch received interest from Radcliffe with respect to BB Loan No. 3 and paid interest to Double Wealth on its $1,000,000 deposit.

Petitioner asserts, and respondent does not dispute, that Bangkok Bank Ltd. through its Los Angeles branch had sufficient funds to make BB Loan No. 3 to Radcliffe without having had the Double Wealth $1,000,000 CD. Presumably Bangkok Bank Ltd. through that same branch also had sufficient funds to pay interest on the Double Wealth $1,000,000 CD without its having received interest from Radcliffe with respect to BB Loan No. 3.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Bangkok Bank Ltd. and its Los Angeles branch with petitioner, Mme. Koo, Radcliffe, and

Double Wealth and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the BB Loan No. 3 transaction, that Bangkok Bank Ltd. through its Los Angeles branch (1) had a source (viz., the Double Wealth $1,000,000 CD) for BB Loan No. 3 that it funded and (2) had a source (viz., the interest paid by Radcliffe on BB Loan No. 3) for the interest it paid on the Double Wealth $1,000,000 CD. Moreover, Bangkok Bank Ltd. through its Los Angeles branch (1) had an inflow of funds (viz., the Double Wealth $1,000,000 CD) that was sufficient to cover its outflow of funds for BB Loan No. 3 and (2) had an inflow of funds (viz., the interest paid by Radcliffe on BB Loan No. 3) that was sufficient to cover its outflow of funds for the interest paid on the Double Wealth $1,000,000 CD.

With respect to the nature of the relationships disclosed by the record between the respective rates of interest on BB Loan No. 3 and the Double Wealth $1,000,000 CD, the record establishes that, throughout the period during which that loan was outstanding, the interest rate on that loan was set at .5 percent above the corresponding interest rate on that certificate. In addition, petitioner acknowledges on brief that interest was payable on BB Loan No. 3 by Radcliffe to Bangkok Bank Ltd. through its Los Angeles branch on the same day of the month on which interest was payable by that bank through that same branch on the certifi-

cate of deposit that, in form, secured that loan.[111]  Consequent-
ly, even though, as petitioner points out, Bangkok Bank Ltd.
through its Los Angeles branch could be considered to have
"owned" the interest that Radcliffe, in form, paid to it with
respect to BB Loan No. 3, the inflow of those interest payments
to it was matched in both amount (except for the .5 percent dif-
ference between the interest rate on that loan and the interest
rate on the certificate of deposit that, in form, secured that
loan) and time by the outflow of interest payments by it to
Double Wealth on the certificate of deposit that secured BB Loan
No. 3.

Turning to whether the Double Wealth $1,000,000 CD that
secured BB Loan No. 3 was applied to repay that loan, the record
discloses that that loan was repaid on September 12, 1986, with
the proceeds represented by that certificate of deposit.

Based on our examination of the entire record in these
cases, we find that petitioner has failed to carry his burden of
showing that respondent erred in determining that Radcliffe was
required to withhold tax on the interest that it, in form, paid
to Bangkok Bank LA branch as part of the BB Loan No. 3 transac-

---

[111]  See _supra_ note 109 for our views on petitioner's alleged
reason why the due dates for the payment of interest on the loan
and the deposit were made coextensive.

tion.[112]  Accordingly, we sustain respondent's determinations that (1) for the period that commenced on November 12, 1985, the date on which BB Loan No. 3 was funded, and ended on September 12, 1986, the date on which that loan was repaid, Radcliffe was required to withhold tax on the full amount of the interest that it, in form, paid to Bangkok Bank LA branch on BB Loan No. 3 and (2) petitioner, as transferee of Radcliffe, is liable for that withholding tax liability of Radcliffe.

### 4.    UB $570,000 Pre-March 1984 Loan and UB $570,000 Renewed Loan Transactions

The record establishes that, in form, Union Bank funded a $570,000 loan to BOT and Union Bank's affiliate Standard Chartered Bank HK held a deposit in the name of Merit that secured that loan.  With respect to the UB $570,000 renewed loan transaction, the record establishes that, in form, Union Bank renewed its $570,000 loan to BOT and Union Bank's affiliate Standard Chartered Bank, Singapore, held a deposit in the name of Forward that secured that loan.  The record also shows that, in form, Union Bank received interest from BOT with respect to the UB $570,000 pre-March 1984 and renewed loan transactions and, although the record is silent on this point, its affiliate Standard Chartered Bank HK presumably paid interest to Merit on its $570,000 deposit and its affiliate Standard Chartered Bank,

---

[112]  See first paragraph supra note 108 for our views on petitioner's alternative argument about portfolio interest.

Singapore, presumably paid interest to Forward on its $570,000 deposit.

Petitioner asserts, and respondent does not dispute, that Union Bank had sufficient funds to make the UB $570,000 pre-March 1984 loan to BOT without its affiliate Standard Chartered Bank HK having had the Merit $570,000 deposit. Presumably Standard Chartered Bank HK also had sufficient funds to pay interest on the Merit $570,000 deposit without its affiliate Union Bank having received interest from BOT with respect to the UB $570,000 pre-March 1984 loan. Nor does respondent dispute petitioner's assertion that Union Bank had sufficient funds to renew the $570,000 loan to BOT in March 1984 without its affiliate Standard Chartered Bank, Singapore, having had the Forward $570,000 deposit. Presumably Standard Chartered Bank, Singapore, also had sufficient funds to pay interest on the Forward $570,000 deposit without its affiliate Union Bank having received interest from BOT with respect to the UB $570,000 renewed loan.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Union Bank and its affiliates Standard Chartered Bank HK and Standard Chartered Bank, Singapore, with petitioner, Mme. Koo, BOT, Merit, and Forward and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the UB $570,000 pre-March 1984 and renewed loan transactions, that Union Bank (1) through its affil-

iate Standard Chartered Bank HK had a source (viz., the Merit $570,000 deposit) for the UB $570,000 pre-March 1984 loan and (2) through its affiliate Standard Chartered Bank, Singapore, had a source (viz., the Forward $570,000 deposit) for the UB $570,000 renewed loan that it funded. We are also satisfied from that record that (1) Standard Chartered Bank HK through its affiliate Union Bank had a source (viz., the interest paid by BOT to Union Bank on the UB $570,000 pre-March 1984 loan) for the interest it presumably paid on the Merit $570,000 deposit and (2) Standard Chartered Bank, Singapore, through its affiliate Union Bank had a source (viz., the interest paid by BOT to Union Bank on the UB $570,000 renewed loan) for the interest it presumably paid on the Forward $570,000 deposit. Moreover, Union Bank (1) through its affiliate Standard Chartered Bank HK had an inflow of funds (viz., the Merit $570,000 deposit) that was sufficient to cover its outflow of funds for the UB $570,000 pre-March 1984 loan to BOT and (2) through its affiliate Standard Chartered Bank, Singapore, had an inflow of funds (viz., the Forward $570,000 deposit) that was sufficient to cover its outflow of funds to renew the UB $570,000 renewed loan to BOT. In addition, (1) Standard Chartered Bank HK through its affiliate Union Bank had an inflow of funds (viz., the interest paid by BOT to Union Bank on the UB $570,000 pre-March 1984 loan) that was sufficient to cover its outflow of funds for the interest presumably paid on

the Merit $570,000 deposit and (2) Standard Chartered Bank, Singapore, through its affiliate Union Bank had an inflow of funds (viz., the interest paid by BOT to Union Bank on the UB $570,000 renewed loan) that was sufficient to cover its outflow of funds for the interest presumably paid on the Forward $570,000 deposit.[113]

Except as noted below with respect to the first renewal of the UB $570,000 renewed loan, we cannot determine the nature of the relationships, if any, between (a) the respective rates of interest on the UB $570,000 pre-March 1984 loan and the Merit $570,000 deposit and on the UB $570,000 renewed loan and the Forward $570,000 deposit and (b) the respective dates on which interest was payable or paid on those respective loans and deposits. This is because the record is inadequate. In this regard, while the record shows certain facts relating to that inquiry with respect to the UB $570,000 pre-March 1984 and renewed loan

---

[113] The record does not disclose the interest rates applicable to or the amounts of interest payable or paid on certain of the deposits (viz., the Merit $570,000 deposit, the Forward $570,000 deposit, and the Forward $325,000 deposit) that served, in form, as security for certain of the Union Bank loans at issue (viz., the UB $570,000 pre-March 1984 loan, the UB $570,000 renewed loan, and the UB $325,000 loan, respectively). Nonetheless, we find it reasonable to infer from the evidence in the record, in particular the evidence relating to the transactions involving the UB $800,000 Radcliffe loan, the UB $1,300,000 loan, and the UB $1,830,000 loan, that the interest rates applicable to and the amounts of interest payable or paid on those deposits were always less than the percentage interest rates on and the amounts of interest payable or paid on the respective loans that were, in form, secured by those deposits.

transactions (viz., certain of the interest rates and percentage interest rates that were in effect for certain periods and certain of the dates on which interest was payable or paid on those loans), the record does not disclose those facts with respect to the Merit $570,000 deposit or the Forward $570,000 deposit.[114]

As for the first renewal of the UB $570,000 renewed loan, the record establishes that the interest rate on that renewal was linked to the interest rate on the Forward $570,000 deposit in that the former was not to be less than 1 percent more than the annualized effective interest rate on the latter.

Turning to whether the Merit $570,000 deposit and the Forward $570,000 deposit that secured the UB $570,000 pre-March 1984 loan and the UB $570,000 renewed loan, respectively, were applied to repay those loans, the Merit $570,000 deposit was not applied to repay the UB $570,000 pre-March 1984 loan. Instead, it was replaced by the Forward $570,000 deposit that was to serve as security for the UB $570,000 renewed loan. Although petitioner claims on brief that BOT repaid the UB $570,000 renewed loan, the record does not disclose (1) the identity of the person or persons who provided the funds that were used to repay it or (2) whether or not the Forward $570,000 deposit was so applied.

Based upon our examination of the entire record in these

---

[114] We note that petitioner failed to produce certain documents of Forward sought by respondent in discovery.

cases, and bearing in mind the substantial gaps in the evidence with respect to the UB $570,000 pre-March 1984 and renewed loan transactions, we find that petitioner has failed to carry his burden of showing that respondent erred in determining that BOT was required to withhold tax on the interest that it, in form, paid to Union Bank as part of those transactions.[115]  Accordingly, we sustain respondent's determinations that (1) for the period that commenced on January 1, 1984, the first day of the years at issue, and ended on July 10, 1986, the date on which the $570,000 loan to BOT was repaid, BOT was required to withhold tax on the full amount of the interest that it, in form, paid to Union Bank on the UB $570,000 pre-March 1984 loan and the UB $570,000 renewed loan, and (2) petitioner, as transferee of BOT, is liable for that withholding tax liability of BOT.

### 5.  UB $325,000 Loan Transaction

The record establishes that, in form, Union Bank funded a $325,000 loan to Radcliffe and Union Bank's affiliate Standard Chartered Bank HK held a deposit in the name of Forward that secured that loan.  The record also shows that, in form, Union Bank received interest from Radcliffe with respect to the UB $325,000 loan and, although the record is silent on this point, its affiliate Standard Chartered Bank HK presumably paid interest

---

[115]  See first paragraph supra note 108 for our views on petitioner's alternative argument about portfolio interest.

to Forward on its $325,000 deposit.

Petitioner asserts, and respondent does not dispute, that Union Bank had sufficient funds to make the UB $325,000 loan to Radcliffe without its affiliate Standard Chartered Bank HK having had the Forward $325,000 deposit. Presumably Standard Chartered Bank HK also had sufficient funds to pay interest on the Forward $325,000 deposit without its affiliate Union Bank's having received interest from Radcliffe with respect to the UB $325,000 loan.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Union Bank and its affiliate Standard Chartered Bank HK with petitioner, Mme. Koo, Radcliffe, and Forward and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the UB $325,000 loan transaction, that (1) Union Bank through its affiliate Standard Chartered Bank HK had a source (viz., the Forward $325,000 deposit) for the UB $325,000 loan it funded and (2) Standard Chartered Bank HK through its affiliate Union Bank had a source (viz., the interest paid by Radcliffe to Union Bank on the UB $325,000 loan) for the interest it presumably paid on the Forward $325,000 deposit. Moreover, (1) Union Bank through its affiliate Standard Chartered Bank HK had an inflow of funds (viz., the Forward $325,000 deposit) that was sufficient to cover its outflow of funds for the UB $325,000 loan to Radcliffe and

(2) Standard Chartered Bank HK through its affiliate Union Bank had an inflow of funds (viz., the interest paid by Radcliffe to Union Bank on the UB $325,000 loan) that was sufficient to cover its outflow of funds for the interest presumably paid on the Forward $325,000 deposit.[116]

We cannot determine the nature of the relationships, if any, between (a) the respective rates of interest on the UB $325,000 loan and the Forward $325,000 deposit and (b) the respective dates on which interest was payable or paid on that loan and that deposit. This is because the record is inadequate. In this regard, while the record shows certain facts relating to that inquiry with respect to the UB $325,000 loan at issue (viz., certain of the interest rates and percentage interest rates that were in effect for certain periods and certain of the dates on which interest was payable or paid on that loan), the record does not disclose those facts with respect to the Forward $325,000 deposit.

Turning to whether the Forward $325,000 deposit that secured the UB $325,000 loan was applied to repay that loan, petitioner claims on brief that Radcliffe repaid that loan. While the record does not disclose (1) the identity of the person or persons who provided the funds to repay it or (2) whether or not the Forward $325,000 deposit was so applied, it does establish that the

---

[116] See *supra* note 113.

funds used to repay the UB $325,000 loan were wired to Union Bank from Standard Chartered Bank HK, the same affiliate of Union Bank in which the Forward $325,000 deposit that secured that loan was maintained. Thus, it appears reasonable to infer that the Forward $325,000 deposit could have been used to repay that loan, and petitioner has not shown that that deposit was not so applied.

Based upon our examination of the entire record in these cases, and bearing in mind the substantial gaps in the evidence with respect to the UB $325,000 loan transaction, we find that petitioner has failed to carry his burden of showing that respondent erred in determining that Radcliffe was required to withhold tax on the interest that it, in form, paid to Union Bank as part of that transaction.[117] Accordingly, we sustain respondent's determinations that (1) for the period that commenced in April 1984 on the date on which the UB $325,000 loan was funded and ended on July 10, 1986, the date on which that loan was repaid, Radcliffe was required to withhold tax on the full amount of the interest that it, in form, paid to Union Bank on the UB $325,000 loan and (2) petitioner, as transferee of Radcliffe, is liable for that withholding tax liability of Radcliffe.

---

[117] See first paragraph supra note 108 for our views on petitioner's alternative argument about portfolio interest.

### 6. UB $800,000 Radcliffe Loan Transaction

The record establishes that, in form, Radcliffe assumed an $800,000 loan that Union Bank or one of its branches or predecessors in San Francisco had made to NMSC and initially Union Bank's affiliate Standard Chartered Bank HK and thereafter Union Bank's affiliate Standard Chartered Bank, Singapore, held a deposit in the name of Multi-Credit that secured that assumed loan.[118] The record also shows that, in form, Union Bank received interest from Radcliffe with respect to the UB $800,000 Radcliffe loan and initially Standard Chartered Bank HK and thereafter Standard Chartered Bank, Singapore, paid interest to Multi-Credit on its $800,000 deposit.

Petitioner asserts, and respondent does not dispute, that Union Bank or one of its branches or predecessors in San Francisco had sufficient funds to make the UB $800,000 NMSC loan that was assumed by Radcliffe and to continue that loan after Radcliffe assumed it without its affiliate Standard Chartered Bank HK and thereafter its affiliate Standard Chartered Bank, Singapore, having had the Multi-Credit $800,000 deposit. Presumably Standard Chartered Bank HK and thereafter Standard Chartered Bank, Singapore, also had sufficient funds to pay interest

---

[118] The parties agree on brief that the Multi-Credit $800,000 deposit served as security for not only the UB $800,000 Radcliffe loan but also the UB $800,000 NMSC loan that Radcliffe assumed.

on the Multi-Credit $800,000 deposit without their affiliate Union Bank's having received interest from Radcliffe with respect to the UB $800,000 Radcliffe loan.

Nonetheless, we are satisfied from the record before us, including (1) the relationships of (a) Union Bank and its affiliates Standard Chartered Bank HK and Standard Chartered Bank, Singapore, with petitioner, Mme. Koo, Radcliffe, and Multi-Credit and (b) petitioner with Mme. Koo and (2) the lack of a nontax, business purpose for the form of the UB $800,000 Radcliffe loan transaction, that Union Bank through its affiliate Standard Chartered Bank HK and thereafter its affiliate Standard Chartered Bank, Singapore, had a source (viz., the Multi-Credit $800,000 deposit) for the UB $800,000 NMSC loan that it or one of its branches or predecessors in San Francisco funded and that was assumed by Radcliffe. We are also satisfied from that record that Standard Chartered Bank HK and thereafter Standard Chartered Bank, Singapore, through their affiliate Union Bank had a source (viz., the interest paid by Radcliffe to Union Bank on the UB $800,000 Radcliffe loan) for the interest they paid on the Multi-Credit $800,000 deposit. Moreover, Union Bank through its affiliate Standard Chartered Bank HK and thereafter its affiliate Standard Chartered Bank, Singapore, had an inflow of funds (viz., the Multi-Credit $800,000 deposit) that was sufficient to cover

its outflow of funds for the UB $800,000 NMSC loan that was assumed by Radcliffe. In addition, Standard Chartered Bank HK and thereafter Standard Chartered Bank, Singapore, through their affiliate Union Bank had an inflow of funds (viz., the interest paid by Radcliffe to Union Bank on the UB $800,000 Radcliffe loan) that was sufficient to cover their outflow of funds for the interest paid on the Multi-Credit $800,000 deposit.

With respect to the nature of the relationship disclosed by the record between the respective rates of interest on the UB $800,000 Radcliffe loan and the Multi-Credit $800,000 deposit,[119] the record establishes that, for the period that began on or about June 27, 1985, the date on which Radcliffe assumed the $800,000 loan that Union Bank or one of its branches or predecessors in San Francisco had made to NMSC, and ended on July 10, 1986, the date on which the UB $800,000 Radcliffe loan was due, the excess of the percentage interest rates on that loan over the corresponding interest rates on the Multi-Credit $800,000 deposit that secured that loan ranged from approximately 2 percent to 3.5 percent. We note that that range of difference appears to be substantial when considered in relation to the range of percentage interest rates on the UB $800,000 Radcliffe loan (viz., 10.14 percent to 10.91 percent) and the range of the interest rates on

---

[119] The record does not show that relationship, if any, for the brief period that began on July 10, 1986, the date on which the loan was due, and ended on July 23, 1986, the date on which that loan was repaid.

the Multi-Credit $800,000 deposit (viz., 6.875 percent to 8
percent).[120]

With respect to the nature of the relationship disclosed by
the record between the respective dates on which interest was
payable or paid on the UB $800,000 Radcliffe loan and the Multi-
Credit $800,000 deposit that secured that loan,[121] the record es-
tablishes that, for the period that began on or about June 27,
1985, the date on which Radcliffe assumed the $800,000 loan that
Union Bank or one of its branches or predecessors in San Francis-
co had made to NMSC, and ended on July 10, 1986, the date on
which the UB $800,000 Radcliffe loan was due, (1) 11 of the dates
on which interest was payable on the Multi-Credit $800,000 depos-
it were the same or nearly the same or occurred, at most, one
week before the dates on which interest was payable on the UB
$800,000 Radcliffe loan, and (2) four of the dates on which
interest was payable on that deposit occurred, at most, 13 days
before the dates on which interest was payable on that loan.

---

[120] We also note that the differences disclosed by the record
between the percentage interest rates on the UB $800,000
Radcliffe loan over the corresponding interest rates on the
Multi-Credit $800,000 deposit that secured that loan were larger
than any of the differences disclosed by the record between the
actual interest rate percentages on each of certain other loans
at issue and the interest rates on each of certain deposits that
secured them (viz., .5 percent with respect to BB Loan Nos. 2 and
3 and 1.15 percent with respect to the UB $1,300,000 and
$1,830,000 loans).

[121] The record does not show that relationship, if any, for the
brief period that commenced on July 10, 1986, and ended on July
23, 1986. See supra note 119.

At first blush, the differences disclosed by the record between the percentage interest rates on the UB $800,000 Radcliffe loan and the corresponding interest rates on the Multi-Credit $800,000 deposit and the differences in the dates, at least the differences exceeding one week, between the respective dates on which interest was payable on that loan and that deposit might appear to be factors supporting petitioner's position that the UB $800,000 Radcliffe loan was, in substance, from Union Bank to Radcliffe. However, we are unwilling to give any particular weight to any of those differences, especially when we take into account (1) that Union Bank and its affiliates Standard Chartered Bank HK and Standard Chartered Bank, Singapore, desired to accommodate, and were susceptible to influence by, petitioner, Mme. Koo, Radcliffe, and Multi-Credit and (2) petitioner's failure to establish a nontax, business purpose for the form of the UB $800,000 Radcliffe loan transaction.

Turning to whether the Multi-Credit $800,000 deposit that secured the UB $800,000 Radcliffe loan was applied to repay that loan, petitioner claims on brief that Radcliffe repaid that loan. However, the record does not disclose (1) the identity of the person or persons who provided the funds that were used to repay it or (2) whether or not the Multi-Credit $800,000 deposit was so applied.

Based upon our examination of the entire record in these cases, we find that petitioner has failed to carry his burden of

showing that respondent erred in determining that Radcliffe was required to withhold tax on the interest that it, in form, paid to Union Bank as part of the UB $800,000 Radcliffe loan transaction.  Accordingly, we sustain respondent's determinations that (1) for the period that commenced on or about June 27, 1985, the date on which Radcliffe assumed the $800,000 loan that Union Bank or one of its branches or predecessors in San Francisco had made to NMSC, and ended on July 23, 1986, the date on which that loan was repaid, Radcliffe was required to withhold tax on the full amount of the interest that it, in form, paid to Union Bank on the UB $800,000 Radcliffe loan and (2) petitioner, as transferee of Radcliffe, is liable for that withholding tax liability of Radcliffe.

### 7.    UB $1,300,000 Loan Transaction

Respondent concedes that a loan, in fact, was made to Radcliffe in the UB $1,300,000 loan transaction.[122]  Thus, as she acknowledges on brief, "The only issue here is the identity of the lender."  It is petitioner's position that the lender in that transaction was Union Bank.  It is respondent's position that the lender was initially Pioneer and thereafter Mandalay, the foreign corporations pledging collateral for the UB $1,300,000 loan.  The

---

[122]  As noted above, respondent's concession that a loan, in fact, was made to Radcliffe or BOT, as the case may be, extends to all the loan transactions at issue.  Petitioner alleges on brief, respondent disputes, and the evidence in the record does not reliably establish that the UB $1,300,000 loan was used to repay a loan to Radcliffe that Pioneer had previously made.

reason respondent espouses for her position is that those corporations "were the ultimate source of the loans to * * * Radcliffe."[123]

Proceeding from and constrained by respondent's concession that a loan, in fact, was made to Radcliffe in the UB $1,300,000 loan transaction, we limit our inquiry to a determination of the identity of the lender.[124]  The record establishes that, in form, Union Bank funded the UB $1,300,000 loan to Radcliffe and that, at the direction of petitioner and Ms. Gaw on behalf of Radcliffe, the proceeds of that loan were used to purchase initially the Pioneer $1,300,000 CD and thereafter the Mandalay $1,300,000 CD that secured that loan.  Thus, neither Pioneer nor Mandalay funded the certificates of deposit that were pledged to secure the UB $1,300,000 loan.  Consequently, neither of those foreign corporations could have been, in the words of respondent, "the ultimate source" of the UB $1,300,000 loan to Radcliffe.

Based upon our examination of the entire record in these cases, and bearing in mind respondent's concession that a loan was, in fact, made to Radcliffe in the UB $1,300,000 transaction, we reject respondent's determination that the interest that Radcliffe paid on that loan was subject to withholding tax.

---

[123]  As noted above, respondent advances the same rationale for her position regarding all the loan transactions at issue.

[124]  We shall not explore, for example, under substance over form and related principles whether a loan, in fact, was made to Radcliffe.

## 8.  UB $1,830,000 Loan Transaction

Respondent concedes that a loan, in fact, was made to BOT in the UB $1,830,000 loan transaction[125] and acknowledges on brief that the identity of the lender is the only issue presented here. It is petitioner's position that the lender in that transaction was Union Bank.  It is respondent's position that the lender was Pempire, the foreign corporation pledging collateral for the UB $1,830,000 loan, because that corporation was "the ultimate source of the loans to BOT".

Proceeding from and constrained by respondent's concession that a loan, in fact, was made to BOT in the UB $1,830,000 loan transaction, we limit our inquiry to a determination of the identity of the lender.  The record establishes that, in form, Union Bank funded the UB $1,830,000 loan to BOT and that, at the direction of petitioner on behalf of BOT, the proceeds of that loan were used to purchase the Pempire $1,830,000 CD that secured that loan.  Thus, Pempire did not fund the certificate of deposit that was pledged to secure the UB $1,830,000 loan.  Consequently, Pempire could not have been, in the words of respondent, "the ultimate source" of the UB $1,830,000 loan to BOT.

Based upon our examination of the entire record in these cases, and bearing in mind respondent's concession that a loan

---

[125]  Petitioner testified, respondent disputes, and the evidence in the record does not reliably establish that the UB $1,830,000 loan was used to repay a loan to BOT that Pempire had previously made.

was, in fact, made to BOT in the UB $1,830,000 loan transaction, we reject respondent's determination that the interest that BOT paid on that loan was subject to withholding tax.

B.   Horbury Transaction

Petitioner argues that the interest paid by BOT that is at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) of the U.S.-Netherlands treaty (article VIII(1)).  Article VIII(1) provides:

> Interest on bonds, notes, debentures, securities, deposits or any other form of indebtedness (including interest from mortgages or bonds secured by real property) paid to a resident or corporation of one of the Contracting States shall be exempt from tax by the other Contracting State.

In advancing his position, petitioner contends that this Court should create a presumption under rule 301 of the Federal Rules of Evidence that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1). To support that contention, petitioner asserts that, under the circumstances relating to the Horbury transaction that he alleges are present here, "Probability and notions of social and economic policy,[126] i.e., the unfairness of applying the conduit doctrine retroactively nine years after the event, when records are unavailable, justify the creation of a presumption here."

---

[126]   Probability and notions of social and economic policy are two of the factors listed and discussed in 1 Weinstein & Berger, Weinstein's Evidence, par. 300[02], at 300-7 to 300-8 (1995), which petitioner cites on brief, that courts have considered in deciding whether to create a presumption under rule 301 of the Federal Rules of Evidence.

The circumstances on which petitioner relies in support of his position for the creation of a presumption under rule 301 of the Federal Rules of Evidence include his allegations that (1) Horbury was organized in the Netherlands in 1982 at the direction of S.C. Gaw, petitioner's father; (2) San Francisco counsel was employed by S.C. Gaw for that purpose; (3) Horbury was a third-tier subsidiary of Pioneer; (4) the Horbury loan to BOT was made before S.C. Gaw's death in October 1983; (5) petitioner was not responsible for the Horbury loan; (6) petitioner did not handle Horbury's day-to-day accounting; (7) petitioner did not know what happened to the interest at issue after BOT paid it to Horbury; (8) petitioner furnished respondent with all records concerning Horbury and the Horbury loan that were within his possession, custody, and control; and (9) Horbury was liquidated in 1986 or 1987.

We note first that we are not willing to accept as facts most of the foregoing allegations relied on by petitioner.[127] This is because most of them are based wholly on petitioner's testimony that we found to be vague, conclusory, or evasive on those points. Moreover, based on our observation of his demeanor at trial, we generally did not find him to be credible.[128]

---

[127] The only such allegations that are established by reliable evidence in the record are that Horbury was organized in the Netherlands in 1982 and that it was a third-tier subsidiary of Pioneer.

[128] Petitioner claimed at trial that even though (1) Horbury was

(continued...)

Having analyzed the factors considered by courts in deciding whether to create a presumption under rule 301 of the Federal Rules of Evidence that are relied upon by petitioner, we conclude that creation of such a presumption is not warranted or appropriate under the circumstances presented in these cases. Thus, petitioner has the burden of going forward with evidence to show that respondent erred in determining that BOT was required to withhold tax on the interest at issue in the Horbury transaction.

Turning to the merits of petitioner's position with respect to the Horbury transaction, petitioner appears to advance two principal contentions to support his argument that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1). He first contends that that interest is exempt under that article because it was paid to a corporation organized in the Netherlands, viz., Horbury, and therefore the express provisions of that article have been satisfied.

---

[128](...continued)
a subsidiary of Pioneer during the years at issue and (2) Pioneer was a public corporation, Horbury's records were in his father's files, and those files were in the control of his mother and siblings who refused to talk to him, let alone provide those files to him, because of a hostile family relationship. We note that petitioner was able to obtain from his mother and siblings at least one document from his father's files (viz., a letter to S.C. Gaw from Mr. Catterton) that he introduced into evidence in an attempt to support his position in these cases. In any event, even if we were to accept petitioner's testimony concerning his inability to obtain Horbury's records, that inability would affect only the type of evidence that petitioner could have presented in support of his claim. See Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979). Petitioner did not offer credible secondary evidence concerning the Horbury transaction.

Petitioner appears to contend further that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) because it qualifies for the grandfathering provided by Rev. Rul. 85-163, 1985-2 C.B. 349.[129]  In that ruling, the Commissioner announced that the holdings of Rev. Rul. 84-152, 1984-2 C.B. 381, and Rev. Rul. 84-153, 1984-2 C.B. 383, are not to be applied to interest payments made in connection with, inter alia, debt obligations issued prior to October 15, 1984.[130]  In Rev. Rul. 84-152, supra, the Service concluded that, where (1) the foreign parent of a controlled group of corporations lent funds to its wholly owned Netherlands Antilles subsidiary, (2) that subsidiary relent those funds to a wholly owned domestic subsidiary of that parent, and (3) the Netherlands Antilles subsidiary was a conduit for the passage of interest payments by that domestic subsidiary to its foreign parent, those interest payments were not exempt from U.S. taxation under the U.S.-Netherlands treaty as extended to the Netherlands Antilles.  In Rev. Rul. 84-153, supra, the Service concluded that, where (1) a

[129]  Rev. Rul. 95-56, 1995-36 I.R.B. 20, renders Rev. Ruls. 85-163, 1985-2 C.B. 349, 84-152, 1984-2 C.B. 381, and 84-153, 1984-2 C.B. 383, obsolete for payments made after Sept. 10, 1995, that are subject to the final regulations under sec. 7701(l), T.D. 8611, 60 Fed. Reg. 40997 (Aug. 11, 1995).

[130]  Petitioner's contention presumes that Rev. Ruls. 84-152, supra, and 84-153, supra, apply to the interest at issue in the Horbury transaction.  We have not relied upon those revenue rulings in reaching our holdings with respect to the Horbury transaction.  Rather, we have relied upon the substance over form doctrine, the facts and circumstances disclosed by the record, and petitioner's failure of proof.

wholly owned Netherlands Antilles subsidiary of a domestic parent of a controlled group of corporations sold bonds to foreign persons in public offerings outside the United States, (2) the Netherlands Antilles subsidiary lent the proceeds of the bond sale to a wholly owned domestic subsidiary of that parent, and (3) the Netherlands Antilles subsidiary was a conduit for the passage of interest payments by that domestic subsidiary to the foreign bondholders, those interest payments were not exempt from U.S. taxation under the U.S.-Netherlands treaty as extended to the Netherlands Antilles.

With respect to petitioner's contention that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) because the express provisions of that article have been satisfied, it is respondent's position that petitioner has not satisfied his burden of proving that that interest is so exempt.  To support that position, respondent relies on the substance over form doctrine and related princi-ples, which this Court applied in Aiken Indus., Inc. v. Commis-sioner, 56 T.C. at 933-934.  Although respondent concedes that a loan, in fact, was made to BOT in the Horbury transaction, she contends that, in substance, Pioneer, rather than Horbury, was the lender and the interest paid by BOT was paid to Pioneer, and not to Horbury.

With respect to petitioner's contention that the interest at issue in the Horbury transaction is exempt from U.S. taxation

under article VIII(1) because it qualifies for the grandfathering provided by Rev. Rul. 85-163, supra, it is respondent's position that petitioner has not satisfied his burden of proving that that interest so qualifies.[131]

Turning to petitioner's contention that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) because the express provisions of that article have been satisfied, we agree with respondent that, under substance over form and related principles, which we applied in Aiken Indus., Inc. v. Commissioner, 56 T.C. at 933-934, the question whether a payment of interest is exempt from U.S. taxation under the provisions of a treaty is determined by the substance, rather than the form, of the transaction with respect to which such a payment is made.  The record in these cases is devoid of reliable evidence that would enable us to determine whether or not the form of the Horbury loan to BOT reflected its substance.  We therefore cannot conclude that the interest at issue in the Horbury transaction was, in substance, paid to Horbury, as petitioner contends.  On the instant record, we find that petitioner has failed to satisfy his burden of showing that that interest is exempt from U.S. taxation under article VIII(1)

---

[131]  Respondent seems to agree with petitioner that if the Horbury loan were to qualify for the grandfathering afforded by Rev. Rul. 85-163, supra, the interest at issue in the Horbury transaction would be exempt from U.S. taxation under article VIII(1).

because the express provisions of that article have been satisfied.

We now turn to petitioner's contention that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) because it qualifies for the grandfathering provided by Rev. Rul. 85-163, supra, with respect to interest payments on, inter alia, debt obligations issued prior to October 15, 1984. To support that suggestion, petitioner relies on his testimony that the Horbury loan was made prior to S.C. Gaw's death in October 1983. For the reasons previously stated herein, we do not find that testimony to be credible. We therefore are unwilling to accept it. Accordingly, petitioner has not established that the Horbury loan was made prior to October 15, 1984.[132] Consequently, he has failed to satisfy his burden of showing that the interest at issue that was paid with respect to that loan is exempt from U.S. taxation under article VIII(1) because it qualifies for the grandfathering provided by Rev. Rul.

_____

[132] The only reliable evidence in the record relevant to determining when the Horbury loan was made is inconclusive. The parties stipulated that BOT claimed a deduction of $151,722 in its 1984 income tax return for interest it paid to Horbury. The record does not contain reliable evidence showing whether or not any of that interest was paid prior to Oct. 15, 1984, and therefore the payment of that interest does not indicate whether or not the Horbury loan was made prior to that date. It would be unfortunate if, in fact, the Horbury loan had been made prior to Oct. 15, 1984, and thus would have qualified for the grandfathering provided by the Commissioner in Rev. Rul. 85-163, 1985-2 C.B. 349. However, the instant cases are no different from any other case in which a taxpayer fails to satisfy his or her burden of proof through credible evidence.

85-163, 1985-2 C.B. 349.[133]

Based upon our examination of the entire record in these cases, and bearing in mind the dearth of evidence with respect to the Horbury transaction, we find that petitioner has failed to carry his burden of showing that respondent erred in determining that BOT was required to withhold tax on the interest that it, in form, paid to Horbury in 1984 as part of that transaction. Accordingly, we sustain respondent's determination that (1) for 1984, BOT was required to withhold tax on the full amount of the interest that it, in form, paid to Horbury with respect to the Horbury transaction and (2) petitioner, as transferee of BOT, is liable for that withholding tax liability of BOT.

VI.  Petitioner's Constitutional and
     Abuse of Discretion Claims

Having sustained respondent's determinations to the extent stated herein with respect to the transactions at issue, we consider petitioner's claims that respondent violated his right to equal protection of the law under the Fifth Amendment to the

---

[133] Respondent also contends that petitioner may show error in her determination with respect to the interest at issue in the Horbury transaction by demonstrating that that interest qualifies for the grandfathering provided by sec. 127(g)(3) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 652-653, which protects certain CFC's involved in specified types of financing transactions from being recharacterized as conduits in those transactions. On brief, petitioner has abandoned any reliance on the grandfathering afforded by that provision. In any event, he has not shown by reliable evidence that the requirements of sec. 127(g)(3) of the Deficit Reduction Act of 1984 have been satisfied.

Constitution (Fifth Amendment)[134] and abused her discretion by determining under Rev. Rul. 87-89, 1987-2 C.B. 195, situations (1) and (2),[135] that the interest at issue in the Bank transactions involved herein was, in substance, paid by Radcliffe and BOT, respectively, to one or more of the foreign corporations pledging collateral and that therefore such interest was subject to withholding tax under section 1442(a) by those two companies.[136] Petitioner presumably contends, although he does not explicitly argue, that if we were to sustain his constitutional and/or abuse of discretion claims, we would reject respondent's determinations relating to the Bank transactions involved in these cases.

In Rev. Rul. 87-89, supra, the Service purported to rely on

---

[134] Although the determinations that petitioner claims on brief were the result of respondent's unconstitutional conduct were made with respect to Radcliffe and BOT, he contends that those determinations violated his right to equal protection of the law under the Fifth Amendment, rather than any constitutional rights of Radcliffe and BOT. Accordingly, we address petitioner's constitutional claim on the terms in which he has framed it.

[135] Rev. Rul. 95-56, 1995-36 I.R.B. 20, rendered Rev. Rul. 87-89, 1987-2 C.B. 195, situations (1) and (2), obsolete for payments made after Sept. 10, 1995, that are subject to the final regulations under sec. 7701(l), T.D. 8611, 60 Fed. Reg. 40997 (Aug. 11, 1995).

[136] We do not understand petitioner to argue that, and therefore we do not consider whether, respondent violated petitioner's right to equal protection of the law under the Fifth Amendment and abused her discretion by determining the deficiencies at issue with respect to the Horbury transaction. In any event, petitioner has not shown that respondent violated the Fifth Amendment or abused her discretion in making her determinations regarding that transaction.

the substance over form doctrine that was first enunciated in Gregory v. Helvering, 293 U.S. 465 (1935), when it concluded, inter alia, that, where (1) funds denominated as a demand deposit were, in form, deposited into a publicly held bank by a foreign member of a controlled group of corporations, (2) a loan was made, in form, by that bank to a domestic member of that group, (3) the loan would not have been made or maintained on the same terms without the deposit, and (4) the bank was publicly held and unrelated to the controlled group, such a transaction will be treated as, in substance, a loan from the foreign member of the controlled group of corporations to the domestic member of that group.

Before turning to the parties' contentions regarding Rev. Rul. 87-89, supra, we note that we have not applied or relied upon that ruling in making our findings or in reaching our holdings in these cases.[137] We have applied and relied upon the substance over form doctrine on which the Service purported to rely in reaching its conclusion in Rev. Rul. 87-89, supra.

In advancing his constitutional and abuse of discretion claims, petitioner contends that this Court should create a presumption under rule 301 of the Federal Rules of Evidence that respondent's determinations were the result of her unconstitu-

---

[137] A revenue ruling merely represents the Commissioner's position with respect to a specific factual situation and does not constitute substantive authority for deciding a case in this Court. Stark v. Commissioner, 86 T.C. 243, 250-251 (1986).

tional and/or otherwise improper selective enforcement of the tax laws against petitioner, Radcliffe, and BOT. To support that contention, petitioner asserts that, under the circumstances relating to those determinations that he alleges on brief are present here, all of the factors discussed in 1 Weinstein & Berger, Weinstein's Evidence, par. 300[02], at 300-7 to 300-8 (1995), favor creation of such a presumption. Petitioner offers no analysis of those factors or of their application, if any, to the facts and circumstances presented in these cases.

The circumstances on which petitioner relies in support of his position for the creation of a presumption under rule 301 of the Federal Rules of Evidence include his allegations on brief that (1) the back-to-back loan transaction involved in Rev. Rul. 87-89, supra, was, and the National Office of the Service was aware that it was, commonplace at the time that ruling was is-sued; (2) although the retroactive effect of that ruling was not limited by the Commissioner under section 7805(b), the general administrative practice of the Service was to apply it prospec-tively only; and (3) respondent's examining agent who proposed the deficiencies relating to the Bank transactions bore personal animosity toward petitioner.

We note first that, for the reasons discussed below, we are not willing to accept as facts the allegations on brief on which petitioner relies in support of his contention that this Court should create a presumption that respondent's determinations in

the notices involving the Bank transactions were the result of her unconstitutional and/or otherwise improper selective enforcement of the tax laws against him, Radcliffe, and BOT. Nonetheless, we have analyzed the various factors relied on by petitioner in advancing that contention. Under the circumstances presented here, we conclude that creation of such a presumption under rule 301 of the Federal Rules of Evidence is not warranted or appropriate. Thus, petitioner has the burden of going forward with evidence to establish that respondent's determinations in the notices involving the Bank transactions violated his Fifth Amendment rights and/or constituted an abuse of discretion by respondent.

A.   Petitioner's Constitutional Claim

Petitioner alleges on brief that respondent's determinations with respect to the Bank transactions resulted from her selective enforcement of the tax laws and that, consequently, respondent has violated his constitutional right to equal protection of the law under the Fifth Amendment.[138] To prevail on such an allegation, petitioner must show (1) that he was singled out for audit and deficiency determination while others similarly situated were not and (2) that respondent's selection of him was based upon constitutionally impermissible considerations such as race,

---

[138]   Although the Fifth Amendment contains no equal protection clause, its due process guarantees incorporate similar principles. Nationalist Movement v. Commissioner, 102 T.C. 558, 594 (1994), affd. 37 F.3d 216 (5th Cir. 1994).

religion, or the desire to prevent the exercise of his constitu-
tional rights. See Argabright v. United States, 35 F.3d 472, 477
(9th Cir. 1994); St. German of Alaska E. Orthodox Catholic Church
v. United States, 840 F.2d 1087, 1095 (2d Cir. 1988); Karme v.
Commissioner, 673 F.2d 1062, 1064 (9th Cir. 1982), affg. 73 T.C.
1163 (1980); Penn-Field Indus., Inc. v. Commissioner, 74 T.C.
720, 723 (1980).

This Court has on numerous occasions described our respon-
sibility in cases before us. We have described that responsi-
bility as follows:

> It is the well-established position of this Court that
> our responsibility is to apply the law to the facts of
> the case before us and to determine the correct tax
> liability of the petitioner. How the Commissioner may
> have treated other taxpayers generally has been con-
> sidered irrelevant in reaching our decision. See Davis
> v. Commissioner, 65 T.C. 1014, 1022 (1976), and the
> cases cited therein; Teichgraeber v. Commissioner, 64
> T.C. 453 (1975). It is conceivable, however, that
> there may be situations where a taxpayer should be
> accorded some relief if he were selected for audit on a
> constitutionally impermissible criterion, although such
> situations are extremely rare. Greenberg's Express,
> Inc. v. Commissioner, 62 T.C. 324, 328 (1974). [Penn-
> Field Indus., Inc. v. Commissioner, supra at 722.]

1.   Petitioner's Claim That He Was Singled Out

In support of his claim that he was singled out by respon-
dent when she made the determinations with respect to the Bank
transactions at issue, petitioner contends that (1) the back-to-
back loan transaction involved in Rev. Rul. 87-89, 1987-2 C.B.
195, was, and the National Office was aware that it was, com-
monplace at the time that ruling was issued; (2) although the

retroactive effect of that ruling was not limited by the Commissioner under section 7805(b), the general administrative practice of the Service was to apply it prospectively only; and (3) respondent's examining agent who proposed the deficiencies relating to the Bank transactions bore personal animosity toward petitioner.  Respondent denies petitioner's contentions.

We find on the record before us that petitioner has not established the allegations on brief that form the basis of his first contention (viz., the back-to-back loan transaction involved in Rev. Rul. 87-89, supra, was, and the National Office of the Service was aware that it was, commonplace at the time that ruling was issued).[139]  Even assuming arguendo that those allegations were established by the record herein, they would not cause us to conclude that respondent singled out petitioner for audit and deficiency determination while others similarly situated were not.

---

[139]  To establish his contention that the back-to-back loan transaction involved in Rev. Rul. 87-89, 1987-2 C.B. 195, was commonplace at the time that ruling was issued, petitioner relies upon the newspaper article in the Financial Times and the August 1987 memorandum prepared by an attorney in the National Office that, for the reasons discussed above, we have not admitted into evidence.

To establish his contention that the National Office was aware that the back-to-back loan transaction analyzed in Rev. Rul. 87-89, supra, was commonplace, petitioner relies on the August 1987 memorandum.  As discussed above, we have not admitted the August 1987 memorandum into evidence for that purpose.

The Commissioner is not required to exercise her discretion under section 7805(b) to limit the retroactive application of a revenue ruling solely because it may apply to a type of transaction that is, and that the Service knows is, commonplace. If the Commissioner decides not to exercise her authority to limit the retroactive effect of a revenue ruling, she generally has an obligation to apply the ruling retroactively to all similarly situated taxpayers. Petitioner has the burden of showing that the Commissioner failed to apply Rev. Rul. 87-89, supra, retroactively to all similarly situated taxpayers or that he otherwise was singled out by respondent.

With respect to petitioner's second contention (viz., the Service's general administrative practice was to apply Rev. Rul. 87-89, supra, on a prospective basis only), except for the present cases, the only instance of the application of that ruling disclosed by the record is Fu Inv. Co. v. Commissioner, docket No. 13306-92. In this connection, the parties entered into the following stipulation:

> After making reasonable inquiry of the Office of Associate Chief Counsel (International), the Office of the Assistant Commissioner (International), the Office of Western Regional Counsel, and the San Francisco District Office, respondent has not discovered any unagreed case in the Examination Division or docketed case other than these cases and the case of Fu Investment Company v. Commissioner, Docket No. 13306-92, in which Rev. Rul. 87-89 has been applied retroactively.
> * * *

As we understand petitioner's position, he asks us to infer from the foregoing stipulation the existence of a policy by the Service of applying Rev. Rul. 87-89, supra, on a prospective basis only. We decline to draw any such inference. We also note that there are other inferences that may be drawn from the parties' stipulation. For example, there may have been other cases pending in respondent's examination division and/or in the courts of which the offices of respondent specified in that stipulation were aware, but as to which the parties there involved reached agreement, and therefore such cases were no longer unagreed or docketed.

With respect to petitioner's third contention (viz., respondent's examining agent who proposed the deficiencies relating to the Bank transactions bore personal animosity toward petitioner), the record does not establish that that agent harbored any personal animosity toward petitioner.[140] Even assuming arguendo that such animosity were shown by the record, petitioner has not demonstrated that it was the basis for the determinations in the notices.[141] While the agent admitted in his testimony that he

---

[140]  We are not persuaded by the examining agent's acknowledgment at trial that he previously had indicated that "rich people from Hong Kong undermine the U.S. tax system" that that agent harbored personal animosity toward petitioner.

[141]  We note that petitioner does not suggest that personal animosity played a role in the determination of the deficiencies at issue in Fu Inv. Co. v. Commissioner, docket No. 13306-92. The

(continued...)

previously stated that "rich people from Hong Kong undermine the U.S. tax system", he further testified that he proposed the deficiencies that became the bases for the notices because he believed that such proposed deficiencies were required by the substance over form doctrine and Rev. Rul. 87-89, 1987-2 C.B. 195.  We have no reason to question the examining agent's credibility, and, in fact, we found him to be totally credible and candid.

Based on our review of the entire record before us, we find that petitioner has not established that he was singled out by respondent for audit and deficiency determination while others similarly situated were not.

2.  Petitioner's Claim That He Was Singled Out
Based on Constitutionally Impermissible Grounds

Even assuming arguendo that petitioner had shown that he was singled out, that showing, standing alone, would not have justified our holding that he was denied equal protection of the law under the Fifth Amendment.  In this connection, we have had occasion to observe that

> the Supreme Court has held that the conscious exercise
> of some selectivity in enforcement is not in itself a
> Federal constitutional violation of due process or

---

[141](...continued)
parties have stipulated that the deficiencies in that case are based upon deficiencies in withholding tax proposed by the same examining agent who proposed the deficiencies in withholding tax that form the bases for the notices herein.

equal protection where the selection was not deliber-
ately based upon an unjustifiable standard such as
race, religion, or other arbitrary classification.
Oyler v. Boles, 368 U.S. 448 (1962).  [Penn-Field
Indus., Inc. v. Commissioner, 74 T.C. at 722-723.]

Although petitioner alleges on brief that the examining
agent who proposed the deficiencies that form the bases for the
notices herein was "personally biased against 'rich people from
Hong Kong'" who he believed "all cheated", he does not argue that
that allegation (or any other alleged fact) establishes that he
was singled out based on a constitutionally impermissible ground.

Based on our review of the entire record before us, and
assuming arguendo that petitioner had shown that he was singled
out for audit and deficiency determination while others similarly
situated were not, we find that he has not established that
respondent's selection of him was based upon a constitutionally
impermissible ground.

\*    \*    \*

On the record in the instant cases, we reject petitioner's
contention that respondent's determination of the deficiencies in
these cases relating to the Bank transactions constituted a
denial of his right to equal protection of the law under the
Fifth Amendment.  See Nationalist Movement v. Commissioner, 102
T.C. 558, 595 (1994), affd. 37 F.3d 216 (5th Cir. 1994); Penn-
Field Indus., Inc. v. Commissioner, 74 T.C. at 723-724.

B.   Petitioner's Abuse of Discretion Claims

   1.   Petitioner's Claim That Rev. Rul. 87-89
        Should Not Be Applied Retroactively

Petitioner contends that respondent's retroactive applica-tion of Rev. Rul. 87-89, supra, to taxpayers generally, including specifically Radcliffe and BOT, constituted an abuse of discre-tion, that is to say, the Commissioner's decision not to exercise the discretion provided by section 7805(b) to limit the retroac-tive effect of that ruling was an abuse of that discretion.[142] See Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 185 (1957); Becker v. Commissioner, 85 T.C. 291, 294 (1985).  As we understand the thrust of petitioner's contention, the Commis-sioner changed settled law on which taxpayers had relied when, with no prior notice to the public, the Service held, inter alia, in Rev. Rul. 87-89, supra, that a bank engaged in commercial banking and not controlled by either the borrower or the purport-ed lender in a back-to-back loan transaction could be treated as a conduit for withholding tax purposes.

Respondent disputes petitioner's contention that Rev. Rul. 87-89, supra, changed settled law.  She points out that the substance over form doctrine on which Rev. Rul. 87-89, supra, is

---

[142]  We note that petitioner's claim that respondent abused her discretion appears to be inconsistent with his constitutional claim that, despite respondent's general administrative practice of applying Rev. Rul. 87-89, 1987-2 C.B. 195, on a prospective basis only, that ruling was applied retroactively to the Bank transactions.  In any event, we addressed and rejected above petitioner's constitutional claim.

based is a long-standing, well-known, and firmly established doctrine of Federal tax law. She also cites Rev. Rul. 76-192, 1976-1 C.B. 205, to illustrate that the Service, years before the issuance of Rev. Rul. 87-89, supra, treated as a conduit a bank that was engaged in commercial banking and that was not controlled by the other persons involved in the transaction presented in that ruling.

While we agree with petitioner that the retroactive application of a revenue ruling may constitute an abuse of discretion where such application changes settled law upon which taxpayers justifiably relied, Anderson, Clayton & Co. v. United States, 562 F.2d 972, 981 (5th Cir. 1977); Prabel v. Commissioner, 91 T.C. 1101, 1122 (1988), affd. 882 F.2d 820 (3d Cir. 1989), we reject his contention that Rev. Rul. 87-89, supra, changed settled law on which taxpayers justifiably relied. Petitioner has not established that, prior to Rev. Rul. 87-89, supra, the law was settled in the manner he contends. Nor has he shown that, prior to the issuance of that ruling, taxpayers were not on notice that a bank or another entity involved in a transaction may be treated as a conduit even though it is otherwise engaged in business and is not controlled by the other persons involved in that transaction. In this connection, petitioner does not cite any authority holding that such a bank or other entity can never be treated as a

conduit.[143]

In point of fact, the well-established substance over form doctrine and related principles are so broad in their reach as to permit ignoring or recharacterizing the role of a person in a transaction that is otherwise engaged in business and is not controlled by any of the other persons involved in that transaction. See Koehring Co. v. United States, 583 F.2d at 320; Burns v. Commissioner, 78 T.C. at 212-213; Estate of Weiskopf v. Commissioner, 64 T.C. at 93-98; Bank of Am. Natl. Trust & Sav. Association v. Commissioner, 15 T.C. at 552-553. Moreover, as pointed out by respondent, the public was put on notice when she issued Rev. Rul. 76-192, supra, years before the issuance of Rev. Rul. 87-89, 1987-2 C.B. 195, that a bank involved in a transaction may be treated as a conduit even though it is engaged in commercial banking and is not controlled by the other persons involved in that transaction. In Rev. Rul. 76-192, supra, the Service, relying on factors similar to those relied on in Rev. Rul. 87-89, supra, held that such a bank was a conduit for purposes of determining whether the foreign corporation involved in Rev. Rul. 76-192, supra, had made an investment in U.S. property under section 956(a)(1).

---

[143] Petitioner cites Frank Lyon Co. v. United States, 435 U.S. 561 (1978), to support his contention. His reliance on that case is misplaced. It is distinguishable from the instant cases. See supra note 98.

The Service had not, prior to the issuance of Rev. Rul. 87-89, supra, issued a revenue ruling in which, under the substance over form doctrine, it treated a bank involved in a back-to-back loan transaction as a conduit for withholding tax purposes even though it was engaged in commercial banking and was not controlled by the other persons involved in that transaction. However, the Service's failure to do so does not indicate that it believed that the then existing law precluded such treatment. The Service is under no duty to announce its position on a particular issue as soon as the law authorizes that position. See Dickman v. Commissioner, 465 U.S. 330, 343 (1984).

At worst, the absence of any public announcement by the Service that specifically addressed its position on the treatment for withholding tax purposes of such a bank involved in a back-to-back loan transaction may simply have indicated the Service's view that the law with respect to such treatment was unsettled prior to the issuance of Rev. Rul. 87-89, supra. However, as was made clear in Anderson Clayton & Co. v. United States, 562 F.2d at 985 n.30 (quoting Davis, Administrative Law Text, sec. 5.05, at 135 (3d ed. 1972)): "It is retroactive change of settled law, not retroactive settling of unsettled law, which may produce unjust results." The retroactive application of an interpretation of unsettled law, whether by ruling or regulation, is not an abuse of discretion. See id. at 981-982; Chock Full O' Nuts

<u>Corp. v. United States</u>, 453 F.2d 300, 303 (2d Cir. 1971); <u>First</u>

<u>Chicago Corp. v. Commissioner</u>, 96 T.C. 421, 438 (1991).

Based on our review of the entire record before us, we con-
clude that the Commissioner did not abuse her discretion by fail-
ing to limit the retroactive effect of Rev. Rul. 87-89, <u>supra</u>.
See <u>Anderson, Clayton & Co. v. United States</u>, <u>supra</u> at 983-984.

### 2. Petitioner's Claim That Respondent Did Not Comply With Her Duty to Enforce the Federal Tax Law Consistently

Petitioner appears to argue that respondent abused her
discretion by not complying with her duty to enforce the Federal
tax law consistently[144] when she applied Rev. Rul. 87-89, <u>supra</u>,
retroactively in these cases but allegedly not in cases involving
similarly situated taxpayers.[145]  In support of his argument,
petitioner relies on the same circumstances on which he relies on
brief in advancing his position that respondent violated his
right to equal protection of the law under the Fifth Amendment.

Based on our review of the entire record before us, and for

---

[144]  In advancing his abuse of discretion claim, petitioner
refers to respondent's alleged inconsistent treatment of taxpay-
ers as selective enforcement.  We note that, in the context of
allegations of respondent's abuse of discretion, respondent's
obligation to enforce the Federal tax law consistently, and not
to enforce that law selectively, is generally referred to as
respondent's duty of consistency.  See <u>Jaggard v. Commissioner</u>,
76 T.C. 222, 226-227 (1981).

[145]  See <u>supra</u> note 142 regarding the inconsistency of peti-
tioner's contentions.

the reasons stated above for our rejection of petitioner's constitutional claim, we find that petitioner has not established that respondent abused her discretion by not complying with her duty to enforce the tax law consistently with respect to him, Radcliffe, and BOT.

VII. Additions to Tax

Neither Radcliffe nor BOT filed withholding tax returns for the years at issue.  Nor did either of those corporations make a deposit of withholding tax with respect to those years.

Respondent determined that Radcliffe and BOT are liable for (1) the additions to tax imposed by section 6651(a)(1) for failure to file timely withholding tax returns, (2) the additions to tax imposed by section 6653(a) for negligence or disregard of rules or regulations, and (3) the penalties imposed by section 6656(a) for failure to make timely deposits of taxes.  Respondent further determined that petitioner is liable as a transferee of those corporations for those additions to tax and penalties.

Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return.  If the failure continues for more than four months, the addition to tax is equal to 25 percent of the amount of tax required to be shown in the return.  The addition to tax prescribed by section 6651(a)(1) does not apply if the failure is due to reasonable cause, and not to willful neglect. Sec. 6651(a)(1).  In order to establish reasonable cause, a

taxpayer must show that, despite the exercise of ordinary business care and prudence, such taxpayer was unable to file the required tax return within the prescribed time. United States v. Boyle, 469 U.S. 241, 246 (1985); Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

For 1984 and 1985, section 6653(a)(1) and, for 1986, section 6653(a)(1)(A) impose an addition to tax that is equal to 5 percent of the entire underpayment if any part of it was due to negligence or disregard of rules or regulations. If that addition to tax applies, for 1984 and 1985, section 6653(a)(2) and, for 1986, section 6653(a)(1)(B) impose a further addition to tax in an amount that is equal to 50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); see Crocker v. Commissioner, supra at 916; Neely v. Commissioner, 85 T.C. 934, 947-948 (1985).

Section 6656(a) imposes a penalty for failure to deposit timely a tax in a Government depositary that is equal to 10 percent of the underpayment.[146] That section does not apply if

---

[146] Sec. 8001(a) of the Omnibus Budget Reconciliation Act of
(continued...)

the failure to deposit timely is due to reasonable cause, and not to willful neglect.  Sec. 6656(a).

The parties advance essentially the same arguments with respect to respondent's determinations involving the various additions to tax and penalties.  We therefore consider those determinations and arguments together.  Petitioner argues that the additions to tax and penalties at issue should not be imposed on Radcliffe or BOT because neither of those corporations had any reason to expect that the payment of the interest at issue in these cases was subject to withholding tax.  In this connection, petitioner contends that respondent's determinations against Radcliffe and BOT involving the Bank transactions resulted from Rev. Rul. 87-89, 1987-2 C.B. 195, that he alleges set forth the Service's unprecedented treatment as a conduit of a bank involved in a back-to-back loan transaction that was otherwise engaged in commercial banking and that was not controlled by the other persons involved in that transaction.  Petitioner further asserts on brief that the Horbury loan was made prior to October 15, 1984, and that therefore the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1)

---

[146](...continued)
1986, Pub. L. 99-509, 100 Stat. 1951, sets the amount of that penalty at 10 percent of the amount of the underpayment, and, under sec. 8001(b) of that Act, that amendment is effective for amounts assessed after Oct. 21, 1986, the date of its enactment.

because it qualifies for the grandfathering provided by Rev. Rul. 85-163, 1985-2 C.B. 349. With respect to the Bank transactions, petitioner also alleges on brief that accountants prepared Radcliffe's 1985 and 1986 income tax returns and BOT's 1986 income tax return and that those corporations relied on those advisers in that regard. With respect to the Horbury transaction, petitioner also claims that his father relied on counsel in organizing Horbury.

Respondent argues that petitioner has failed to establish that the additions to tax and penalties determined against Radcliffe and BOT should be rejected. She contends that the payment of interest to the respective U.S. banks in question involved in the Bank transactions was arranged for the purpose of evading the tax on interest paid to foreign persons that is required to be withheld by the payor. Respondent also asserts that petitioner was personally involved in, and acted on behalf of Radcliffe and BOT, respectively, in arranging and carrying out the Bank transactions at issue and that his knowledge of the law with respect to the withholding tax on the payment of interest to foreign corporations, including the provision exempting from withholding tax interest paid by a U.S. bank to such corporations, must be imputed to Radcliffe and BOT.

With respect to the Bank transactions, at the time Rev. Rul. 87-89, supra, was issued, application of the substance over form

doctrine and related principles in order to ignore or recharac-
terize the role of a person in a transaction that was otherwise
engaged in business and that was not controlled by any of the
other persons involved in that transaction was not unprecedented,
as petitioner contends, especially in cases, such as the instant
cases, where no nontax, business purpose had been shown for the
form of the transaction.  See Koehring Co. v. United States, 583
F.2d at 320; Burns v. Commissioner, 78 T.C. at 212-213; Estate of
Weiskopf v. Commissioner, 64 T.C. at 93-98; Bank of Am. Natl.
Trust & Sav. Association v. Commissioner, 15 T.C. at 552-553.[147]

Moreover, petitioner, who acted on behalf of Radcliffe and
BOT, respectively, in arranging and carrying out the Bank trans-
actions at issue herein, admitted at trial that he was familiar
with the U.S withholding tax requirements applicable to interest
from a U.S. source that was paid to foreign corporations.

In short, on the instant record, we reject petitioner's
contention that Radcliffe and BOT had no reason to expect that
withholding was required on the interest payments they made as
part of the Bank transactions in respect of which we have sus-
tained respondent's determinations.

---

[147]  See also Rev. Rul 76-192, 1976-1 C.B. 205, in which the
Service announced to the public that a bank engaged in commercial
banking and not controlled by the other persons involved in a
transaction could be treated as a conduit under the circumstances
set forth in that ruling.

With respect to the Horbury transaction, petitioner has not shown that the interest at issue in the Horbury transaction is exempt from U.S. taxation under article VIII(1) because it was paid on a loan made before October 15, 1984, and therefore qualifies for the grandfathering provided by Rev. Rul. 85-163, supra. Indeed, the record is virtually devoid of any reliable evidence relating to that transaction. On the instant record, we find that petitioner has failed to show that BOT had no reason to expect that its payment of the interest at issue in the Horbury transaction was subject to withholding tax.[148]

Petitioner's suggestion on brief that Radcliffe and BOT relied on advisers is not supported by the record. Petitioner has not shown that an accountant, attorney, or other adviser gave advice to Radcliffe and BOT regarding their respective withholding obligations with respect to the Bank transactions. Nor has petitioner shown that counsel gave advice to petitioner's father concerning whether Horbury might be treated as a conduit for withholding tax purposes or that an accountant, attorney, or

---

[148] Petitioner does not argue that BOT had no reason to expect that the interest at issue in the Horbury transaction was subject to withholding because that interest satisfied the express provisions of article VIII(1). In any event, in 1984, when that interest was paid, application of the substance over form doctrine and related principles in order to ignore or recharacterize the role of a person in a transaction was not unprecedented. See, e.g., Aiken Indus., Inc. v. Commissioner, 56 T.C. 925, 933-934 (1971).

other adviser gave advice to BOT regarding its withholding obligations with respect to the Horbury transaction. Thus, the instant cases are distinguishable from <u>Coldwater Seafood Corp. v. Commissioner</u>, 69 T.C. 966 (1978), and <u>Aiken Indus., Inc. v. Commissioner</u>, 56 T.C. at 936, on which petitioner relies.

Based upon our examination of the entire record in these cases, we find that, to the extent we have sustained respondent's determinations with respect to the withholding tax obligations of Radcliffe and BOT, petitioner has failed to carry his burden of showing that respondent erred in determining that Radcliffe and BOT are liable for the additions to tax and penalties that she imposed in respect of such obligations. Accordingly, we sustain respondent's determinations with respect to the liability of Radcliffe and BOT for (1) the additions to tax provided under section 6651(a) for failure to file timely withholding tax returns with respect to the amounts required to be shown as tax in such returns that result from this Opinion, (2) the additions to tax provided under section 6653(a) for negligence and/or disregard of rules or regulations with respect to the underpayments, as defined in section 6653(c), that result from this Opinion, and (3) the penalties provided under section 6656(a) for failure to make timely deposits with respect to the underpayments, as defined in section 6656(a), that result from this Opinion. We also sustain respondent's determinations that petitioner, as trans-

feree of Radcliffe and of BOT, is liable for their respective liabilities for the additions to tax and penalties determined by respondent that we have sustained herein.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.